Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Kit A. Pierson (*pro hac vice*)
Daniel A. Small (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
dsmall@cohenmilstein.com

*Co-Lead Counsel for Direct Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE RESISTORS ANTITRUST LITIGATION | Case No. 3:15-cv-03820-JD |
| This Documents Relates to:<br><br>DIRECT PURCHASER ACTIONS | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

<u>Page</u>

I.    INTRODUCTION ................................................................................................1

II.   PARTIES ...........................................................................................................4

    A.    Plaintiff ...................................................................................................4

    B.    Defendants ..............................................................................................5

        1.    HDK ..............................................................................................5

        2.    KOA ..............................................................................................5

        3.    Panasonic ......................................................................................6

        4.    ROHM ...........................................................................................6

        5.    Kamaya .........................................................................................7

        6.    Walsin ...........................................................................................7

III.  CO-CONSPIRATORS AND AGENTS ..............................................................8

        1.    Alps................................................................................................8

        2.    Midori ...........................................................................................9

        3.    Susumu .........................................................................................9

        4.    TOCOS ........................................................................................10

IV.   JURISDICTION AND VENUE .......................................................................10

V.    TRADE AND COMMERCE ............................................................................12

VI.   FACTUAL ALLEGATIONS ...........................................................................12

    A.    Background on Linear Resistors ...........................................................12

    B.    Evolution of the Global Resistors Industry ..........................................14

    C.    Late 1990s:  Transformation of the Global Resistors Industry ...............15

    D.    Early 2000s: Resistor Prices Collapse .................................................15

    E.    Defendants Conspire to Restrain Competition .....................................17

    F.    The U.S. Subsidiary Defendants Participated in Defendants' Conspiracy ..............31

    G.    Defendants' Collusive Discussions Were Intended to, and Did, Further Their Agreement to Stabilize Resistor Prices ........................................34

1                1.     The Type of Information Discussed Was Highly Competitively Sensitive, Enabling Collusion and Market Impact to the Benefit of Defendants and the Detriment of Class Members ........................................34

2.     Communications Frequently Occurred in Private Settings Rather than Publicly ..........................................................................................................36

3.     Conspirators Exchanged Company-Specific Information ...........................36

4.     The Information Shared Described Current and/or Future Behavior ...........37

5.     Direct Communications Occurred Frequently and for More Than a Decade ........................................................................................................37

6.     Senior-Level Executives Participated in the Collusive Discussions ...........38

7.     Lack of Oversight or Safeguards ................................................................38

H.    Defendants' Conspiracy Worked: Prices Stabilized and Profitability Returned .......39

VII.   CHARACTERISTICS OF THE RESISTORS MARKET ......................................................41

A.    Industry Concentration ...........................................................................................41

B.    High Barriers to Entry .............................................................................................41

C.    Inelastic Demand ....................................................................................................42

D.    Interchangeable, Commodity-like Products ...........................................................43

E.    Declining Demand ..................................................................................................44

F.    Excess Manufacturing Capacity .............................................................................44

G.    Opportunities for Conspiring and Sharing Information ...........................................45

VIII.  COMPETITION AUTHORITIES INVESTIGATE THE RESISTORS INDUSTRY .........46

IX.    FRAUDULENT CONCEALMENT .................................................................................47

X.     EFFECTS OF THE CONSPIRACY ................................................................................50

XI.    CLASS ALLEGATIONS ................................................................................................50

XII.   CAUSE OF ACTION .....................................................................................................52

Plaintiff Schuten Electronics, Inc. ("Plaintiff"), individually and on behalf of a class of all others similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a jury trial.

## I.       INTRODUCTION

1.       The antitrust laws protect the life blood of our free enterprise system:  competition. Section 1 of the Sherman Act prohibits competitors from working together to charge their customers supra-competitive prices. Defendants – the largest manufacturers of linear resistors in the world – violated this fundamental tenet by conspiring to raise the prices of linear resistors for over a decade.

2.       Seeking to salvage their profitability amid a collapse in prices brought on by elimination of tariff barriers and a global recession, Defendants at least as early as July 2003 agreed to work together – i.e., conspired – to artificially stabilize and increase resistor prices and preserve their position in global resistor markets. Defendants executed their scheme through disciplined, cooperative activities in which they regularly met or had direct communications concerning price, output, capacity, and other competitively sensitive data in order to coordinate their market behavior.

3.       The Japan Electronics and Information Technology Industries Association ("JEITA") and its Passive Components Business Committee was a focal point for Defendants' collusive activities. Because the Committee was composed of and controlled by Defendants and their co-conspirators, it provided a powerful tool for limiting competition. At a July 2003 Committee meeting, Defendants and co-conspirators agreed on a procedure for facilitating coordination of industry behavior in their subsequent meetings with the aim of reducing output and stabilizing prices. Acting in concert, each company provided the others with company-specific competitive information, including their current sales and changes in production of linear resistors, "domestic and foreign price status," and each "company's overseas production status, status of shift to overseas production, export trends, [and] overseas markets[.]"  Defendants adhered to this procedure for facilitating coordination during regularly scheduled meetings of the Passive Components Committee, which convened multiple times each year. For example, in a 2008 "Resistor Information Exchange Meeting," Defendants and co-conspirator resistor manufacturers collusively discussed company-specific resistor sales performance and planned to freeze or increase prices for linear resistors.

4.     Defendants' collusion was not limited to these regularly-scheduled industry meetings, as they also colluded through in-person, telephone, and email exchanges between individual competitors. These individual co-conspirator communications supplemented, and often built upon, the collusive discussions occurring at the JEITA meetings. For example, Panasonic's Yoshinori Hourai wrote to Yoshihiro Hashimoto of Panasonic in September 2006, asking Hashimoto to share price information with ROHM. The collusive pricing discussion was successful, as Hourai later wrote that he "had GM Hashimoto contact the person responsible for General Global at R Co." "R Co.," as used in Hourai's email, was code for competitor "ROHM." The following comment came back from R. Co.: "We plan to raise prices to Nokia for the 1005 type [resistor]." Recognizing the collusive nature of this exchange of pricing information, Hourai attempted to conceal it by warning recipients not to forward his email.

5.     In another collusive price discussion, Keiichi Shimada of HDK Co. emailed Panasonic's Hourai in September 2008, asking for information about a resistor model requested by customer Apple, Inc., a U.S. corporation. Hourai responded with the requested information and asked Shimada what HDK's pricing was on a different resistor model, sharing that Hourai expected that Panasonic's customers would request $0.09 per thousand pieces in October and asking what HDK planned to do.  Hourai shared that Panasonic's profits on the resistor model are "not good" and told his competitor that Panasonic wanted to stop price reductions.

6.     Defendants' collusive discussions neutralized competition among themselves and halted pricing pressure. For example, one week after one of many Passive Components Committee meetings where Defendants met in person and held collusive discussions about each company's market performance and resistor product release plans, the Chairman of the Committee and CEO of Defendant KOA Corp., Koichi Mukaiyama, told a 2008 meeting of KOA's Board of Directors that although he was "not supporting a violation of the antitrust law"

> [W]e (resistor companies) should not be cutting prices for the sake of receiving orders. . . . Each management has to think not only for its company but also for the sake of the industry as a whole.

In fact, Defendants routinely acted "for the sake of the industry as a whole" rather than compete with each other by coordinating their behavior in order to maintain or raise resistor prices. Indeed, at an

August 2008 JEITA Resistors Working Group meeting among Defendants and their co-conspirators, Defendant HDK Co. confirmed to its competitors that its top management had given instructions to raise prices. Co-conspirator Taiyosha affirmed that, despite suffering sales in the vehicle end-market it had "basically stopped price decreases."  According to meeting notes from around this time, "[a]round 50% of resistor manufacturers are implementing price increases or curbing price decreases."

7.      Armed with knowledge of their co-conspirators' current and future prices, production capacity, marketing strategies, and other competitively sensitive data gained through JEITA meetings and individual discussions, Defendants successfully restrained competition and achieved their intended goal of stabilizing, and even raising, resistor prices during the Class Period. Preliminary analysis of publicly available pricing data shows price increases of 20-25% over the decade following the initiation of the conspiracy.  As a result of the conspiracy, Defendants effectively muted the impact subsequent financial crises had on prices, as linear resistors prices remained stable, and even increased, during the 2008 financial crisis and subsequent recession because Defendants successfully resisted efforts to reduce prices. As a result, Plaintiff and the Class paid supra-competitive prices for linear resistors purchased directly from Defendants.

8.      Certain conditions in the linear resistors market rendered it particularly susceptible to Defendants' manipulation. For example, linear resistors are interchangeable, simply designed commodities, forcing sellers to compete largely on the basis of price.  Moreover, the market for linear resistors is dominated by a small number of manufacturers – Defendants here – rendering collusion more manageable, and high barriers to entry exist, reducing the risk that any new market entrants could quickly undermine Defendants' conspiracy.  Not surprisingly, these exact market conditions, involving these Defendants, have resulted in allegations of anticompetitive conduct by global competition authorities and purchasers alike in both the linear resistors industry and in the related capacitors industry.

9.      Defendants concealed their illegal conduct through a variety of means. Among other devices, Defendants carried out their collusive exchanges under the cover of JEITA industry conferences, a private forum that Defendants controlled and limited to co-conspirator manufacturers.

Recognizing the illegal nature of their practices, Defendants frequently warned each other not to forward records of collusive exchanges outside of the conspiracy. Defendants used code-words to refer to fellow conspirators and customers who were affected by the conspiracy, ensured the minutes of their meetings were not distributed publicly, and attempted to sanitize incriminating language in those minutes to avoid revealing the collusive nature of their discussions. Defendants' concealment was successful, as their conspiracy remained a secret until the summer of 2015, when media organizations reported that Defendant Panasonic was seeking leniency from the United States Department of Justice for its participation in anticompetitive conduct in the linear resistors market.

10.     As Defendant KOA's internal meeting minutes note, "[t]here are many events that are considered normal in Japan but strange from the viewpoints of foreigners.  Participating in some of these events can put the company at risk of being deemed taking part in antitrust activities. We are in the process of addressing antitrust-related risks in our regulations. Since we do not have a lot of time as the risk has already materialized, the Import Control Center and the General Affairs Center will be hastily putting together actions to be taken by the KOA Group companies."  Another KOA official responded, "I realize the situation is becoming serious, and we cannot get away by saying, 'We did not know.'  Business practices we are so accustomed to may no longer be deemed legitimate activities."

11.     Unfortunately for Plaintiff and the Class, Defendants' efforts to reform their behavior came after the Class paid supra-competitive prices for more than a decade.  This suit seeks to recover those overcharges for Plaintiff and the Class and impose treble damages under the Sherman Act.

## II.     PARTIES

12.     Whenever this Complaint alleges an act, deed, or transaction of any corporation, that allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

### A.     Plaintiff

13.     Plaintiff Schuten Electronics, Inc. is an Illinois corporation located at 200 N. Michigan Ave., Elmhurst, Illinois 60126. Plaintiff directly purchased linear resistors from one or

1    more Defendants during the Class Period, and has suffered injury as a result of Defendants'

2    anticompetitive and unlawful conduct.

