Jeffrey L. Kessler (*pro hac vice*)
jkessler@winston.com
Eva W. Cole (*pro hac vice*)
ewcole@winston.com
Erica C. Smilevski (*pro hac vice*)
esmilevski@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700

Ian L. Papendick (SBN 275648)
ipapendick@winston.com
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Telephone:  (415) 591-1000
Facsimile:  (415) 591-1400

Brandon W. Duke (*pro hac vice*)
bduke@winston.com
**WINSTON & STRAWN LLP**
1111 Louisiana Street, 25th Floor
Houston, TX 77002
Telephone:  (713) 651-2636
Facsimile:  (713) 651-2700

*Counsel for Defendant Panasonic*
*Corporation of North America.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Resistors Antitrust Litigation* | Case No. 3:15-cv-03820-JD |
| | |
| This Document Relates To: | **U.S. SUBSIDIARY DEFENDANTS' CONSOLIDATED MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| ALL DIRECT PURCHASER ACTIONS | **ORAL ARGUMENT REQUESTED** |
| | Date:  January 18, 2018 |
| | Time:  10:00 AM |
| | Judge:  Hon. James Donato |
| | **Location:  Courtroom 11** |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION TO DISMISS ..................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 3

LEGAL STANDARD ................................................................................................. 4

ARGUMENT ............................................................................................................. 4

I.    DPPs Have Not Alleged that the U.S. Subsidiary Defendants Participated in the Purported Conspiracy ................................................................................... 4

II.   DPPs Fail to Allege that the U.S. Subsidiary Defendants Are Vicariously Liably Under Either Alter Ego or Agency Theories ................................................... 5

III.  Defendant-Specific Arguments ........................................................................ 5

      A.   DPPs Have Failed to Plausibly Allege PNA's Participation in the Purported Conspiracy ................................................................................ 5

      B.   DPPs Have Failed to Allege that HDK America Joined and Played a Role in a Conspiracy ............................................................................... 10

      C.   DPPs Have Failed to Plausibly Allege KOA Speer's Participation in the Purported Conspiracy ......................................................................... 11

      D.   DPPs Have Failed to Plausibly Allege Kamaya, Inc.'s Participation in the Purported Conspiracy ......................................................................... 13

           1.   Kamaya, Inc. Did Not Join or Play a Role in Any Conspiracy .......... 13

           2.   DPPs Fail to Allege that Kamaya, Inc. is the Alter Ego or Agent of Kamaya Electric .......................................................................... 15

                a.   DPPs Cannot Allege that Kamaya, Inc. is the Alter Ego of Kamaya Electric ............................................................... 16

                b.   DPPs Cannot Allege that Kamaya, Inc. is the Agent of Kamaya Electric ............................................................... 17

CONCLUSION ........................................................................................................ 18

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................3

*In re Baby Food Antitrust Litig.,*
166 F.3d 112 (3d Cir.1999).......................................................................11, 15

*Bell Atlantic Corp. v. Twombly.*
550 U.S. 544 (2007).............................................................................1, 3, 4, 18

*Calvert v. Huckins,*
875 F. Supp. 674 (E.D. Cal. 1995)............................................................17

*In re Capacitors Antitrust Litig.,*
106 F. Supp. 3d 1051 (N.D. Cal. 2015) ......................................... *passim*

*In re Capacitors Antitrust Litig.,*
154 F. Supp. 3d 918 (N.D. Cal. 2015) .................................................4, 7, 9, 10

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
738 F. Supp. 2d 1011 (N.D. Cal. 2010) ........................................7, 15, 16

*In re Citric Acid Litig.,*
191 F.3d 1090 (9th Cir. 1999) .................................................6, 9, 11, 12

*E. & J. Gallo Winery v. EnCana Energy Servs., Inc.,*
No. 03-5412, 2008 WL 2220396 (E.D. Cal. May 27, 2008) .................5

*In re Flash Memory Antitrust Litig.,*
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...............................................11

*Gerritsen v. Warner Bros. Entm't, Inc,*
116 F. Supp. 3d 1104 (C.D. Cal. 2015) ...............................................17

*In re Graphics Processing Units Antitrust Litig,*
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................7, 9, 11

*Indus. Bldg. Materials, Inc. v. Interchem. Corp.,*
427 F.2d 1336 (9th Cir. 1970) ...............................................................15

*ING Bank v. Ahn,*
758 F. Supp. 2d 936 (N.D. Cal. 2010) .................................................18

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008) .............................................................4, 12

*Krehl v. Baskin-Robbins Ice Cream Co.,*
664 F.2d 1348 (9th Cir. 1982) .............................................................3, 14

*In re Lithium Ion Batteries Antitrust Litig.,*
2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)................................................................7, 9

*In re Lithium Ion Batteries Antitrust Litig.,*
No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014).............................5, 8, 11, 12

*In re Musical Instruments & Equip. Antitrust Litig.,*
798 F.3d 1186 (9th Cir. 2015)........................................................................15

*Neilson v. Union Bank of Cal., N.A.,*
290 F. Supp. 2d 1101 (C.D. Cal. 2003) .........................................................5, 16, 17

*RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA),*
338 F. Supp. 2d 1208 (D. Colo. 2004)..................................................................7, 11

*Sherman v. British Leyland Motors, Ltd.,*
601 F.2d 429 (9th Cir. 1979) ...........................................................................5

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.,*
622 F. Supp. 2d 890 (N.D. Cal. 2009) .............................................................5, 17, 18

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.,*
738 F. Supp. 2d 505 (D. Del. 2010).....................................................................15

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...........................................................4, 12, 15

*United States v. Bestfoods,*
524 U.S. 51 (1998)...................................................................................5

*Wady v. Provident Life & Accident Ins. Co. of Am.,*
216 F. Supp. 2d 1060 (C.D. Cal. 2002) ...............................................................17