3    **B.     Defendants**

4          **1.     HDK**

5          14.     Defendant Hokuriku Electric Industry Co. ("HDK Co.") is a Japanese corporation

6    with its principal place of business located at 3158 Shimo-okubu, Toyama City, Toyama 939-2292,

7    Japan.  HDK Co. is one of the world's leading manufacturers of linear resistors, and the largest

8    manufacturer of thick film chip resistors used in automobiles. During the Class Period, HDK Co.

9    manufactured, sold, and distributed linear resistors either directly or through its business units,

10   subsidiaries, agents, or affiliates to United States purchasers.

11         15.     Defendant HDK America, Inc. ("HDK America"), a wholly owned subsidiary of

12   HDK Co., is an Illinois corporation with its principal place of business located at 200 N. Northwest

13   Highway, Suite 201, Barrington, Illinois 60010.  During the Class Period, HDK America – either

14   directly or through its business units, subsidiaries, agents, or – sold and distributed to United States

15   purchasers linear resistors manufactured by business units, subsidiaries, agents, or affiliates of its

16   corporate parent, HDK Co.

17         16.     Defendants HDK Co. and HDK America are together referred to herein as "HDK."

18         **2.     KOA**

19         17.     Defendant KOA Corporation ("KOA Corp.") is a Japanese corporation with its

20   principal place of business located at 2-17-2 Midori-Cho, Fuchu-Shi, Tokyo 183-0006, Japan.  KOA

21   Corp. is one of the world's leading manufacturers of linear resistors, and the largest manufacturer of

22   thick film chip resistors used in automobiles.  During the Class Period, KOA Corp. manufactured,

23   sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents,

24   or affiliates to United States purchasers.

25         18.     Defendant KOA Speer Electronics, Inc. ("KOA Speer" or "KSE"), a subsidiary of

26   KOA Corp., is a Delaware corporation with its principal place of business located at 199 Bolivar

27   Drive, Bradford, Pennsylvania 16701.  During the Class Period, KOA Speer – either directly or

28   through its business units, subsidiaries, agents, or affiliates – sold and distributed to United States

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW                              - 5 -

purchasers linear resistors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, KOA Corp.

19. Defendants KOA Corp. and KOA Speer are together referred to herein as "KOA."

**3.     Panasonic**

20. Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric").  Panasonic Electronic Devices Co. Ltd. ("PED") is a former Japanese subsidiary of Panasonic Corporation that was absorbed by Panasonic Corporation around April 2012. During the Class Period, Matsushita Electric, Panasonic Corporation, and PED (referred to together as "Panasonic Corp.") manufactured, sold, and distributed linear resistors either directly or through their business units, subsidiaries, agents, or affiliates to United States purchasers.

21. Defendant Panasonic Corporation of North America ("PNA"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102.  During the Class Period, PNA – either directly or through its business units, subsidiaries, agents, or affiliates (including, without limitation, Panasonic Industrial Sales Company) – sold and distributed to United States purchasers linear resistors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corporation.

22. Defendants Panasonic Corp. and PNA are together referred to herein as "Panasonic."

**4.     ROHM**

23. Defendant ROHM Co., Ltd. ("ROHM Co.") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585, Japan. During the Class Period, ROHM Co. manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

24. Defendant ROHM Semiconductor U.S.A., LLC ("ROHM USA"), a Delaware limited liability corporation, is a wholly owned subsidiary of ROHM Co. with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara, California 95054.  In addition to its

headquarters office, ROHM USA maintains no fewer than sixteen additional sales offices located throughout the United States.  During the Class Period, ROHM USA – either directly or through its business units, subsidiaries, agents, or affiliates – sold and distributed to United States purchasers linear resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, ROHM Co.

25.     Defendants ROHM Co. and ROHM USA are together referred to herein as "ROHM."

**5.     Kamaya**

26.     Kamaya Electric Co., Ltd. ("Kamaya Electric") is a Japanese corporation with its principal place of business located in PSA Building 3F, 6-1-6 Chou, Yamato-shi Kanagawa, 242-0021, Japan.  During the Class Period, Kamaya Electric manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers. Since 2006, Kamaya Electric has been a subsidiary of Walsin Technology Corporation, which owns all or nearly all of Kamaya Electric.

27.     Kamaya Inc. is a wholly owned subsidiary of Kamaya Electric with its principal place of business located at 6407 Cross Creek Boulevard, Fort Wayne, Indiana 46818.  Kamaya Inc. maintains a sales office at 4163 Cleveland Ave #1 San Diego, CA 92103, and a warehouse at 28-A Concord Street, El Paso, TX 79906. During the Class Period, Kamaya Inc. – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers linear resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parents, Kamaya Electric and Walsin Technology Corporation.

28.     Defendants Kamaya Electric and Kamaya Inc. are together referred to herein as "Kamaya."

**6.     Walsin**

29.     Walsin Technology Corporation ("Walsin Technology Co." or "WTC") is a Taiwanese corporation with its principal place of business located at 566-1, Kao-Shi Road, Yang-Mei, Tao-Yuan, Taiwan.  During the Class Period, Walsin Technology Co. manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW

30.     Walsin Technology Corporation U.S.A. ("Walsin USA") is a wholly-owned subsidiary of Walsin Technology Co. with its principal place of business located at 6032 Fieldstone Drive, Dallas, Texas 75252.  During the Class Period, Walsin USA – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers linear resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, Walsin Technology Co., as well as Kamaya Electric Co.

31.     Defendants Walsin Technology Co. and Walsin USA are together referred to herein as "Walsin."

### III.     CO-CONSPIRATORS AND AGENTS

32.     The following firms and corporations, not named as defendants herein, participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name some or all of these persons as defendants and to name additional co-conspirators.

**1.     Alps**

33.     Alps Electric Co., Ltd. ("Alps Electric") is a Japanese corporation with its principal place of business in Tokyo, Japan.  During the Class Period, Alps Electric manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

34.     Alps Electric (North America), Inc. is a subsidiary of Alps Electric with its principal place of business located at 3151 Jay Street, Suite 101, Santa Clara, California 95054.  Alps Electric (North America), Inc. also maintains offices in Detroit, Michigan; McAllen, Texas; Dublin, Ohio; San Diego, California; Austin, Texas; and Redmond, Washington. During the Class Period, Alps Electric (North America), Inc. – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers linear resistors manufactured by its corporate parent, Alps Electric.

35.     Alps Electric and Alps Electric (North America), Inc. are together referred to herein as "Alps."

## 2. Midori

36.     Midori Precisions Co., Ltd. ("Midori Precisions") is a Japanese corporation with its principal place of business located in Tokyo, Japan.  During the Class Period, Midori Precisions manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

37.     Midori America Corp. is a wholly owned subsidiary of Midori Precisions with is principal place of business located at 2501 E. Chapman Ave., Suite 260, Fullerton, CA 92831. According to its website, Midori America Corp. was "established for the purpose of serving the North, Central, and South American markets . . . [a]s the sales, marketing and distribution arm" of Midori Precisions that "maintains a complete inventory of Midori standard products[.]"  During the Class Period, Midori America Corp. – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers linear resistors manufactured by its corporate parent, Midori Precisions.

38.     Midori Precisions and Midori America Corp. are together referred to herein as "Midori."

## 3. Susumu

39.     Susumu Co., Ltd. ("Susumu Co.") is a Japanese corporation with its principal place of business located in Kyoto, Japan. During the Class Period, Susumu Co. manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

40.     Susumu International (USA) Inc. is a subsidiary of Susumu Co. with its principal place of business located in Palisades Park, New Jersey, and with offices located in North Mankato, Minnesota and San Jose, California.  According to its company website, Susumu International (USA) "is a sales and marketing arm of" Susumu Co.  During the Class Period, Susumu International (USA) – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers linear resistors manufactured by its corporate parent, Susumu Co.

41.     Susumu Co. and Susumu International (USA) Inc. are together referred to herein as "Susumu."

**4.     TOCOS**

42.     Tokyo Cosmos Electric Co. ("TOCOS Electric") is a Japanese corporation with its principal place of business located in Zama, Japan.  During the Class Period, TOCOS Electric manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

43.     TOCOS America is a wholly owned subsidiary of TOCOS Electric with is principal place of business located at 1177 E. Tower Road, Schaumburg, IL 60173.  During the Class Period, TOCOS America – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers linear resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, TOCOS Electric.

44.     TOCOS Electric and TOCOS America are together referred to herein as "TOCOS."

**IV.     JURISDICTION AND VENUE**

45.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

46.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

47.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

48.     This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the United States, including in this District; sold linear resistors throughout the United States, including in this District; had substantial contacts with the United

States, including in this District; or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy in the United States.  In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

49.   Defendants purposefully and knowingly directed the conspiracy alleged herein toward United States markets.  As alleged in Section II.B, *supra*, each Defendant maintained U.S. subsidiaries throughout the Class Period through which it marketed and sold linear resistors to United States purchasers. For example, Defendant KOA maintained lists of U.S.-based customers to whom it sold linear resistors at artificially inflated prices during the Class Period. Indeed, Jeff Rice, KOA Speer's Vice President of Sales and Marketing, informed KOA Corp.'s Managing Director Shinichi Makita that KOA held the largest share of U.S. linear resistors markets in 2010. Similarly, ROHM USA maintained annual records of its total linear resistors sales in the United States by product type throughout the Class Period.

50.   Not surprisingly, given all Defendants' ongoing United States presence, each Defendant colluded with other Defendants to coordinate their behavior in United States markets.  For example:

- ROHM, KOA, HDK, and co-conspirator Susumu discussed the performance of U.S. automotive end-markets for linear resistors, with the goal of coordinating their behavior in these markets, during a January 2008 JEITA "Resistor Information Exchange Meeting."

- Defendants discussed the performance of United States linear resistor markets, with the goal of coordinating their sales and marketing activities in those markets, during an August 25, 2010 meeting of the JEITA Passive Components Business Committee and Resistors Working Group, attended by all Defendants as well as co-conspirators Alps Electric, Susumu Co., and Midori Precisions.

- HDK Co., ROHM, and KOA, along with other resistor manufacturers, promoted coordination between the firms present in U.S. markets by discussing their companies' chip resistor sales in the United States during a September 2013 meeting of JEITA's "Chip Resistor Expert Committee."

- Panasonic and KOA discussed KOA's sales to North America in private meetings during the Class Period.

- HDK and Panasonic employees discussed resistor products sold to "A Co." in September 1, 2008 email correspondence. On information and belief, "A Co." was code for customer Apple, Inc., a U.S. corporation.

1    51.    Assignment of this case to the Northern District of California is proper because the

2    interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws

3    was substantially conducted with, directed to, or impacted Plaintiff and members of the Class in

4    counties located within the Division. *See* Civil Local Rule 3.2 (c) and (e).