**Other Authorities**

Fed. R. Civ. P. 8(a) ...................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................1

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on January 18, 2018, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 11, 19th Floor, 450 Golden Gate Avenue, before the Honorable James Donato, Defendants HDK America, Inc. ("HDK America"), Kamaya, Inc., KOA Speer Electronics, Inc. ("KOA Speer"), Panasonic Corporation of North America ("PNA"), and ROHM Semiconductor U.S.A. ("ROHM USA") (together, the "U.S. Subsidiary Defendants") will and hereby do move the Court, pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint (the "Second Amended Complaint" or "SAC") for failure to state a claim that satisfies the pleading standards of *Bell Atlantic Corp. v. Twombly*. 550 U.S. 544 (2007); *see also* Order re Motions to Dismiss at 6, ECF No. 326 ("MTD Order") (an antitrust complaint "must allege that each individual defendant joined the conspiracy and played some role in it"); *In re Capacitors Antitrust Litig. ("Capacitors I")*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (dismissing certain defendants' U.S. subsidiaries for failure to allege each individual defendant joined and played a role in the alleged conspiracy).

Pursuant to the Stipulation and [Proposed] Order re Case Schedule, ECF No. 336, submitted on October 17, 2017, the U.S. Subsidiary Defendants may file a single, consolidated brief in support of their dismissal under Rule 12(b)(6) from the amended complaints of each of the Plaintiff groups, which may contain up to five pages of argument per Defendant. The U.S. Subsidiary Defendants accordingly incorporate and adopt by reference the motion and arguments in the U.S. Subsidiary Defendants' Motion to Dismiss the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint and present their respective individual arguments in this consolidated motion and brief. This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the complete files and records in these consolidated actions, oral argument of counsel, and such other and further materials and arguments as the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

1.       Whether the Second Amended Complaint fails to state a claim against PNA;

2.       Whether the Second Amended Complaint fails to state a claim against ROHM USA;

3.       Whether the Second Amended Complaint fails to state a claim against HDK America;

4.       Whether the Second Amended Complaint fails to state a claim against KOA Speer; and

5.       Whether the Second Amended Complaint fails to state a claim against Kamaya, Inc.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Direct Purchaser Plaintiffs' ("DPPs") claims against the U.S. Subsidiary Defendants should be dismissed because DPPs fail, once again, to plausibly allege the involvement of any of the U.S. Subsidiary Defendants in the purported conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Despite the Court's clear instructions, DPPs plead only the barest conclusory allegations of the U.S. Subsidiary Defendants' participation in the purported conspiracy, which are again insufficient to state a claim for the same reasons set forth in the MTD Order. *See* MTD Order at 6. For example, DPPs rely on allegations that certain PNA employees purportedly received reports of trade association meetings but have failed to set forth a ***single*** allegation that employees of PNA actually participated in any collusive conduct. With respect to ROHM USA, DPPs rely on a single allegation that a ROHM USA employee sent one email to her colleagues at ROHM affiliates that referenced "pricing information," while failing to allege how that email suggests any collusive conduct by ROHM USA. As to Kamaya, Inc. and KOA Speer, at most, DPPs allege that employees of these companies exchanged business information. DPP-SAC ¶¶ 93-95. But it is well-established in the Ninth Circuit that allegations of information exchanges alone do not amount to participation in or joining of a conspiracy. *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982).

Without any facts supporting the U.S. Subsidiary Defendants' direct participation in the purported conspiracy, DPPs instead rely on formulaic and conclusory allegations that the Defendant families held themselves out as single entities and that the parent companies exercised business and pricing control over their subsidiaries. However, without any additional factual support, these allegations cannot not save the Second Amended Complaint. Critically, DPPs have failed to allege a conscious decision by any of the U.S. Subsidiary Defendants to join and participate in the purported conspiracy. Consistent with the Court's prior decision, this Court should dismiss DPPs' claims against the U.S. Subsidiary Defendants with prejudice.

**LEGAL STANDARD**

The applicable legal standard is set forth in the U.S. Subsidiary Defendants' Motion to Dismiss the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint (the "Motion to Dismiss IPPs' Amended Complaint").

**ARGUMENT**

**I.     DPPs Have Not Alleged that the U.S. Subsidiary Defendants Participated in the Purported Conspiracy**

In a conspiracy case, the plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Plaintiffs must also allege "evidentiary facts . . . which could prove the [alleged] conspiracy." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008) (pleading only ultimate facts, such as conspiracy and legal conclusions, fails to meet the requisite standard). To meet this burden, DPPs must plead "who, did what, to whom (or with whom), where, and when." *Id*. at 1048.

As this Court has explained, "at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." MTD Order at 6 (quoting *In re Capacitors Antitrust Litig. ("Capacitors I")*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (emphasis added).[1] To plausibly allege participation in an antitrust conspiracy, DPPs "must allege that each individual defendant joined the conspiracy and played some role in it." *Id*.; *see also Capacitors I*, 106 F. Supp. 3d at 1066 (dismissing certain U.S. subsidiary defendants for failure to allege each individual defendant joined and played a role in the alleged conspiracy). This standard is well-established within the Ninth Circuit. *See Kendall*, 518 F.3d at 1048; *In re TFT-LCD (Flat Panel) Antitrust Litig. ("TFT-LCD")*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (dismissing complaint where plaintiff set forth "general allegations as to all defendants, to 'Japanese Defendants,' or to a single corporate entity" as insufficient); *In re Lithium Ion Batteries Antitrust Litig. ("Batteries I")*, No. 13-MD-2420 YGR, 2014 WL 309192, at *13 (N.D. Cal. Jan. 21, 2014) (granting seven motions to dismiss by American subsidiaries because the complaints lacked any "plausible allegations" that "the American

---

[1] Unlike this case, there were a number of indictments and guilty pleas in *Capacitors*. *See, e.g.*, Letter from Mikal J. Condon re: United States Status Report 10/18/2017 at 1, *In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, ECF No. 1904.

subsidiaries themselves made a conscious decision to conspire with their Korean or Japanese parents"). Absent any allegations that the U.S. Subsidiary Defendants themselves participated in the purported conspiracy, DPPs' Second Amended Complaint cannot stand.