5                    **V.    TRADE AND COMMERCE**

6    52.    The activities of Defendants and their co-conspirators, as described in this

7    Consolidated Amended Complaint, were within the flow of and substantially affected interstate

8    commerce.

9    53.    During the Class Period, Defendants and their co-conspirators sold substantial

10   quantities of linear resistors in a continuous and uninterrupted flow of interstate commerce, including

11   through and into this District.

12   54.    Defendants' conduct both within and outside the United States that caused direct,

13   substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate

14   commerce within the United States.

15   55.    Defendants manufactured certain linear resistors outside the United States that were

16   sold within the United States. These sales constitute domestic or import commerce.

17   56.    The cumulative effect of Defendants' collusion resulted in the Class paying millions

18   of dollars more for linear resistors than they otherwise would have in a competitive market. This

19   effect was, or should have been, anticipated by Defendants as the natural and predictable

20   consequence of their actions.

21                    **VI.    FACTUAL ALLEGATIONS**

22   **A.    Background on Linear Resistors**

23   57.    Resistors are electrical components that limit or regulate the flow of electrical current

24   in an electronic circuit.  Resistors can also be used to provide a specific voltage for an active device

25   such as a transistor.  The resistance is the measure of opposition to the flow of current in a resistor.

26   More resistance means more opposition to current.

27   58.    Resistors are considered "passive" electronic components because they regulate rather

28   than generate electrical current and do not require electrical power to operate.  Resistors are a

fundamental component of electrical circuits used in electronic devices such as televisions, cell phones, computers, and kitchen equipment. Many such devices will contain multiple – sometimes hundreds – of resistors per device.

59.    Resistors may be divided into two basic categories – linear resistors and non-linear resistors. In basic terms, a linear resistor is a resistor in which the current produced is directly proportional to the applied voltage. Linear resistors consist of fixed and variable resistors. A non-linear resistor is a resistor whose current does not change linearly with changes in applied voltage. Non-linear resistors are excluded from this Second Consolidated Amended Class Action Complaint.

60.    Linear resistors can be created in a variety of ways. The most common type used in electronic devices and systems is the carbon-composition resistor. In carbon-composition resistors, fine granulated carbon is mixed with clay and hardened. The resistance depends on the proportion of carbon to clay; the higher this ratio, the lower the resistance.

61.    Two other common types of linear resistor used in many electronic devices are thick and thin film resistors. Thick and thin film resistors are characterized by a ceramic basic encompassed by a resistive layer. Thin film resistors have a thickness in the order of .1 micrometer or smaller while thick film resistors are about a thousand times thicker. Thick film resistors tend to be more accurate, have a better temperature coefficient, and be more stable. Thus, thin film resistors are used in technologies requiring a high level of precision. Conversely, thick film resistors are preferred for applications where these requirements are not necessary. Though each type of linear resistor has properties that may render it more or less useful for a given electronic device, many manufacturers, including Defendants, manufacture multiple different types of linear resistors. Generally, linear resistors are most commonly used in consumer electronics such as computers and audio/visual devices.

62.    Throughout the Class Period, Defendants sold linear resistors to:  (1) Original Equipment Manufacturers ("OEMs") who incorporate resistors into their finished products, (2) manufacturers who create or assemble electrical circuits that ultimately are incorporated into finished products manufactured by OEMs and other product manufacturers, and (3) electronic component distributors who buy resistors directly from manufacturers and resell them.

1

**B.      Evolution of the Global Resistors Industry**

2        63.     Resistors were first widely produced as components with wire leads that were inserted

3   through holes into electronic circuit boards, then soldered into place on the circuit board.  These

4   resistors were produced as single components, with two leads, or packaged into a network of

5   resistors within a single component, with multiple leads.  Both types of leaded components were

6   inserted into the circuit board.

7        64.     In the mid-1980s, so-called surface mount technology came into widespread use,

8   supplanting the use of through-hole, leaded components on electronic circuit boards.  By the late

9   1990s, both integrated circuits (which contain active components, like transistors, which electrically

10  control electron flow) and passive components (like resistors and capacitors, which do not control

11  electrical current in response to another electrical signal) were being packaged and mounted directly

12  on the surface of electronic circuit boards.  The use of surface mount technology in producing

13  consumer electronics expanded dramatically in the late 1990s, driven in large part by the increasing

14  miniaturization of electronic functionality incorporated into integrated circuits.  Surface mount

15  technology was further popularized with the later development of so-called tape automated bonding

16  (TAB), in which automated machinery was used to automatically place and solder electronic

17  components directly on circuit boards.

18       65.     Continuing technological innovation in semiconductors drove increasing

19  miniaturization of integrated circuits, with numbers of electronic components per area of a silicon

20  chip doubling every two years over the period from about 1995 to 2010.  As a result, electronic

21  circuits that previously occupied an entire circuit board, including transistors, capacitors, and

22  resistors, are now often entirely integrated onto a single electronic chip.  The resistors contained in

23  the circuit on the chip are now manufactured by the semiconductor chip fabricator, and not by a

24  resistor producer.  Nonetheless, external, discrete resistor components are still used in electronic

25  equipment, particularly in the electrical interfaces between chips, and in the circuitry linking chips to

26  their power supplies and external signal interfaces.

27

28

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW
                                                - 14 -

**C.      Late 1990s:  Transformation of the Global Resistors Industry**

66.      In the mid-1990s, Japanese producers dominated the global resistor industry, accounting for almost half of global resistor production.  This was an era in which Japanese producers also dominated the consumer electronic industry, and had large shares of the computer and industrial electronic markets as well.  Defendants ROHM, KOA, and Panasonic, and co-conspirator Susumu, were among the major Japanese resistor manufacturers during the mid-1990s.

67.      In the early to mid-1990s, the domestic Japanese electronics market was still protected by significant tariff and non-tariff barriers.  In 1992, imports comprised slightly over 3 percent of Japanese consumption, and increased to 7 percent in 1996. Japanese imports of passive components were limited mostly to products for which there is no domestically produced equivalent. According to U.S. industry representatives, the major Japanese consumers of passive components, large electronics OEMs, were averse to purchasing products from sources outside their industrial groupings.

68.      The signing of the international Information Technology Agreement of 1996 transformed the global resistor industry. This Agreement called for elimination of  all tariffs on trade in resistors (and many other electronic products) over the 1997-2000 period, and required the twenty-nine initial signatories, including the U.S., Japan, the EU, Korea, and Taiwan, "to consult on non-tariff barriers to trade in information technology products," including resistors.  For the United States, this meant eliminating a 6 percent tariff, for the EU a 2.7 percent tariff, for Korea a 13 percent tariff, and for Japan, new pressures to remove non-tariff barriers preventing imports of products produced domestically. In short, the ITA opened up industries like the resistors industries to global competition. As detailed below, the effect on prices was significant.

**D.      Early 2000s: Resistor Prices Collapse**

69.      Signing and implementation of the ITA precipitated major declines in prices in the Japanese resistor industry.  Figure 1 depicts export and domestic producer price indexes for resistors in Japan. Resistor prices fell by about 30 percent from 1997 to early 2000 in Japan's protected market.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    70.    Prices for the resistor products that Japan was exporting fell by approximately 20

percent over 1997-2000.  This suggests that the exported products sold to foreign buyers were

initially priced lower than products sold into the domestic market, as would be expected with a

protected domestic market.  As implementation of the ITA continued, however, this divergence

between domestic and export prices of Japanese resistors disappeared.  After 2001, Japan's domestic

and export resistor price indexes roughly converge and show a similar pattern of movement.

        71.    Globally, robust economic conditions in the 1990s resulted in an explosion of demand

for consumer electronics that, in turn, resulted in strong demand for resistors.  However, economic

growth slowed significantly in 2001, causing a corresponding decline in demand for resistors.

According to U.S. Census Bureau figures, shipment values for resistors manufactured in the United

States dropped from $981.7 million in 2000 to $712.9 million in 2001 – a 27% decline.

72.     Amidst this weak economic climate, purchasers of resistors began applying significant pressure on the industry to lower prices.  Indeed, between 2001 and 2002, global prices for resistors dropped a whopping 43% from $0.0080 per unit to about $0.0045 per unit.

73.     This had a devastating impact on resistor manufacturers' profitability, forcing some manufacturers to produce components at or below the cost of production.  Facing significant losses, manufacturers were forced to reduce work forces, consolidate, close plants, and reduce capacity. During this period, many manufacturers of passive electronic components such as resistors were operating at between 60 and 70% while vendors were "swimming in excess supply and fighting for contracts" according to a 2002 EBN report.

74.     Despite falling global prices for resistors, and even after resistors prices underwent a sharp decline through 2000, both domestic and export prices for Japanese resistors roughly stabilized—or even increased.  As Figure 1 (above) demonstrates, from 2002 through early 2005, resistor export prices increased by about 20% to a level coinciding with domestic resistor prices. Japanese resistor prices, both domestic and for export, declined moderately from 2005 through the end of 2006 before beginning a prolonged period of increase, followed by stability, through the end of 2014.  Indeed, the data shown in Figure 1 suggests an elevation in resistor prices of 20-25% over 2007-2014, compared with prices at the end of 2001.

75.     Another consequence of this increased competition was the increased use by resistor purchasers of online reverse auctions for passive electronic components such as resistors. Unsurprisingly, the use of online reverse auctions was vigorously opposed by manufacturers such as Defendants.  Yet, given the market power of many resistors purchasers, pro-competitive practices such as reverse auctions could only be squelched if the industry as a whole acted together.

**E.     Defendants Conspire to Restrain Competition**

76.     The rebound in Japanese resistor prices that occurred after 2002 followed by further price increases after 2006 was the result of coordinated efforts among Japanese resistor manufacturers to restrain competition and stabilize and increase resistor prices.  Despite weak economic conditions, Defendants had one thing going for them: purchasers of resistors were almost always committed to inflexible production or delivery deadlines to their respective customers, and

accordingly could be forced to accept a price increase in order to avoid production delays or customer dissatisfaction.

77.     Thus, a plan was hatched.  No later than 2003, if not earlier, Defendants agreed to restrain competition to halt price erosion and maintain or increase prices.  Defendants carried out the conspiracy through regular collusive discussions under the auspices of the Japan Electronics and Information Technology Industries Association ("JEITA"), as well as through discussions among individual competitors.  Defendants facilitated the coordination of their behavior and eliminated competition through these regular meetings, which provided a ready mechanism for coordinating behavior concerning current and future prices, capacity, costs, sales, forecasts, and in other competitively sensitive areas.