## II. DPPs Fail to Allege that the U.S. Subsidiary Defendants Are Vicariously Liably Under Either Alter Ego or Agency Theories

Without plausible allegations of direct participation, DPPs attempt to impute conduct by the Japanese corporate parent Defendants to the U.S. Subsidiary Defendants by peppering their Second Amended Complaint with language such as "agent," "control," and "dominate." *See, e.g.*, DPP-SAC ¶¶ 62, 184-85, 188-89. Courts have long recognized that "[t]he independence of a subsidiary from [its] parent corporation is to be presumed." *E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, No. 03-5412, 2008 WL 2220396, at *5 (E.D. Cal. May 27, 2008); *see also Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 441 (9th Cir. 1979); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."). Accordingly, such conclusory pleading falls far short of DPPs' burden to allege a claim against the U.S. Subsidiary Defendants based on vicarious liability theories.[2]

## III. Defendant-Specific Arguments

### A. DPPs Have Failed to Plausibly Allege PNA's Participation in the Purported Conspiracy

DPPs' Second Amended Complaint does not include any allegation that any employee of PNA had any communications with any competitors—let alone any participation in collusive

---

[2] Though DPPs do not explicitly say so in their Second Amended Complaint, it appears that DPPs attempt to allege that the U.S. Subsidiary Defendants act as either (1) the alter egos of their respective corporate parents or (2) the agents of their respective corporate parents. *See, e.g.*, DPP-SAC ¶¶ 62, 184-85, 188-89. DPPs' allegations contain fatal legal flaws that do not permit this Court to make such findings. *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003) ("Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, [P]laintiff[s] must allege specifically both of the elements of alter ego liability, as well as facts supporting each."); *see also Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009) (citing Restatement (Third) of Agency § 1.01) (restating the traditional common law agency test: "(1) manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking"). DPPs plead no facts that any of the U.S. Subsidiary Defendants wanted their parent corporations to act on their behalf, or that any of the Japanese parent corporations accepted any invitations to act for the U.S. Subsidiary Defendants (or *vice versa*).

contacts with any competitors—which requires dismissal of DPPs' claims against PNA for the reasons set forth in the MTD Order. *See* MTD Order at 6. Instead, DPPs rely only on the allegation that employees of Panasonic Corporation ("Panasonic Corp.") sent reports of trade association meetings to employees of PNA. DPP-SAC ¶¶ 115-16; 122. In this regard, the only specific allegations concerning PNA are as follows:

- "[E]mployees of the parent corporations regularly sent JEITA meeting reports to employees of their U.S. subsidiaries. As an example, Howard Takiguchi of PNA was a routine recipient of JEITA meeting reports sent to him by other Panasonic employees." DPP-SAC ¶ 122.

- "In November 2012, Panasonic Corp. employees emailed multiple employees of Panasonic corporate family members, including Howard Takiguchi of PNA, regarding linear resistor data gathered from JEITA. That data included monthly sales and volume information by model and region. Takiguchi was grateful for the information, but he also remarked that the JEITA 'information exchange' in the past seemed better, perhaps because now it was 'acknowledged as a compliance issue' and the prior 'kind of information exchange itself is becoming difficult under fair trade law, so a valuable place for industry exchange has been watered down.' Takiguchi concluded that it might be 'best to think of another method.'" DPP-SAC ¶ 115.

- "Despite these concerns, employees of KOA, Panasonic, and other companies participated in a July 31, 2013 JEITA meeting in which KOA disclosed to its competitors detailed information on KOA's second-quarter sales performance in comparison to the previous period, in furthering their agreement to eliminate competition. Reporting on this meeting to employees of, *inter alia*, Panasonic Corp. and PNA (Takiguchi), Panasonic's Hourai noted that KOA often talks about its sales to North America in meetings with Panasonic. PNA's Takiguchi responded to Hourai and others about KOA Speer's share of sales for vehicle customers." DPP-SAC ¶ 116.

But these allegations are insufficient to plausibly allege that PNA ***joined and participated*** in the purported conspiracy. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (finding defendant did not have a role in price-fixing conspiracy where defendant "attended meetings and had telephone conversations with individuals" that led the conspiracy, and refusing to "infer participation in the conspiracy from the opportunity to do so"); *In re Graphics Processing Units Antitrust Litig* ("*GPU*")., 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (explaining that a defendant's mere interaction with competitors who "have admitted to meeting to fix prices" is not grounds to infer that the defendant "was part of the conspiracy"). As DPPs do not (and cannot) allege that any PNA employee attended any of the alleged meetings or otherwise participated in the conspiracy, their allegations must fail. *Compare* DPP-SAC ¶¶ 115-16, *with Capacitors I*, 106 F. Supp. 3d at 1069

(denying motion to dismiss with respect to defendant that was alleged to be included in "'[m]eeting rosters during the period from 2003 to 2008' for 'cartel meetings'" where those representatives were "alleged to have attended at least one meeting").[3]