78.     When participating in conspiratorial meetings and discussions, the members of each and every Defendant family named in this Complaint often did not distinguish among entities within a particular corporate family.  Indeed, generally, the minutes and records reflecting Defendants' conspiratorial meetings – which span many years – regularly (but not always) reflect generic uses of the Defendants' corporate family names without distinguishing or recognizing differences between corporate parents and subsidiaries.  Employees from each of the Defendant families appear to have attended the conspiratorial meetings on behalf of their entire corporate family, including their respective U.S. subsidiaries.  Accordingly, when the generic name of a Defendant corporate family (and coconspirator corporate family) is used in these allegations, it reflects the generic and/or otherwise non-specific use of the family's name in the underlying evidentiary record (such as use of codenames like "R. Co." to refer to the ROHM family).

79.     In one of the many examples of this, Panasonic's Kamioka wrote in his notes concerning a 2007 meeting among Defendants to "discuss coordination in resistor markets."  These notes reflect a collusive discussion of highly-sensitive competitive information – including specific resistor prices, sales volumes, production capacity, and market position – and refer to each and every Defendant family using its generic name for the corporate family without distinguishing between corporate parents and their subsidiaries.  Kamioka labeled his email reporting this information, "Same Industry Information (Confidential)" and instructed recipients to "handle with care."

80.     Defendants ROHM, Panasonic, HDK, and KOA entered the conspiracy to foster cooperation, stabilize prices, and restrain competition in the linear resistors industry when employees of ROHM, HDK Co., KOA, and Panasonic, as well as co-conspirator resistor manufacturers Alps Electric, Midori Precisions, Susumu Co., and TOCOS Electric, attended a July 9, 2003 meeting of JEITA's Passive Components Business Committee. At the meeting, participants agreed on a procedure for facilitating coordination of industry behavior in their subsequent meetings. In order to coordinate behavior and limit competition, each company would provide the others:  (1) current sales and changes in production of resistors, (2) business conditions judging from current orders received, (3) market trends, "especially your company's strong markets," (4) product trends, (5) overseas production status, meaning "your company's overseas production status, status of shift to overseas production, export trends, overseas markets, etc.," (6) future outlook  ("your company's estimated forecast and outlook"), and (7) shared industry topics, including "domestic and foreign price status[.]"

81.     According to meeting minutes, Defendant ROHM attended subsequent Passive Components Committee meetings in which participants facilitated their common scheme to reduce competition through this procedure in June and July 2003, as well as March, May, July, and November of 2004; Defendant Panasonic attended such meetings in September and November of 2003, and in January and March of 2004; Defendant HDK Co. attended and participated in September 2003, and  in January and March of 2004; Defendant KOA attended in November of 2003, and in January and March of 2004; and Defendant Kamaya Electric attended the January 2004 meeting.

82.     Defendants' collusion continued within and outside the context of JEITA meetings during and after 2004. Defendants participated in a summer 2006 meeting of JEITA's Passive Components Business Committee, where Kamaya, Panasonic, ROHM, KOA, HDK, Kamaya, Sakae Tsushin, Teikoku Tsushin, Taiyosha, Alps, and TOCOS met and exchanged monthly resistor sales information, including sales as a percentage of the previous period, in order to coordinate their market behavior. In early 2006, ROHM General Manager Hiroshi Kaida met privately at least three times between January and April 2006 with competitor Panasonic.

83.     Collusive discussions included the exchange of price information for sales to individual resistor customers. In late August 2006, Panasonic's Yoshinori Hourai wrote to Yoshihiro Hashimoto of Panasonic that both Panasonic and ROHM were seeking to sell resistors to Nokia, and because Hourai had heard from another Panasonic employee that Hashimoto had directly exchanged resistor price information with ROHM, he wanted to know if Hashimoto would check the price information with ROHM this time as well.  Hourai then listed his proposals for the prices that he wanted Hashimoto to confirm with ROHM.  Hourai wrote a later email to Panasonic Corp. employees Minoru Sowa, Hiroaki Kamioka, and Hideki Matsuhashi about pricing for Nokia. "Yesterday, related to handling prices for Nokia, I had GM Hashimoto contact the person responsible for General Global at R Co." "R Co.," as used in Hourai's email, was code for competitor "ROHM." "The following comment came back from R. Co.:  'We plan to raise prices to Nokia for the 1005 type [resistor].'"  Hourai also relayed to his colleagues that he had learned that ROHM's top management had given instructions to review its pricing strategy for customers where ROHM was not earning money due to soaring materials costs.  In closing, Hourai warned recipients not to forward his email.

86.     ROHM and Panasonic executives continued to hold in-person and telephonic private meetings throughout early 2007.  In particular, ROHM's Kaida met privately with Panasonic on January 25, April 3 (in a meeting that also included competitors Akira Nonomura of KOA Corp. and Akihiro Katada of resistor manufacturer Taiyosha Electric), April 10, April 13, and April 23.

87.     Defendants also continued to collude at JEITA meetings held in 2007. In May 2007, Koichiro Nakagawa of Panasonic sent Panasonic's Hashimoto and Kamioka his notes for the previous week's meeting of the JEITA Capacitor and Resistor Committee.  Nakagawa reported that, at the meeting, he "tried to ask about KOA's FY07 business plan, but the KOA representative told Nakagawa that there were internal discussions not to share competitive information before the 5/26 Passive Components Committee Meeting."  In anticipation of "shar[ing] competitive information" at that meeting, Nakagawa told Hashimoto and Kamioka that he "would like to take some of your time and hear your requests for information exchange and our public relations."

88.     In a related email, Nakagawa reported to Kamioka that he, ROHM (through ROHM Co. General Manager Ikeda), and KOA (via Director Hiromitsu Kitabayashi) discussed forming a "Japanese federation" to respond to competition from Taiwanese resistor manufacturer Yageo. Kamioka forwarded Nakagawa's report to Panasonic's Hideki Matsuhashi and Hashimoto, stating that he would ask ROHM's Hiroshi Kaida about Panasonic's reported plan to coordinate with KOA and ROHM at the JEITA Passive Components Committee Meeting on the upcoming Friday.

90.     Panasonic employee Hiroaki Kamioka met with representatives of resistor manufacturers HDK (Keiichi Shimada), KOA (Kunio Misawa, Hiromitsu Kitabayashi), ROHM (Hiroshi Kaida), Taiyosha (Akihiro Katada, Senji Hibino), and Kamaya (H. Miura) to discuss coordination in resistor markets and play golf from November 30 to December 1, 2007.  Before the meeting, Kamioka asked fellow Panasonic executive Yoshihiro Hashimoto if Hashimoto would

attend too. Hashimoto replied that he had "exchanged opinions with key members the other day, so I'll leave this time to you."  Notes taken by Panasonic's Kamioka from the meeting reflect the following collusive discussion of price, capacity, and market positioning exchanged with the goal of coordinating the competitors' behavior, ████████████████████████████████████ ████████████████████████████████████████████████ (the companies are referred to in the underlying document as KOA, ROHM, Taiyosha, HDK, Kamaya, Panasonic, and Walsin):

> (1) Square chip [resistor] supply and capacity balance

> - Does not have available capacity . . . . KOA, HDK, Taiyosha

> - Has available capacity . . . ROHM, Kamaya

> - ROHM's current sales are 180 million units/M

> (2) Current status of microscopic chip

> - As estimated from each company's discussion, Panasonic is believed to have the top production volume; ROHM around 1 billion; Kamaya, HDK and Taiyosha around 500 million each.

> - The bottom price is around 0.09 (HDK), Kamaya seems to have stopped at around .10. All companies would have difficulty making a profit at .09.

> - HDK is having technical trouble at Casio Hitachi.

> - ROHM and Kamaya have available capacity for supply. . . .

> - KOA is supplying 0402 to Taiwan Mo manufacturers.

> - HDK, Kamaya, and Taiyosha have around one customer each, but regardless of volume, they have supply results. All companies are aware that Panasonic is the leader.

> (3) Kamaya information

> - Working with Walsin, a Taiwanese company; they will mostly continue to sell under the Kamaya brand.

> - Top management instructed them to always have 10% available capacity in the production structure.

> (4) Other

> - KOA's sales to Chinese EMS manufacturers are passive, and they aren't profiting.

- HDK is quite interested in Panasonic ESD suppressors and will likely enter the market.

Kamioka labeled his email reporting this information to other Panasonic employees "Same Industry Information (Confidential)," and instructed recipients to "handle with care."

91.    On January 23, 2008, ROHM, KOA, Taiyosha, HDK, and Susumu participated in a JEITA "Passive Component Committee Resistor Information Exchange Meeting." At the meeting, competitors engaged in further coordinating conduct by discussing market performance and product release plans for ROHM, HDK, KOA, Taiyosha, Susumu, and Panasonic.  In January 2009, KOA Corp.'s CEO Koichi Mukaiyama, who was also the then-current Chairman of JEITA's Passive Components Business Committee, acknowledged the ongoing discussion of resistor prices and competitive information at JEITA meetings, telling a meeting of KOA Corp.'s Board of Directors, "I am not supporting a violation of the antitrust law, but we (resistor companies) should not be cutting prices for the sake of receiving orders."

92.    On April 22, 2008, Yoshihiro Hashimoto of Panasonic sent Panasonic employees Kazuo Sakami, Koichiro Nojiri, and Nobuo Nakayami an email entitled "Confidential Competitor Information (KOA)."  Hashimoto reported detailed information provided to him by KOA about KOA's monthly production volume for carbon resistors, metal oxide resistors, and cement winding resistors, its strategies to supply foreign vs. domestic products, and KOA's average sale price for carbon resistors.  Separately, Hashimoto added that he also met with "R. Co," code for "ROHM," and reported information about ROHM's domestic vs. foreign production of chip resistors.

96.     JEITA's Passive Components Business Committee held a "Resistor Division Meeting" on July 10, 2008.  Hiroshi Kaida of ROHM served as Vice Chairman, and Akira Nonomura and Kunio Misawa of KOA, Yoshinori Hourai of Panasonic Corp., Senji Hibino of Taiyosha Electric, Keiichi Shimada of HDK Co., Nakarai of Alps Electric, Yukihiro Fukudome of resistor manufacturer Sakae Tsushin, Shoji Sakamoto of resistor manufacturer Teikoku Tsushin, and Okamura of Midori Precisions were the attendees.  According to the meeting minutes, "[a]ll attendees carried out information exchange."  On information and belief, the attendees held these collusive discussions according to the procedure for exchanging company-specific sales, pricing, capacity, supply, and other competitive information that was established by the Committee during its July 9, 2003 meeting.

97.     Private meetings continued to supplement collusive group discussions at JEITA events. For example, Panasonic executive Yoshinori Hourai met with representatives of KOA on July 31, 2008 regarding carbon resistors.  During the meeting, the KOA representatives informed Hourai that KOA planned to continue selling this type of resistor, in furtherance of their agreement to coordinate sales activities and avoid competition.