Moreover, as set forth in the Motion to Dismiss IPPs' Amended Complaint, there is no authority for the proposition that DPPs can state a claim against PNA on the basis of the conclusory allegation that employees of Panasonic Corp. attended purported conspiratorial meetings on behalf of their corporate families. *Compare* DPP-SAC ¶¶ 78-79, *with In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 929, 933 (N.D. Cal. 2015) ("*Capacitors II*") (including numerous allegations of specific participation of U.S. subsidiary defendants in competitor meetings); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1017 (N.D. Cal. 2010) (same); *In re Lithium Ion Batteries Antitrust Litig.* ("*Batteries II*"), 2014 WL 4955377, at *34 (N.D. Cal. Oct. 2, 2014) (same). Finally, having failed to plausibly allege that PNA joined and participated in the purported conspiracy, DPPs' allegations that PNA sold linear resistors on behalf of Panasonic Corp., which allegedly had ownership and control over PNA and controlled PNA's pricing, do not save the Second Amended Complaint for the same reasons as set forth in the Motion to Dismiss IPPs' Amended Complaint. *See* DPP-SAC ¶¶ 124-25, 127-28; *Capacitors I*, 106 F. Supp. 3d at 1066-70; *Cal. Title Ins.*, 2009 WL 1458025, at *7-8 (N.D. Cal. May 21, 2009); *RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1216 (D. Colo. 2004); *Batteries I*, 2014 WL 309192, at *13.

Despite having had ample opportunity to review over two and a half million documents produced by Defendants, DPPs have failed once again to plausibly allege that PNA participated in the purported conspiracy. Accordingly, DPPs' claims with respect to PNA should be dismissed with prejudice.

**B.**       **DPPs Have Failed to Plausibly Allege ROHM USA's Participation in the Alleged Conspiracy**

The Court should dismiss DPPs' claims against ROHM USA for the same reasons explained

---

[3] As the Court explained in *Capacitors I*, membership in a trade association "adds nothing to the analysis" of whether plaintiffs have plausibly alleged a defendant's participation in an antitrust conspiracy. *See* 106 F. Supp. 3d 1051 at 1069. Simply receiving reports of trade association meetings adds even less to support allegations that a party joined a conspiracy.

1   by PNA above.

2      First, DPPs fail to allege a single evidentiary fact showing that ROHM USA participated in

3   the alleged conspiracy. Despite the Court's clear guidance that DPPs must allege that each

4   Defendant "joined the alleged conspiracy and played some role in it," DPPs have not done so. MTD

5   Order at 6. Rather than make any specific factual allegations regarding ROHM USA's allegedly

6   collusive contacts, DPPs make only a single allegation that, in 2006, an employee of ROHM USA

7   emailed colleagues at ROHM USA's affiliates "regarding pricing information she had acquired from

8   ROHM's Japanese competitors."[4] DPP-SAC ¶ 85. Notably, DPPs do not allege that the "pricing

9   information" that had been acquired was at all improper, failing even to specify whose pricing

10  information was acquired (i.e. customer, competitor, or otherwise). Apart from this allegation, DPPs

11  add only allegations about ROHM USA's pricing policies, staffing, and communications with

12  ROHM Co. DPP-SAC ¶¶ 124, 127. These allegations include:

13  
14
- "A 2008 email reflected that ROHM has 'unified worldwide sales prices for individual product.'" DPP-SAC ¶ 124.

15
16
- "A May 2010 email between employees of ROHM Co. and ROHM USA reflected ROHM Co.'s policy of approving bidding prices by ROHM USA during an online bidding event." DPP-SAC ¶ 124.

17
18
19
- "Numerous emails during the class period that included employees of ROHM USA and ROHM Co. show ROHM Co. employees asking ROHM USA for reports on competitors' pricing, including for Defendants in this case (such as Panasonic and KOA), and ROHM USA reporting the information." DPP-SAC ¶ 124.

20
21
22
- "In an April 2014 email, ROHM Co. requested that ROHM USA provide explanations for sales and price adjustments at particular customers so that they could be discussed among ROHM Co.'s upper management for decisions moving forward." DPP-SAC ¶ 124.

23
24
- "Other employees of Defendants with resistors-related responsibilities who were seconded to the United States during the Class Period include, but are not limited to, … ROHM's Hiroshi Ikeda and Hide Teramoto." DPP-SAC. ¶ 127.

25  These allegations do not amount to specific factual allegations that ROHM USA joined or

26

27  _____

    [4] In the same paragraph, DPPs allege both that the email was sent in *2006* and that the email was
28  sent on May 17, *2016*. The 2016 date appears to be a typo, as the email to which DPPs refer was
    sent on May 17, 2006. DPP-SAC ¶ 85.

participated in the alleged conspiracy. Without any specific facts, DPPs' conclusory claims against ROHM USA are not plausible. *See In re Citric Acid*, 191 F.3d at 1103; *GPU*, 527 F. Supp. 2d at 1023.

Second, neither DPPs' allegations regarding the relationship between ROHM USA and its Japanese affiliate—ROHM Co., Ltd. ("ROHM Co.") or DPPs' unsupported conclusory allegation that participants in the alleged conspiracy were acting on behalf of entire corporate families make up for this omission. In *Capacitors II*, where the Court found that plaintiffs' allegations against a specific U.S. subsidiary were sufficient, the Court noted that the plaintiffs there had "provide[d] specific factual examples of these allegations from e-mails and other documents [plaintiffs] have been able to gather thus far." 154 F. Supp. 3d at 929. That was also the case in *In re Lithium Ion Batteries Antitrust Litigation*, which the Court relied on in *Capacitors II*. 2014 WL 4955377, at *34. DPPs have provided no such "specific factual examples" here. Rather, unlike in *Capacitors II*, DPPs make only general allegations about the business and pricing relationship between ROHM Co. and ROHM USA, none of which is improper. DPPs ask the Court to infer that the participants in the alleged conspiracy were acting on behalf of their entire corporate families, despite no direct allegations of independent improper conduct by ROHM USA. Despite having had access to millions of documents, DPPs do not allege that any ROHM USA employees were involved in any conspiratorial conduct. Without allegations of any conspiratorial conduct by ROHM USA, or any "specific factual examples" supporting their allegations that participants were acting on behalf of ROHM USA, it is not plausible to infer that any alleged conspiratorial acts were undertaken on behalf of ROHM USA, and the Court should decline to make such an inference. *Capacitors II*, 154 F. Supp. 3d at 929.