98.     JEITA's Passive Components Business Committee held a "Resistor Information Exchange Meeting" on August 27, 2008, attended by Akira Nonomura and Kunio Misawa of KOA Corp., a representative of Panasonic Corp., Keiichi Shimada of HDK Co., Yoshikazu Tamaki of ROHM Co., Nakarai of Alps Electric, Ogasawara of Alpha Electronics, Yukihiro Fukudome of Sakae Tsushin, Morimasa of Susumu Co., Senji Hibino of Taiyosha Electric, Shoji Sakamoto of

Teikoku Tsushin, Yoshida and Tsunekawa of Japan Resistor Manufacturing, and Okamura of Midori Precisions. According to the meeting minutes, "[a]ll attendees carried out information exchange." On information and belief, the attendees held these collusive discussions according to the procedure for exchanging company-specific sales, pricing, capacity, supply, and other competitive information that was established by the Committee during its July 9, 2003 meeting. For example, ROHM, Panasonic, HDK, KOA, Sakae Tsushin, Susumu Co., Teikoku Tsushin, Alpha Electronics, Taiyosha, and Alps collusively exchanged company-specific sales performance as a percentage of first-quarter sales, general performance by end product market and region, and planned price increases and price freezes for resistors.  KOA Corp. President Koichi Mukaiyama commented on rising material costs and the need for resistor manufacturers to protect their business.

99.     Continuing JEITA discussions led to continued exchange of price information as to specific customers, and continued efforts to coordinate pricing strategies. Thus, in September 2008 Keiichi Shimada of HDK Co. and Panasonic's Hourai corresponded about demand from specific customers and the need to resist customer requests for price reductions. On September 1, Shimada wrote to Hourai, "[t]hank you very much for the other day" (referring to an earlier meeting), and asked for information about a resistor model requested by "A Co." On information and belief, "A Co." was code for customer Apple, Inc., a U.S. corporation. Hourai responded with the requested information and asked Shimada what HDK's pricing was on a different resistor model, sharing that Hourai expected that Panasonic's  customers would request $0.09 per thousand pieces in October and asking what HDK planned to do.  Hourai further shared that Panasonic's profits on the resistor model are "not good" and that he wanted to stop price reductions.

100.     JEITA's Passive Components Business Committee held a "Resistor Information Exchange Meeting" on October 30, 2008, attended by ROHM Co. (represented by Osamu Maeda and Hiroshi Kaida), KOA Corp. (Kunio Misawa), Panasonic Corp. (Yoshinori Hourai), HDK Co. (Keiichi Shimada), Taiyosha (Senji Hibino), Alps Electric (Nakarai), and Midori Precisions (Okamura). The minutes state that "[a]ll attendees carried out information exchange."  The meeting involved coordinating discussions and presentations, including presentations by competitors HDK Co., KOA Corp., Taiyosha, Midori Precisions, Alps Electric, and ROHM Co.'s performance in

comparison to previous years. The next day, Panasonic Corp.'s Yoshihiro Hashimoto and Yoshinori Hourai, KOA Corp.'s Akira Nonomura and Kunio Misawa, ROHM Co.'s Hiromichi Katafuchi and Hiroshi Kaida, HDK's Kazuo Nomura and Keiichi Shimada, and Taiyosha's Akihiro Katada and Senji Hibino attended a resistors meeting in Nagoya, Japan, from October 31 until November 1, 2008.  Attendees held another collusive "information exchange meeting" on October 31 and participated in a golf session on November 1, providing further opportunities for collusive discussions.

103.    In January 2010, Motorola – a purchaser of resistors – initiated an e-bid process to try and obtain a supplier.  In response to this initiative, KOA indicated that such online auctions were not acceptable in the industry.  Specifically, KOA Speer's Jeff Rice emailed his team that, "Motorola never learns from history.  I remember they did the auction during the last shortage and suppliers

raised prices.  Motorola is a small fish in a big pond.  What the heck do they think they are doing?
Wow cannot believe they are doing this."

106.    ROHM, HDK, KOA, Taiyosha, Alps, Sakae Tsushin, and Teikoku Tsushin
participated in a January 20, 2010 JEITA meeting in which all companies presented competitively
sensitive sales information, including by specific end-product.  For example, ROHM reported to its

competitors that its December results were up 40-50% compared to the previous year, and around 80% of 2007 sales, and that ROHM's sales in the television and notebook PC end-product markets were favorable. KOA reported its sales had returned to 85% of 2007, sales for vehicles were at 90% compared to 2007, the flat TV market was favorable, and that KOA's delivery periods for chip resistors and resistors with leads were tight.  All of this discussion facilitated coordination among the meeting attendees.

107.    Yoshinori Hourai of Panasonic met privately with a KOA representative on May 8, 2010 to further coordination between the two firms in the market for carbon resistors.

108.    ROHM, KOA, and Taiyosha collusively provided their projected peak sales of resistors and their respective performances in resistor end-product markets at August 25, 2010 meetings of JEITA's Passive Components Committee and Resistors Committee, which were also attended by Teikoku Tsushin, Alps, Panasonic, Sakae Tsushin, HDK, and Susumu Co.  At the same meeting, Panasonic presented a chart showing its first quarter 2010 to fourth quarter 2010 actual and projected growth rates compared to the growth rates of other JEITA members. KOA gave an update on its expectations of resistor market performance in North America and Europe with the goal of coordinating behavior among participants. Susumu Co. presented on its quarterly performance in comparison to previous years in chip resistor sales.  Panasonic presented a chart showing its first quarter 2010 to fourth quarter 2010 growth rates compared to the average growth rate of JEITA members and of JEITA's largest member.

109.    Panasonic attended a meeting of the JEITA Resistors Committee in November 2010, where Panasonic and other meeting participants took further steps to coordinate their market behavior by presenting updates on their performance in target end-markets such as television sets, notebook PCs, vehicles, and cell phones.

110.    ROHM's Hiroshi Kaida, Panasonic's Hourai, KOA (Kunio Misawa and others), HDK Co. (Akio Nomura, Keiichi Shimada), Taiyosha (Akihiro Katada, Yoshida), and other resistor manufacturers participated in JEITA Passive Components Committee and Resistors Working Group meetings on January 19, 2011. During the Working Group meeting, participants furthered their scheme to reduce competition and coordinate behavior by providing their sales percentages

compared to the previous quarter, the resistor models manufactured by each company, expected

market volume by region, and performance by end product market.

111.    KOA, HDK, Taiyo Yuden, Sakae Tsushin, and Susumu Co. presented forecasts for

each company's resistor sales for the remainder of the year during a February 19, 2011 meeting of

the Resistors Working Group of JEITA's Passive Components Committee, in order to enable

participants to coordinate their market behavior.  For example, KOA reported that it expected peak

sales in July and that its December sales would be 10% lower than its July sales.

112.    During an August 2011 meeting of the JEITA Passive Components Committee,

ROHM, KOA, Taiyosha, and HDK engaged in detailed discussions of each company's sales

information.  For example, ROHM disclosed that its resistor sales to the European automotive end-

markets were favorable, KOA revealed that its sales had worsened generally, and HDK indicated that

its sales were struggling. Resistor sales information was compiled in charts comparing Q1-Q4 HDK,

Panasonic Corp., KOA, Taiyosha, and ROHM resistor sales as a percentage of the previous period,

enabling the competitors to coordinate their market behavior.  ██████████████████

████████████████████████████████

113.    KOA, HDK, and other resistor manufacturers participated in a JEITA Passive

Components Committee meeting and Resistors Working Group meeting on January 26, 2012.

During the meeting, Defendants discussed their intention to target the vehicle and smartphone end-

markets for resistor sales. KOA and HDK disclosed their outlook for resistor sales during the coming

fiscal year as compared to previous years, and the effect of recent flooding in Thailand on HDK's

and other manufacturer's factories, enabling further coordination.

114.    KOA Corp. (General Manager Kitabayashi), Panasonic Corp. (Group Manager

Kuwada or Kuwata), Alps Electric (General Manager Taniguchi), and HDK Co. (Osaka Sales Office

Director Nogawa) attended a two-hour meeting of JEITA's Capacitor and Resistor/General

Components Committee on May 18, 2012.  At the meeting, all four companies' representatives

sought to facilitate coordination between the firms by presenting on their FY 2011 sales amounts,

profit and losses, and current sales information, breaking out current performance data by end

1   product type, effects of the 2011 earthquake in Japan, effect of exchange rates on sales, and other

2   competitive information.

3

4

5

6

7

8

9

10

11       116.    Despite these concerns, employees of KOA, Panasonic, and other companies

12   participated in a July 31, 2013 JEITA meeting in which KOA disclosed to its competitors detailed

13   information on KOA's second-quarter sales performance in comparison to the previous period, in

14   furthering their agreement to eliminate competition.

15

16

17

18       117.

19

20

21

22       118.    On October 23, 2013, Kamaya Electric's President (Susumu Fujimoto), Marketing

23   General Manager (Nakano), and two other representatives of Kamaya Electric met with Panasonic's

24   Yoshinori Hourai.  During the meeting, Kamaya Electric shared its total capacity and orders received

25   in furtherance of their scheme to facilitate coordination and reduce competition.

26       119.

27                                                                                                      o

28

1  ███████████████████████████████████████████████████████████

2  ████████████████████

3      120.    As of June 2014, KOA had recognized that its collusive discussions with competitors

4  violated the antitrust laws, and that it was too late to fix its past mistakes.  During a June 16, 2014

5  meeting of KOA's Board of Directors concerning "[t]he guidelines for global antitrust laws,"

6  Manager Yajima noted that KOA was "in the process of addressing anti-trust related risk in our

7  regulations.  Since we do not have much time, as the risk has already materialized, the Import

8  Control Center and General Affairs Center will be hastily putting together the actions to be taken by

9  the KOA Group companies."  Director Kayoko Fukano added, "I realize the situation is becoming

10  serious, and we cannot get away by saying '[w]e did not know.'  Business practices we are so

11  accustomed to may no longer be deemed legitimate activities." ███████████████████

12  ███████████████████████████████████████████████████████████

13  █████████████

14      121.    By July 2014, JEITA's leadership also had become aware that its activities violated

15  the antitrust laws. During that month, JEITA distributed a handout to its members (including

16  Panasonic) announcing an internal investigation into creating an antitrust compliance structure. A██

17  ███████████████████████████████████████████████████████

18  ██████████████████████████████████████   Electronic Components Working

19  Group announced plans to look into current antitrust compliance issues arising from its activities.

20  **F.     The U.S. Subsidiary Defendants Participated in Defendants' Conspiracy**

21      122.    The conspiracy was organized at the highest level of the Defendant families, and

22  carried out by both executives and subordinate employees, with the foreign corporate parent of each

23  Defendant family using the U.S. subsidiaries to implement, effectuate, and achieve the cartel's aims

24  and purposes. This included conspiratorial conduct by high-level employees of the Defendant foreign

25  parent corporations and conspiratorial conduct by employees of the Defendants' U.S. subsidiaries. It

26  also included the parent companies' control over the prices set by the U.S. subsidiaries, and the

27  communication, from parents to subsidiaries, of confidential information learned by the parents from

28  employees of other Defendants and coconspirators.  For instance, employees of the parent

corporations regularly sent JEITA meeting reports to employees of their U.S. subsidiaries. ███

███████████████████████████████████████████████████████████████

███████████████

123.     Additionally, employees of the Defendant families participated in the conspiratorial discussions and meetings and entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families including their U.S. affiliates.  Defendants' employees and executives regularly used generic forms of each Defendant family's name in the course of furthering the conspiracy and only occasionally made known to other participants at conspiratorial meetings distinctions between the corporate entities within their corporate families whose interests they were representing. Accordingly, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts. As a result, each Defendant's entire corporate family was represented in meetings and discussions by their agents and was party to the agreements reached in those meetings.