**B.    DPPs Have Failed to Allege that HDK America Joined and Played a Role in a Conspiracy**

As was the case in DPPs' Original Class Action Complaint, DPPs' allegations against HDK America leave much to be desired.  DPPs' Second Amended Complaint fails to present a single factual allegation that HDK America committed a conspiratorial or even wrongful act.  DPPs instead ask this Court to jump to the conclusion that HDK America joined and participated in a conspiracy with its competitors merely based upon one HDK America employee's attendance at trade association sponsored social events and an invitation to meet at a Japanese gastropub.  DPP-SAC ¶¶ 89,119, 126.  Specifically, DPPs allege the following as it pertains to HDK America:

- "In October 2007, Susumu USA's Thomas Nagashima emailed HDK America's Kenny Nakagawa, informing him that he would be in Chicago on a business trip and asked, "Shall we exchange information on the evening of 11/1 or afternoon on the 2nd, if you're available?" Nakagawa replied, copying other HDK America and Susumu USA employees, that it has been a while and suggested a meeting on 11/1 at an izakaya, which is a type of informal Japanese gastropub." DPP-SAC ¶89.

- "In April 2014, KOA's Hideaki Matsushita sent an email to members of a Singapore golf group that included employees of multiple other defendants, including HDK America's Makoto Hase.  He thanked them for the get together the previous evening and stated that another meeting was planned for April 22, 2014." DPP-SAC ¶119.

- "For instance, HDK's Makoto Hase – who had participated for years in golf matches and social events with employees of other Defendants (including ROHM, KOA and the subsidiaries of each) as part of the "Singapore Golf Boys" – was seconded to HDK America in 2010.  After Hase announced his secondment to employees of ROHM, KOA, and other Japanese electronics managers, KOA Corp.'s Nonomura provided Hase with his cell phone number and asked Hase to contact him if he visited Singapore.  Hase responded by thanking Nonomura and asking that they "continue to exchange information" even though Hase had moved to the United States.  In another 2010 email, Hase provided his U.S. cell phone information to representatives of KOA, ROHM, HDK, and their subsidiaries, and invited them to contact them when they travelled to the United States on business.  Hase stayed on the Singapore Golf Boys email list at least as late as 2015 and continued to ask employees of Defendants to contact him on visits to the United States.  For example, in July 2013, Hase asked KOA's Matsushita to reach out to him on the latter's next trip to the United States." DPP-SAC ¶ 126.

DPPs allegations against HDK America do not pass muster.  Communicating with competitors without more is not an antitrust violation.  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1143 (N.D. Cal. 2009) ("Nevertheless, there is nothing inherently improper with

competitors communicating with one another."); *see In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir.1999) ("communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise.'"). DPPs do not allege one single fact that supports the inference that these communications rise to the level of an agreement. DPPs' allegation that Nagashima and Nakagawa met to "exchange information" is a red herring. The mere exchanging of information is not an antitrust violation. *In re Baby Food*, 166 F.3d at 118. Even assuming that information was exchanged, DPPs' allegation on its face is not sufficient to establish that HDK America joined and participated in the purported conspiracy. DPPs then point to Makoto Hase's participation in the Singapore Golf Boys group as factual support for their claims against HDK America. However, for the same reasons as articulated above these allegations fail to support DPPs' claims.

As a matter of law these claims are insufficient and do not plausibly allege that HDK America joined and participated in a conspiracy. *See In re Citric Acid*, 191 F.3d at 1103; *GPU*, 527 F. Supp. 2d at 1023. Similarly, DPPs' contentions that HDK controlled HDK America's policies and pricing do not allow the Second Amended Complaint to survive a motion to dismiss. *See* DPP-SAC ¶¶ 124-26, 128; *Capacitors I*, 106 F. Supp. 3d at 1066-70; *Cal. Title Ins.*, 2009 WL 1458025, at *7-8; *RSM Prod. Corp.*, 338 F. Supp. 2d at 1216 (D. Colo. 2004); *Batteries I*, 2014 WL 309192, at *13. DPPs allegations against HDK America have yet again fallen short of the well-established and articulated pleading standards. For these reasons, all claims against HDK America should be dismissed.

**C.    DPPs Have Failed to Plausibly Allege KOA Speer's Participation in the Purported Conspiracy**

While the DPPs again name KOA Speer as a defendant in the Second Amended Complaint, they have still not alleged that KOA Speer "joined the conspiracy and played some role in it." MTD Order at 6; *In re TFT-LCD*, 586 F. Supp. 2d at 1117. This allegation is required for DPPs' claims against KOA Speer "because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *Batteries I*, 2014 WL 309192, at *13 (internal quotation marks omitted). Despite the production of over one million KOA documents prior to its filing, the

Second Amended Complaint fails again to state an antitrust conspiracy claim against KOA Speer, with specific facts establishing the involvement of KOA Speer in the alleged conspiracy. *See Kendall*, 518 F.3d at 1048 (requiring allegations that answer the who, what, when and where of each purported conspirator's involvement).

The DPPs have again failed to allege that any KOA Speer employee had any collusive contacts. There are zero allegations in the Second Amended Complaint supporting KOA Speer ever joining a conspiracy and playing a role in it. As to KOA Speer, DPPs allege nothing close to an antitrust conspiracy:

- Kamaya allegedly contacted KOA Speer via a "sales agent" to obtain information on a KOA price, and an opinion "about the sales market and prices" and its "sample policy." DPP-SAC ¶¶ 93, 95, 101.

- HDK employees allegedly learned "KOA prices" from a KOA Speer manager. DPP-SAC ¶ 105.