124.     Moreover, each Defendant family's corporate parent dominated and controlled the finances, policies, and business decisions of their various subsidiaries, including the U.S. subsidiaries. That dominance included, for example, the parent companies' ultimate control over the prices set by the U.S. subsidiaries. What follow are just a few representative examples:



125.    The U.S. subsidiary of each and every Defendant family performed functions at the direction of, and was controlled by, the foreign-based Defendant parent's officers and managers. As a means of control, the Defendant foreign parent corporations "seconded" their employees to their U.S. subsidiaries so that these employees could act a conduit for the parents' decisions and conspiratorial agreements and implement them at the subsidiary level.

127.    Other employees of Defendants with resistors-related responsibilities who were seconded to the United States during the Class Period include, but are not limited to,

128.    Finally, employees of the Defendant foreign corporations also maintained control over their U.S. subsidiaries, and the polices and pricing of each, by sitting on boards of the U.S. subsidiaries.

**G.    Defendants' Collusive Discussions Were Intended to, and Did, Further Their Agreement to Stabilize Resistor Prices**

129.    Defendants' discussions exhibited the characteristics of collusion among competitors that creates and furthers a conspiracy to stabilize prices and reduce competition.

**1.    The Type of Information Discussed Was Highly Competitively Sensitive, Enabling Collusion and Market Impact to the Benefit of Defendants and the Detriment of Class Members**

130.    Particular types of data exchanges are more likely than others to reduce strategic uncertainty in the market and facilitate coordination among competitors. Strategic information relates to current or future prices, capacity, costs, sales, forecasts, customer information, marketing plans, and actual and planned investments, among others. This competitively sensitive information is not

the type of information that would normally be exchanged by companies that are actually competing with each other, since exchange of this information provides important advantages to a true competitor.  The fact that the communications among Defendants involved this type of information indicates that the purpose was to coordinate behavior rather than to compete more effectively.

131.    The collusive discussions alleged in Section E, *supra*, demonstrate Defendants' regular collusive exchange of competitively sensitive information. To highlight just three representative instances from the many examples noted above:

- Defendants ROHM and Panasonic exchanged price information for the sale of resistors to customer Nokia.  As reported by the Panasonic employee who received Nokia's price information, "[y]esterday, related to handling prices for Nokia, I had GM Hashimoto contact the person responsible for General Global at R Co." "R Co.," as used in Hourai's email, was code for competitor "ROHM." "The following comment came back from R. Co.: 'We plan to raise prices to Nokia for the 1005 type [resistor]."

- During a November 2007 meeting of JEITA's Resistor Committee, Defendants KOA, ROHM, HDK, and Kamaya exchanged detailed competitive information about each company's supply and capacity of square chip resistors, production volumes, technical production capacity, and profitability in specific markets.

- Defendants KOA Corp., Panasonic Corp., ROHM Co., HDK Co., and co-conspirators Alps Electric and Susumu Co. exchanged company-specific competitive information, including sales performance as a percentage of first-quarter sales, general performance by end product market and region, and planned price increases and price freezes for resistors, during a "Resistor Information Exchange Meeting" on August 27, 2008.

132.    Defendants carried out regular collusive discussions in meetings hosted by JEITA, which provided Defendants with both a consistent forum for these discussions as well as a mechanism for ensuring compliance with the conspiratorial agreement by all competitors.  As early as July 2003, Defendants agreed to promote cooperation and reduce competition through JEITA meetings involving the regular exchange of strategic information among competitors, enabling co-conspirators to coordinate their behavior with the overall effect of reducing competition and stabilizing resistor prices.

**2.     Communications Frequently Occurred in Private Settings Rather than Publicly**

133.    Information shared through communications among competitors is considered private rather than public when such information is not equally available to all market participants.  Private sharing of information among competitors is more likely to occur in order to coordinate behavior among parties.

134.    The collusive discussions alleged in Section E, *supra*, demonstrate that Defendants regularly exchanged competitively sensitive information in private settings that were not accessible to non-members of the conspiracy.  These settings included meetings of JEITA's Passive Components Business Committee and its Resistors subcommittee, which were not made publicly available and were used to facilitate and provide cover for the exchange of competitively sensitive information.  For example, JEITA hosted a "Passive Component Committee Resistor Information Exchange Meeting" in January 2008, in which Defendants ROHM, KOA, and HDK shared market performance and resistor product release plans for each of their companies.

135.    As alleged in Section E, *supra*, collusive discussions between Defendants also occurred via email and in private, in-person meetings.  For example, HDK Co.'s Keiichi Shimada and Panasonic's Hourai provided pricing of specific resistor models and their intentions to stop price reductions in September 2008.  Similarly, KOA Corp. representative Akira Nonomura met privately with Hiroshi Kaida of ROHM, Director Akihiro Katada of Taiyosha Electric, and Yoshihiro Hashimoto of Panasonic on April 3, 2007 to foster coordination among their respective firms.

**3.     Conspirators Exchanged Company-Specific Information**

136.    The more individualized the information communicated as to specific firms' prices, quantities, and customers, the more the information enables competitors to identify and coordinate each other's behavior.

137.    As alleged in Section E, Defendants' discussions involved highly specific information, enabling them to coordinate their activities.  For example, during the January 2012 meeting of JEITA's Passive Components Committee and Resistors Working Group, KOA, HDK, and other resistors manufacturers discussed their intention to target the vehicle and smartphone end-markets for resistor sales, and KOA and HDK disclosed their projected resistor sales.  In an August

1   2008 Resistors Working Group Meeting, ROHM Co., Panasonic, HDK Co., and KOA Corp.

2   representatives exchanged company-specific sales volumes and discussed planned price increases for

3   resistors.  And in September 2006, Panasonic and ROHM representatives privately discussed their

4   companies' intentions to raise prices for a specific resistor model.

5           **4.**    **The Information Shared Described Current and/or Future Behavior**

6         138.   Communicating current information or future projections is likely to facilitate

7   coordination among competitors.  The more recent the information exchanged, the easier it is for a

8   competitor to determine another competitor's current or future conduct, and the more useful the

9   information is to coordinate their behavior and to monitor for potential deviations from the

10  conspiratorial agreement.

11        139.   As alleged in Section E, Defendants  routinely discussed current and/or future

12  competitive information. For example, ROHM Co., Panasonic Corp., HDK Co., and KOA Corp.

13  representatives met and exchanged company-specific – including for ROHM, Panasonic, HDK, and

14  KOA – current sales volumes and discussed future price increases for linear resistors during an

15  August 27, 2008 JEITA Resistors Working Group meeting. HDK Co. and Panasonic executives

16  discussed plans to increase prices on a specific linear resistor model in September 2008.  During a

17  meeting of JEITA's Capacitor and Resistor/General Components Committee in May 2012,

18  Panasonic Corp., KOA Corp., and HDK Co. representatives presented on their companies' respective

19  FY 2011 sales amounts, profit and losses, and current sales information, breaking out current

20  performance data by product type (including resistors), effect of exchange rates on sales, and other

21  company-specific data, enabling other competitors to adjust their behavior accordingly in response to

22  this information.

23          **5.**    **Direct Communications Occurred Frequently and for More Than a Decade**

24        140.   The more frequently competitors communicate competitive information to each other,

25  the more likely it is that they are using the information to coordinate behavior because frequent

26  communications enable competitors to intentionally coordinate their behavior and monitor

27  compliance with the conspiracy.

1     141.    As alleged in Section E, Defendants' collusive discussions occurred on a frequent

2   basis.  For example, ROHM, Panasonic, HDK, and KOA met and exchanged competitive

3   information in no fewer than five JEITA-sponsored forums occurring in 2008 alone.  From 2003 to

4   2014, JEITA's Passive Components Business Committee and Resistors Working Group provided

5   regular meetings and forums that Defendants used to exchange competitive information.  These

6   JEITA meetings were interspersed with one-on-one meetings and communications, such as when

7   Yoshinori Hourai of Panasonic met privately with a KOA representative on May 8, 2010, to discuss

8   carbon resistors, or when Keiichi Shimada of HDK Co. and Panasonic's Hourai exchanged emails on

9   September 1, 2008, in order to coordinate their response to requests from customers to reduce

10  resistor prices.

11          **6.     Senior-Level Executives Participated in the Collusive Discussions**

12          142.    Senior employees are generally expected to be more aware than junior employees,

13  through company-sponsored anti-trust trainings as well as from general experience, that sharing

14  competitively sensitive information with competitors is anticompetitive. Senior employees are also

15  more likely able to commit the company to collusive conduct or agreements than their juniors. Thus,

16  when collusive discussions occur among senior employees, this often indicates the existence of a

17  conspiracy.

18          143.    Virtually all of the conduct alleged in Section E was undertaken by management-level

19  employees or higher. For example, ROHM General Manager Hiroshi Kaida also served as Vice

20  Chairman of the JEITA Passive Components Business Committee and participated frequently in the

21  collusive discussions alleged in Section E. Akira Nonomura (KOA Corp.) became a Managing

22  Director in December 2009, and Kazuo Nomura (HDK Co.) was a Director since at least 2004, as

23  well as a Sales Manager. All three individuals, among others identified in Section E who held

24  Manager or Director-level positions, played principal and frequent roles in furthering the conspiracy.

25          **7.     Lack of Oversight or Safeguards**

26          144.    Direct communications among competitors have a high likelihood of being an

27  effective means to coordinate behavior.  Direct competitor communications are even more likely to

28  be collusive when they occur without the supervision of an attorney.

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW

145.     Here, Defendants freely exchanged competitive information directly with one another without the presence of an attorney.  Private emails and meetings gave rise to collusive discussions. For example, ROHM and Panasonic employees corresponded privately about ROHM's "plan to raise prices" charged to customer Nokia. Panasonic and HDK corresponded by email, with no attorney copied, about forecasted 2008 sales and market share of HDK, Panasonic, and other firms.

146.     Similarly, although HDK, Panasonic, KOA, and ROHM regularly shared company-specific information in and around JEITA Resistors Working Group and Passive Components Committee meetings, the records of these meetings do not reflect the presence of an attorney. Indeed, by July 2014, JEITA's leadership had become aware that its activities violated the antitrust laws.  During that month, JEITA distributed a handout to its members (including Panasonic) announcing an internal investigation into creating an antitrust compliance structure.  In particular, the Electronic Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

147.     Defendants ultimately recognized that their collusive discussions violated the antitrust laws, with JEITA announcing an internal investigation into its antitrust compliance policies, particularly in its Electronic Components Working Group, and KOA's Board of Directors candidly acknowledging that  "[b]usiness practices we are so accustomed to may no longer be deemed legitimate activities," and that it "we cannot get away by saying '[w]e did not know.'"