- A KOA Speer manager was allegedly informed by KOA Corp. that "ROHM was only focusing on particular resistors lines," and was "having a delivery problem with a particular resistor line." DPP-SAC ¶ 102.

- A KOA Speer manager commented in response to a new auction bidding process by a purchaser of resistors that resistors prices increased during the last shortage. DPP-SAC ¶ 103.

None of these allegations involve collusion between competitors. Nor do they reference JEITA or Japan-based competitor communications. These alleged KOA Speer communications certainly do not allege any understanding or agreement required for a conspiracy case—or even awareness of such a conspiracy. Ultimately, the Second Amended Complaint fails to allege that KOA Speer joined the alleged conspiracy, or attended an alleged price-fixing meeting. *In re Citric Acid*, 191 F.3d at 1103 (finding alleged opportunities to collude insufficient to allege collusion).

The DPPs' allegations based solely on ownership and affiliation are also insufficient to tie KOA Speer to any alleged conspiracy. *See, e.g., Cal. Title Ins.*, 2009 WL 1458025, at *7-8 (dismissing claims based on general allegations as to corporate families). While DPPs do add the bare conclusory allegation that KOA Corporation "dominated and controlled the finances, policies, and business decisions" of KOA Speer—DPPs allege no more than "control over the prices set by the U.S. subsidiaries." DPP-SAC ¶ 124. Agreement on pricing between a parent and subsidiary

does not qualify as the domination of day-to-day operations required to disregard the corporate separation between KOA Corporation and KOA Speer.

Without alleging KOA Speer joined and played a role in the alleged conspiracy, DPPs' complaint against them should be dismissed. MTD Order at 6; *Capacitors I*, 106 F. Supp. 3d at 1066. Furthermore, as the DPPs have already reviewed hundreds of thousands of documents produced by KOA Speer prior to filing their Second Amended Complaint, further amendment would be futile and should not be permitted. On this motion, the Court should dismiss the claims against KOA Speer with prejudice.

### D. DPPs Have Failed to Plausibly Allege Kamaya, Inc.'s Participation in the Purported Conspiracy

#### 1. Kamaya, Inc. Did Not Join or Play a Role in Any Conspiracy

DPPs' Second Amended Complaint does not allege that Kamaya, Inc. joined any conspiracy or played any role in it. *See Capacitors I*, 106 F. Supp. at 1066 (citing *TFT-LCD*, 586 F. Supp. 2d at 1117). To the contrary, DPPs allege only that:

1. Members of "every Defendant family" participated in "meetings and discussions" with competitors and did not "distinguish among entities within a particular corporate family, including "within and outside the context of [Japanese trade association meetings]." DPP-SAC ¶¶ 78, 82.

2. Kamaya, Inc.'s Mike Liebing ("Liebing") "obtain[ed] information regarding KOA's price" from a non-party sales agent (the "sales agent") and Kamaya, Inc. "used this information when discussing the company's pricing and marketing strategy." DPP-SAC ¶ 93. Liebing "shared the information" from the sales agent with Walsin Technology Corporation ("WTC") and Walsin Technology Corporation U.S.A. ("WTC USA"). DPP-SAC ¶ 94. And the sales agent wrote to Kamaya, Inc. that KOA informed him of its pricing for "particular resistors" and that "KOA would be lowering its price soon." DPP-SAC ¶ 95.

3. Kamaya, Inc. exchanged information with KOA Speer related to their businesses via the sales agent. DPP-SAC ¶ 101.

4. Michael Chang, who was Kamaya Electric's Chairman at the time, sent Liebing an email notifying him that a Kamaya Electric employee would "sometimes have informal meeting with KOA and Hokuriku to discuss industry trend, demand supply status, and price." DPP-SAC ¶ 104.

5. "The U.S. subsidiar[ies] of each and every Defendant family performed functions [for the parent corporation]" and were used to "implement, effectuate, and achieve the cartel's aims and purposes," including by participating in "conspiratorial discussions and meetings." DPP-SAC ¶¶ 122-24.

DPPs fail to make even one allegation of Kamaya, Inc. giving competitive information to its

13

corporate parent, Kamaya Electric, but rather make broad and vague allegations against "every Defendant family," all "Defendants," and "each and every Defendant family." *See* DPP-SAC ¶¶ 78, 82, 104, 122-24 (containing broad, sweeping allegations against "every Defendant family"). These claims are not enough.[5]

DPPs' sole remaining allegation against Kamaya, Inc. (*see* #2 above) essentially boils down to the following: Indiana-based Kamaya, Inc. allegedly received information about Pennsylvania-based KOA Speer from a non-party sales agent in the United States, and in doing so, joined an alleged 11-year conspiracy between Japanese corporate parent Defendants. *See* DPP-SAC ¶¶ 93-95, 101, 104. These communications—including those allegedly with WTC (Kamaya Electric's Taiwanese parent corporation) and WTC USA (WTC's U.S.-based subsidiary)—do not suggest that Kamaya, Inc. knowingly joined a conspiracy or played a role in it, nor is there any indication that these communications were sent to coordinate or agree on the pricing of linear resistors with any Defendant. *See Capacitors I*, 106 F. Supp. 3d at 1066; *Krehl*, 664 F.2d at 1357 (holding "sporadic exchanges of price information . . . having no effect upon actual pricing decisions" and "mere exchange[s] of price information" are not per se illegal); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (noting that mere information exchanges and even participation in trade-organization meetings were information is exchanged "does not suggest an illegal agreement"); *In re Baby Food*, 166 F.3d at 118 (stating that "[e]xchanges of information . . . can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive"); *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 516 (D. Del. 2010), order amended on reconsideration, No. 1:09-CV-00438-LDD, 2010 WL 11470613 (D. Del. Dec. 1, 2010) (noting that actionable exchanges of information relate to those that impacting "pricing decisions"); *Indus. Bldg. Materials, Inc. v. Interchem. Corp.*, 427 F.2d 1336, 1343 (9th Cir. 1970).