148.     By July 2014, JEITA's leadership also had become aware that its activities violated the antitrust laws. During that month, JEITA distributed a handout to its members (including Defendants) announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

**H.     Defendants' Conspiracy Worked: Prices Stabilized and Profitability Returned**

149.     Defendants' conspiracy had its intended effect. As shown in Figure 1, *supra*, the conspiracy successfully halted the decline in the price of Japanese resistors, and even achieved price increases above the pre-conspiracy levels.

1      150.   Defendants' conspiracy also succeeded in stabilizing and increasing the prices of

2  resistors purchased by United States original equipment manufacturers.  Figure 2 below shows the

3  United States resistor import price indexes for the two largest subcategories of imports, which are

4  corroborated by the most available data among all United States resistor imports – surface mount

5  resistors with 2 terminals (solid gold), and through hole resistors with two leads (solid green).

6  Dashed lines representing the Japanese export and producer price indexes have been superimposed.

7



151.   This data is based on publicly available information that may be confirmed by price

and export data in Defendants' possession.  However, even this limited data shows that the Japanese

and US import price indexes demonstrate declining prices through the late 1990s, stabilization or

apparent elevation around 2002-2003, followed by some decline through 2006, and a significant

increase after 2006.  This pattern is consistent with the time period of Defendants' collusion alleged

in Section E.

1

## VII.   CHARACTERISTICS OF THE RESISTORS MARKET

2        152.    The structure and characteristics of the resistors market is particularly conducive to a

3    price-fixing agreement, rendering allegations of collusion particularly plausible.  These factors are

4    discussed below.

5    **A.    Industry Concentration**

6        153.    A high degree of concentration facilitates coordination among co-conspirators.  The

7    fewer competitors in a market, the easier it is for those competitors to collude.  The resistors market

8    is highly concentrated.

9        154.    Defendants are the dominant players in the resistors market.  For example, in 2003,

10   Defendants KOA, ROHM, Kamaya, HDK, and Panasonic held approximately 51% of the market for

11   linear resistors.  Their market shares have remained fairly stable for more than a decade.

12       155.    Defendants possessed sufficient market share to impose price increases and ensure

13   price stabilization during the Class Period.

14   **B.    High Barriers to Entry**

15       156.    The presence of significant entry barriers to potential competitors that could otherwise

16   cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

17       157.    Companies seeking to manufacture and sell resistors, without having any prior

18   involvement in the resistors market, face various significant barriers to their entry.  Thus, those

19   fringe companies producing resistors could not sufficiently ramp up production to become large

20   enough to undermine Defendants' conspiracy.

21       158.    The barriers to entry for new market participants are quite high.  Barriers to entry into

22   the resistors markets include:  (i) patents; (ii) high research and development costs; (iii) capital costs

23   to build a manufacturing facility; (iv) investments in machinery and production lines; and

24   (v) maintenance of a sizable sales, marketing and technical support organization.

25       159.    Defendant KOA acknowledged the difficulty of entering into new resistor segments

26   stating in its business minutes, "Trying to do something new is much more difficult than I originally

27   thought, because of existing patents."

28

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW

160.    Likewise, leading resistors manufacturers have reported spending between 4-6% of revenue on research and development – the equivalent of millions if not hundreds of millions of dollars a year.

161.    New market entrants would need substantial start-up capital – exceeding hundreds of millions of dollars – in addition to access to production technology, raw materials, and sufficient supply chain commitments to warrant such a significant outlay of capital.

162.    The resistors manufacturing industry is a mature one dominated by established corporations, most having multinational operations, global market reach, and diverse product portfolios of all types of passive electrical components.  These companies – Defendants here – have significant experience in the global resistors industry and established reputations with both sellers of raw materials and purchasers of finished resistors.  These companies typically have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes.  This readily available access to capital also permits manufacturers like Defendants the ability to establish and secure necessary supply chain commitments for all raw materials they require.  Defendants are all established manufacturers in the resistors industry.

**C.    Inelastic Demand**

163.    Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.  Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

164.    As set forth above, resistors are critical to the manufacture of certain types of electrical circuits used in electronic devices.  Defendant KOA's own internal documents acknowledge that chip resistors are "the building block of almost all electronic circuits" and are used to improve the reliability and functionality of electrical components through the creation and maintenance of an optimal level of current.

165.   When there are few or no substitutes for a product, purchasers have little choice but to pay higher prices in order to produce their product.  Because OEMs, circuit assemblers, and third-party distributors regularly have inflexible production and delivery deadline commitments with their own customers, there often is no immediate substitute for resistors needed to make those commitments.  Indeed, no other type of passive electrical component (such as an inductor or capacitor) would be able to serve an equivalent function and thus to satisfy production and delivery demands Defendants' purchasers had no alternatives to linear resistors.

**D.    Interchangeable, Commodity-like Products**

166.   A commodity is a product that is standardized across suppliers allowing for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, market participants typically compete on the basis of price rather than other attributes such as product quality or customer service rendering it is easier for participants both to agree on prices for the product and to monitor these prices.

167.   In the resistors market, standardization is a key element in the design of electronic components such as resistors.  Indeed, both the International Electrical Commission ("IEC") and American National Standards Institute ("ANSI") promulgate standards denoting resistor sizes, values, markings, and measurement methods.  Resistors are mass-produced pursuant to these standardized manufacturing processes rendering them mutually interchangeable.

168.   Moreover, resistors of like resistance are interchangeable.  Thus, even if certain aspects of a given resistor differs, so long as the amount of resistance remains constant resistors are substitutable.

169.   Defendants are aware of the interchangeability of their products.  Defendants have even created cross-reference guides that list competitor's resistors by product number or technical and operational specifications with a corresponding reference to those resistors offered by Defendants that are interchangeable.

170.   Indeed, Defendants' own internal documents referred to thick film chip resistors as "commodity chips" and acknowledged the interchangeability of their resistor products.  For example,

2011 KOA minutes discuss ramp up of "commodity flat chip production," also referred to as "standard products," and distinguish these from high margin resistor products.

171.   Because resistors of like resistance are interchangeable, commodity-like products, in a competitive market, manufacturers would compete largely on the basis of price. Where, as here, prices have remained stable or increased, market conditions are suggestive of collusive conduct.

**E.      Declining Demand**

172.   Static or declining demand renders collusion more likely. Under normal business conditions, when faced with weak demand conditions firms will attempt to maintain sales by taking market share from competitors via price competition. Stable or increasing prices in the face of static or declining demand is yet another characteristic that is suggestive of anticompetitive conduct among market participants.

173.   As discussed more fully above, demand for resistors has steadily declined since the early 2000s both as a result of declining demand for consumer electronics and also due to technological trends favoring the smaller design of such electronics that, in turn, require fewer resistors. Despite these demand conditions, prices for resistors have remained relatively stable since 2003.

**F.      Excess Manufacturing Capacity**

174.   The existence of excess manufacturing capacity tends to have a negative correlation with price because manufacturers have the ability to steal share by lowering prices and increasing production. As witnessed in 2001, this trend is even stronger in an environment of declining demand because manufacturers have no choice but to compete for a smaller number of potential buyers. Where prices remain stable or rise in an environment of excess manufacturing capacity and declining demand, it becomes more likely that anticompetitive behavior is afoot.

175.   As described in more detail above, both before and during the Class Period, Defendants possessed excess manufacturing capacity and demand for resistors has steadily declined. However, after 2003, these market conditions did not result in dramatic price reductions. To the contrary, prices often remained stable or even rose. These pricing trends are suggestive of anticompetitive conduct.

1

### G.        Opportunities for Conspiring and Sharing Information

2           176.    Because of their common membership and participation in trade associations and

3    interrelated business relationships between certain executives, officers, and employees of the

4    Defendants, there were many opportunities both before and during the Class Period for Defendants

5    to collude by discussing competitive information regarding their resistors.

6           177.    Industry trade associations make a market more susceptible to collusive behavior

7    because they can provide a pretext under which conspirators can exchange sensitive company

8    information such as pricing and market allocation.

9           178.    A number of industry trade associations exist and count Defendants among their

10   members.  For example, Defendants are all members of the Japan Electronics and Information

11   Technology Industries Association ("JEITA"), a prominent trade organization.  Additionally,

12   Defendants were also members of the Passive Components Marketing Services group and the

13   Electronic Components Industry Association, trade associations that facilitated the conspiracy by

14   collecting and aggregating competitive information including sales in terms of dollars and units. The

15   aggregate data was then circulated to Defendants with a short time lag, allowing Defendants to

16   monitor each other's pricing.

17          179.    Defendants also attended various trade conferences that allowed them to meet without

18   drawing attention.  For example, the employees of Defendants regularly attended the Electronics

19   Distribution Show and the Consumer Electronics Show.  These trade shows provided numerous

20   opportunities for Defendants to meet privately to further the conspiracy.

21          180.    Additionally, many of the Defendants also manufactured other passive electronic

22   components, including capacitors.  These Defendants regularly met in secret to fix prices and

23   exchange confidential non-public information, and engage in cartel activity with respect to the

24   capacitors industry.  For example, Panasonic conspired in violation of the antitrust laws with

25   capacitor manufacturers, including at times Defendant ROHM, starting no later than January 1, 2003.

26   These meetings provided yet another opportunity for Defendants to further their conspiracy as to

27   resistors.

28

1

**VIII.   COMPETITION AUTHORITIES INVESTIGATE THE RESISTORS INDUSTRY**

2

181.    Competition authorities in the United States have recently launched an investigation

3

into the major participants in the resistors industry.  This is not the first time Defendants have been

4

the target of investigations involving alleged collusion.

5

182.    Indeed, the United States Department of Justice has targeted Panasonic/SANYO

6

several times in the last ten years for participating in price-fixing conspiracies involving automotive

7

parts and lithium ion battery cells.  As a result of these investigations, SANYO pleaded guilty for its

8

role in a conspiracy to fix prices on cylindrical lithium ion battery cells sold worldwide for use in

9

notebook computer battery packs, and agreed to pay a $ 10.731 million criminal fine.  Likewise,

10

Panasonic recently admitted its involvement in a six and a half year-long conspiracy to fix prices of

11

switches, steering angle sensors, and automotive high intensity discharge ballasts installed in cars

12

sold in the United States and elsewhere.  Panasonic agreed to pay a $45.8 million criminal fine, and a

13

number of its executives pled guilty in exchange for limited fines and imprisonment.