---

[5] Without any plausible allegations that Kamaya, Inc. employees joined and participated in the alleged conspiracy, DPPs' claims against Kamaya, Inc. should be dismissed. *See, e.g.*, MTD Order at 6-7; *Capacitors I*, 106 F. Supp. 3d at 1068 (granting motion to dismiss because plaintiffs had failed to "plead the precise role in the conspiracy of each individual company in each corporate family" and holding that plaintiffs could not rely on general allegations against corporate families); *see also Cal. Title Ins.*, 2009 WL 1458025, at *7 (granting motion to dismiss where plaintiffs made "general allegations against the 'Defendants,' without distinguishing among them").

As this Court found in *Capacitors*, "[t]he cases that [have] found adequate pleading against subsidiaries contained much more than is present here."  *See Capacitors I*, 106 F. Supp. 3d at 1068; *see also In re CRT*, 738 F. Supp. 2d at 1019.  Unlike here, the complaints in *CRT* alleged that corporate "employees engaged in conspiratorial meetings on behalf of members of their corporate families, that participants did not always know the corporate affiliation of their counterparts and did not distinguish between the entities within a corporate family."  *See* 738 F. Supp. 2d at 1019. Further, the *CRT* complaints alleged that "participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families."  *Id.* (internal quotations omitted).  Again, unlike here, the complaints in *TFT-LCD* contained "ample detail about defendants' involvement in the conspiracy" including "a detailed description of the meetings that were held in furtherance of the price-fixing conspiracy, as well as a description of actions taken in furtherance of the conspiracy by defendants and their American subsidiaries."  *See* 586 F. Supp. 2d at 1117.

But DPPs make no such allegations—"detailed" or otherwise—that Kamaya, Inc. entered into a similar conspiracy or played comparable roles in a conspiracy because they cannot plausibly claim that an Indiana-based U.S. subsidiary with no Japanese-speaking employees participated in Japanese trade associations and played a role in an alleged Japanese conspiracy.  Glazing over these deficiencies, DPPs assert a number of allegations that mimic the language of the *CRT* court, but still do not sufficiently allege that Kamaya, Inc. joined or played a role in any Japanese-based conspiracy.  As such, this Court should dismiss Kamaya, Inc. with prejudice.

### 2. DPPs Fail to Allege that Kamaya, Inc. is the Alter Ego or Agent of Kamaya Electric

Although DPPs never explicitly state so in their Second Amended Complaint, DPPs seem to allege that Kamaya, Inc. is either the alter ego and/or agent of its corporate parent, Kamaya Electric. To support their claims, DPPs allege that:

1. A Kamaya, Inc. employee's signature block noted that Kamaya, Inc. sold both Kamaya Electric-branded and WTC-branded resistors.  DPP-SAC ¶ 84.

2. The "foreign corporate parent of each Defendant family" established subsidiaries in the United States to "implement, effectuate, and achieve the cartel's aims and purposes." DPP-SAC ¶ 122.

3. The Defendant corporate parents "dominate[] and control[]" their U.S. subsidiaries, including the "finances, policies, and business decisions of their various subsidiaries." DPP-SAC ¶¶ 124-25, 128.

4. "The U.S. subsidiary of each and every Defendant family performed functions at the direction of, and was controlled by, the foreign-based Defendant parent's officers and managers." DPP-SAC ¶ 125.

5. Defendant foreign parent corporations "seconded" their employees to their U.S. subsidiaries so that these employees "could act a conduit for the parents' decisions and conspiratorial agreements and implement them at the subsidiary level." DPP-SAC ¶ 125.

6. Kamaya Electric exerted "ultimate control over the price set by [Kamaya, Inc.]." DPP-SAC ¶ 124.

As explained below, these allegations are insufficient to state a claim against Kamaya, Inc. based on alter ego or agency liability.

### a. DPPs Cannot Allege that Kamaya, Inc. is the Alter Ego of Kamaya Electric

DPPs do not, and cannot, allege that Kamaya, Inc. is the alter ego of Kamaya Electric. *See Neilson*, 290 F. Supp. 2d at 1115–16.[6] Specifically, DPPs have not alleged a "unity of interest" between Kamaya, Inc. and Kamaya Electric. Nor could they, as Kamaya Electric does nothing "more than exercise the broad oversight [of Kamaya, Inc.] typically indicated by common ownership and common directorship." *See Calvert v. Huckins*, 875 F. Supp. 674, 679 (E.D. Cal. 1995). Showing "some measure of control . . . is simply not enough." *Id.* The alter ego test is satisfied only when plaintiffs allege facts sufficient to show that the parent "dictates *every facet* of [the subsidiary's] business—from broad policy decision[s] to routine matters of day-to-day operation." *Gerritsen v. Warner Bros. Entm't, Inc*, 116 F. Supp. 3d 1104, 1140 (C.D. Cal. 2015) (emphasis added).

---

[6] Under California law, courts apply a two-part test to determine whether the alter ego doctrine should be invoked to hold a corporation liable for the acts of its subsidiary. *See Neilson*, 290 F. Supp. 2d at 1115-16. First, there must be a "unity of interest" between a corporation and its subsidiary. *Id.* And second, there must be evidence that an "inequitable result" would follow if the subsidiary's actions are not imputed to the parent corporation. *Id.*

However, DPPs' Second Amended Complaint makes no such allegations about Kamaya, Inc. DPPs' broad assertions that Kamaya Electric "dominate[s] and control[s]" Kamaya, Inc., including Kamaya, Inc.'s "finances, policies, and business decisions," are plainly insufficient under alter ego law because they do not show that Kamaya Electric "dictates *every facet* of [Kamaya, Inc.'s] business—from broad policy decision[s] to routine matters of day-to-day operation." *See Neilson*, 290 F. Supp. 2d at 1116; *Gerritsen*, 116 F. Supp. 3d at 1140. Likewise, DPPs fail to allege any inequitable result that would follow if Kamaya, Inc. is not deemed the alter ego of Kamaya Electric. That alone is fatal to any alter ego claim, which "unmistakably" consists of two elements, and DPPs must allege facts that support *both* elements. *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1070 (C.D. Cal. 2002).