14

183.    Additionally, the EC Competition Authority has targeted Panasonic for its

15

participation in a price-fixing conspiracy involving CRT televisions and monitors.  Panasonic was

16

also named as a defendant in related U.S. civil litigation regarding a conspiracy to fix the prices of

17

CRT televisions and monitors.  As a result of that suit, Panasonic agreed to pay $17.3 million to

18

settle claims brought by direct purchasers.  Finally, Panasonic is also a defendant in U.S. civil

19

litigation regarding price fixing among TFT-LCD flat panel display manufacturers and was named as

20

a Defendant in litigation alleging price fixing in the market for hermetic compressors.

21

184.    In June 2008, Japan's Ministry of Economy, Trade and Industry issued a report on

22

Japanese companies' compliance with U.S. and European Union antitrust laws.  The report

23

recommended to companies participating in industry trade associations that "when prices and other

24

important business conditions are put forward in an industry association's meeting, they have to

25

leave the meeting by saying that 'we cannot discuss such kinds of subjects.'"  The purpose of this

26

report was to "call attention to overseas competition laws and to show key measures to be taken by

27

Japanese corporations."

28

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW

185.    In a follow-up report released in 2010, the Ministry noted that even after the publication of its report, "incidents of competition law violations related to cartels continued to occur."  The report warned that "it is difficult to conclude at the present time that there is a sufficient competition law compliance regime in place for Japanese trade associations.  Activities of trade associations, where competitors are in contact with one another, are high-risk activities from the perspective of competition law as they not only include formal discussion at trade associations' meetings but also informal contacts before and/or after these meetings."  Despite these warnings from their own competition authorities, JEITA members such as KOA, HDK, Panasonic, ROHM and Kamaya continued sharing company-specific competitive information such as price and production capacity during their frequent meetings.

186.    It has also been reported that competition authorities in Korea and Japan – the Korean Fair Trade Commission ("KFTC") and Japanese Fair Trade Commission ("JFTC") – recently conducted on-site investigations and raids at some of the Defendants' offices.

## IX.    FRAUDULENT CONCEALMENT

187.    Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 2015, when foreign competition authorities began investigating the industry.

188.    Defendants recognized the unlawful nature of their conspiracy and took steps to conceal it.  For example, recognizing the collusive nature of discussions within the JEITA Passive Components Business Committee and its Resistors subcommittees, the Committee in 2008 changed the entries on its meeting minutes to begin referring to "information exchange concerning general market conditions" instead of "information exchange conducive to corporate management," as it had previously, in order to conceal participants' ongoing collusive discussions including individual companies' resistor prices, sales, and production capacity.  JEITA meetings were held in private settings and their minutes were not made public.

189.    Key participants in the conspiracy concealed their activities by warning each other to treat collusive discussions as "confidential," by referring to co-conspirators with code words, and by reminding their co-conspirators to not distribute evidence of their competitive information exchanges

outside the conspiracy.  For example, ROHM exchanged price information for the sale of resistors to customer Nokia with Panasonic in September 2006.  As reported by Yoshinori Hourai, the Panasonic employee who received Nokia's price information, "[y]esterday, related to handling prices for Nokia, I had GM Hashimoto contact the person responsible for General Global at R Co." "R Co.," as used in Hourai's email, was code for competitor "ROHM."  Hourai wrote to participants not to forward this information because it was "confidential."

190.    Similarly, Yoshihiro Hashimoto of Panasonic emailed Panasonic employees Kazuo Sakami, Koichiro Nojiri, and Nobuo Nakayami, styling his email "Confidential Competitor Information (KOA)."  In the email, Hashimoto reported detailed information about KOA's monthly production volume for carbon resistors, metal oxide resistors, and cement winding resistors, its strategies to supply foreign vs. domestic products, and KOA's average sale price of 0.30 for carbon resistors.  Hashimoto used code words, adding that he also met with "R. Co," code for "ROHM."

191.    When distributing his notes on a discussion with Defendant Kamaya and other JEITA participants about available capacity, volume, and prices, Panasonic's Hiroaki Kamioka entitled his message "Same Industry Information (Confidential)."  He wrote, "[t]his is an information memo from when I participated in a meeting with another company in the same industry last week.  Please handle with care."

192.    Again, Panasonic's Yoshinori Hourai reported the details of a collusive discussion in which Rohm, KOA, HDK, and Panasonic exchanged current resistor sales information during an August 2011 meeting of the JEITA Passive Components Committee.  Recognizing the collusive nature of this discussion with competitors, Hourai instructed recipients of his report not to forward it to others.

193.    Because Defendants' alleged conspiracy was kept secret until at least July 2015, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for resistors throughout the United States during the Class Period.

194.    Moreover, Defendants' concerted pricing remained unnoticed for many reasons including the facts that pricing for these resistors changes frequently and the sheer number and variety of resistors rendered it difficult to track market-wide movement in pricing.

195.    By its very nature, Defendants' conspiracy was inherently self-concealing.  Resistors are not exempt from antitrust regulation, and thus, before July 2015, Plaintiff reasonably considered the resistors industry to be a competitive industry.

196.    Under the circumstances surrounding Defendants' collusive practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' linear resistors prices before July 2015.

197.    Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

198.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 2015, when investigations by foreign competition authorities of the resistors industry were first made publicly known.

199.    None of the facts or information available to Plaintiff and members of the Class prior to July 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

200.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

201.    Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning resistors, which they affirmatively concealed, at least in the following respects:

(a)    By communicating secretly to discuss output and prices of resistors;

(b)    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

(c)    By attributing pricing to reasons other than their anticompetitive agreement; and

(d)    By falsely describing the market for resistors as competitive.

202.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Class's claims have been tolled.

## X.    EFFECTS OF THE CONSPIRACY

203.    Because of Defendants' illegal conspiracy, Plaintiff and the Class have been injured in their business or property because they have paid more for linear resistors than they otherwise would have in a competitive market.

204.    Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)    price competition in the resistors market has been artificially restrained;

(b)    prices for resistors sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

(c)    purchasers of resistors from Defendants have been deprived of the benefit of free and open competition in the resistors market.

## XI.    CLASS ALLEGATIONS

205.    Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 (a), (b)(2) and (b)(3), on behalf of a similarly situated Class, which is defined as follows:

> All persons in the United States who purchased linear resistors (including through controlled subsidiaries, agents, affiliates or joint-ventures) directly from any of the Defendants, their subsidiaries,

agents, affiliates or joint ventures from July 9, 2003 through August 1, 2014 (the "Class Period").

206.    The following persons or entities are excluded from the Class: Defendants and their co-conspirators, Defendants' parent companies and their subsidiaries, agents or affiliates, Defendants' officers, directors, management, employees, subsidiaries, agents or affiliates, and federal governmental entities and instrumentalities of the federal government.

207.    The Class encompasses persons and entities who purchased linear resistors directly from any of the Defendants, even if those linear resistors were manufactured, sold, or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

208.    Plaintiff believes that there are hundreds of Class members located throughout the United States, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

209.    Questions of law or fact common to the Class include:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy to restrict output and fix, raise, maintain, or stabilize the prices of linear resistors sold in the United States;

(b)    The identity of the conspiracy's participants;

(c)    The duration of the conspiracy alleged herein and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)    Whether Defendant fraudulently concealed their conspiracy from resistors purchasers in the United States;

(f)    Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to the business and property of Plaintiff and the other Class members;

(g)    The effect of the conspiracy on the prices of resistors sold in the United States during the Class Period;

(h)    The appropriate Class-wide measure of damages; and

1       (i)     Whether Plaintiff and members of the Class are entitled to injunctive relief

2    and, if they are, the appropriate injunctive relief in this matter.

3       210.    These and other questions of law and fact are common to the Class and predominate

4    over any questions affecting the Class members individually.

5       211.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly

6    and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly

7    affected by Defendants' wrongful conduct in violation of the antitrust laws, in that they paid

8    artificially inflated prices for products purchased directly from Defendants or their co-conspirators.

9    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the

10    other Class members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the

11    other Class members.

12       212.    Plaintiff is represented by competent counsel experienced in the prosecution of

13    antitrust and class action litigation.

14       213.    The prosecution of separate actions by individual members of the Class would create

15    a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

16    Defendants.

17       214.    A class action is superior to other available methods for the fair and efficient

18    adjudication of this controversy.  The Class is readily definable.  Prosecution as a class action will

19    eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large

20    number of similarly situated persons to adjudicate their common claims in a single forum

21    simultaneously, efficiently, and without the duplication of effort and expense that numerous

22    individual actions would engender.  This action presents no difficulties in management that would

23    preclude maintenance as a class action.

24             **XII.   CAUSE OF ACTION**

25           **SHERMAN ACT VIOLATION § 1 15 U.S.C. § 1**

26              **(Alleged Against All Defendants)**

27       215.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding

28    paragraphs of this Complaint.

216.     Beginning at least as early January 1, 2005, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for linear resistors in the United States, and entered into a continuing agreement, understanding and conspiracy in restraint of trade to exchange information regarding output and production capacity that had the effect of restricting output and of fixing, raising, maintaining, or stabilizing the prices of resistors.

217.     Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiff and Class members have paid more for resistors than they otherwise would have paid in the absence of Defendants' conduct.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

218.     Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

B.     That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.     That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW

1    D.    That Plaintiff and the Class recover pre-judgment and post-judgment interest as

2 permitted by law.

3    E.    That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as

4 provided by law.

5    F.    That Defendants be enjoined from continuing their participation in the alleged

6 conspiracy.

7    G.    For such other and further relief as is just and proper under the circumstances.

8                                **JURY TRIAL DEMANDED**

9    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the

10 claims asserted in this complaint so triable.

11 DATED: October 3, 2017                    HAGENS BERMAN SOBOL SHAPIRO LLP

12

13                                          By _____ s/ Jeff D. Friedman _____
                                                    JEFF D. FRIEDMAN
14
                                            Jeff D. Friedman (173886)
15                                          Shana E. Scarlett (217895)
                                            Benjamin J. Siegel (256260)
16                                          715 Hearst Avenue, Suite 202
                                            Berkeley, CA 94710
17                                          Telephone: (510) 725-3000
                                            Facsimile:  (510) 725-3001
18                                          jefff@hbsslaw.com
                                            shanas@hbsslaw.com
19                                          bens@hbsslaw.com

20                                          Steve W. Berman (*pro hac vice*)
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
21                                          1918 Eighth Avenue, Suite 3300
                                            Seattle, WA 98101
22                                          Telephone: (206) 623-7292
                                            Facsimile:  (206) 623-0594
23                                          steve@hbsslaw.com

24
                                            By _____ s/ Kit A. Pierson _____
25                                                  KIT A. PIERSON

26                                          Daniel A. Small (*pro hac vice*)
27                                          Emmy L. Levens (*pro hac vice*)
                                            Robert A. Braun (*pro hac vice*)
28                                          Laura Alexander (255485)

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT- Case No.: 15-cv-03820-RMW                      - 54 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
dsmall@cohenmilstein.com
elevens@cohenmilstein.com
rbraun@cohenmilstein.com
lalexander@cohenmilstein.com

*Co-Lead Counsel for Direct Purchaser Plaintiffs*