### b. DPPs Cannot Allege that Kamaya, Inc. is the Agent of Kamaya Electric

DPPs seem to insinuate that Kamaya, Inc. acted as Kamaya Electric's agent in the alleged conspiracy, but then fail to allege any facts that would satisfy the first two elements of the agency relationship test. *See, e.g.*, DPP-SAC ¶ 122 ("each Defendant's entire corporate family was represented in meetings and discussions by their agents" in the alleged conspiracy); *Sun Microsystems*, 622 F. Supp. 2d at 899. First, DPPs do not plead that any Defendant wanted Kamaya, Inc. to act on its behalf (or *vice versa*). Consequently, DPPs also do not plead that Kamaya, Inc. accepted any invitation to act for another Defendant. This failure alone undermines an agency claim. *See, e.g.*, *Twombly*, 550 U.S. at 556-57. Finally, while DPPs do assert various conclusory allegations using the words "agent" and "control" (*see, e.g.*, DPP-SAC ¶¶ 122-23), those allegations do not satisfy the third element of the agency test, which requires DPPs to allege well-pled facts showing that Kamaya Electric (or any other Defendant) exercised "day to day control" over Kamaya, Inc. (or *vice versa*). *See Sun Microsystems*, 622 F. Supp. 2d at 899; *see also ING Bank v. Ahn*, 758 F. Supp. 2d 936, 941 (N.D. Cal. 2010) (holding that control must be "comprehensive, immediate, and day-to-day" to establish an agency relationship).

* * *

DPPs have again failed to plausibly allege Kamaya, Inc.'s direct participation in the alleged conspiracy, and they have failed to allege any alter ego or agency-based claims against Kamaya, Inc. DPPs' claims against Kamaya, Inc. should be dismissed with prejudice.

**CONCLUSION**

DPPs' Second Amended Complaint should be dismissed with respect to the U.S. Subsidiary Defendants because DPPs fail to allege any facts sufficient to prove that those Defendants participated in the alleged conspiracy. Further amendment would be futile because DPPs already had the benefit of reviewing millions of documents produced by Defendants prior to filing the Second Amended Complaint, and Defendants' document productions are now substantially complete. Therefore, the U.S. Subsidiary Defendants respectfully request that the Court dismiss DPPs' claims against them with prejudice.

Dated: November 3, 2017          Respectfully submitted,


**WINSTON & STRAWN LLP**

By: /s/ *Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
jkessler@winston.com
Eva W. Cole (*pro hac vice*)
ewcole@winston.com
Erica C. Smilevski (*pro hac vice*)
esmilevski@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Ian L. Papendick (SBN 275648)
ipapendick@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

Brandon W. Duke (*pro hac vice*)
bduke@winston.com
WINSTON & STRAWN LLP

1111 Louisiana Street, 25th Floor
Houston, TX 77002
Telephone: (713) 651-2636
Facsimile: (713) 651-2700

*Counsel for Defendant Panasonic Corporation of North America.*

**CROWELL & MORING LLP**

By: /s/ *Jason C. Murray*
Jason C. Murray (CSB No. 169806)
jmurray @crowell.com)
Emily T. Kuwahara (CSN No. 252411)
ekuwahara@crowell.com
Robert McNary (CSB No. 253745)
rmcnary@crowell.com
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213.622.4750
Facsimile: 213.622.2690

Daniel Zelenko (admitted *pro hac vice*)
dzelenko@crowell.com
590 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: 212.223.4000
Facsimile: 212.223.4134

*Counsel for KOA Speer Electronics, Inc.*

**O'MELVENY & MYERS LLP**

By: /s/ *Michael F. Tubach*
 Michael Frederick Tubach
Megan L. Havstad
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
mtubach@omm.com
mhavstad@omm.com

Kenneth Ryan O'Rourke
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
korourke@omm.com

*Counsel for Rohm Semiconductor U.S.A., LLC*

**BARNES & THORNBURG LLP**

By: /s/ *Kendall Millard*
Kendall Millard
Todd Dixon
Bradley R. Love
11 South Meridian Street
Indianapolis, IN 46204-3535
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
Kendall.Millard@Btlaw.com
Tdixon@Btlaw.com
Blove@Btlaw.com

*Counsel for HDK America, Inc.*

**LATHAM & WATKINS LLP**

By: /s/ *Belinda S Lee*
Belinda S Lee
Ashley M. Bauer
Cameron J. Clark
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Belinda.Lee@lw.com
Ashley.Bauer@lw.com
Cameron.Clark@lw.com

*Counsel for Kamaya, Inc.*

*Pursuant to N.D. Cal. L.R. 5-1(i)(3), the filer attests that concurrence in filing of this document has been obtained from the above signatories.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2017, I electronically filed with the Clerk of Court via the CM/ECF system the following document:

**U.S. SUBSIDIARY DEFENDANTS' CONSOLIDATED MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Notice of this filing will be sent by email to all parties with an email address of record by operation of the Court's electronic filing system. Parties may access the filing through the Court's CM/ECF system.

Dated: November 3, 2017          ___/s/ *Brandon W. Duke*___
                                 Brandon W. Duke (*pro hac vice*)
                                 bduke@winston.com
                                 WINSTON & STRAWN LLP
                                 1111 Louisiana Street, 25th Floor
                                 Houston, TX 77002
                                 Telephone: (713) 651-2636
                                 Facsimile: (713) 651-2700