Joseph W. Cotchett (36324)
Adam J. Zapala (245748)
Elizabeth T. Castillo (280502)
Mark F. Ram (294050)
Tamarah P. Prevost (313422)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
mram@cpmlegal.com
tprevost@cpmlegal.com

*Interim Lead Counsel
for the Indirect Purchaser Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE RESISTORS ANTITRUST LITIGATION** | **Case No.: 3:15-cv-03820-JD** |
| | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY DEMAND** |
| **This Document Relates To:** | |
| **All Indirect Purchaser Actions** | |

**DOCUMENT SUBMITTED UNDER SEAL**

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**

# **TABLE OF CONTENTS**

                                                                        Page

I.     NATURE OF ACTION ................................................................1

II.    GOVERNMENT INVESTIGATIONS INTO THE RESISTORS INDUSTRY AND
       RELATED INDUSTRIES ...........................................................6

       A.     U.S. Investigations ........................................................6

       B.     Foreign Investigations ....................................................7

III.   THE DEFENDANTS CONCEALED THEIR UNLAWFUL CONDUCT ...................8

       A.     The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not
              and Could Not Discover Their Claims...........................................8

       B.     Defendants' Fraudulent Concealment Tolled the Statute of Limitations. ...........9

IV.    JURISDICTION AND VENUE ....................................................12

V.     INTRADISTRICT ASSIGNMENT ..................................................14

VI.    PARTIES ..........................................................................14

       A.     Indirect Purchaser Plaintiffs..................................................14

       B.     Defendants .....................................................................16

VII.   AGENTS AND CO-CONSPIRATORS .............................................18

VIII.  FACTUAL ALLEGATIONS .......................................................19

       A.     The Characteristics of the Resistors Market Render Collusion Plausible ..........19

              1.     The Resistors Industry Has High Barriers to Entry ..................19

              2.     The Demand for Resistors Is Inelastic. ...............................20

              3.     The Resistors Industry Is Highly Concentrated. ....................22

              4.     Resistors Are Homogenous and Commoditized Products. ...................23

              5.     Sales of Resistors .........................................................24

       B.     Opportunities in the Industry to Conspire..........................................26

              1.     Defendants Have Ample Opportunities to Conspire. ...........................26

              2.     Resistor Manufacturers Had Relationships in Other Price-Fixed
                     Markets. ........................................................................31

       C.     Defendants Had a Common Motive to Conspire ...................................32

D.     Indirect Purchasers Of Resistors Lacked Buying Power. ..................................32

E.     Defendants Colluded To Keep The Price Of Resistors Elevated During The Class Period. ..................................34

       1.     Illustrative Examples of Defendants' Conspiratorial Conduct ..............34

F.     Defendants Utilized "R Meetings" to Further their Conspiracy. .......................40

G.     Defendants Conspiratorial Meetings and Efforts Occurred Outside Japan and Took Many Forms..................................41

       1.     Illustrative Examples of U.S. Subsidiaries Engaging in Conspiratorial Conduct   ..................................47

H.     Defendants' Corporate Families Acted as Single Enterprises; Defendant Parent Companies Exercised Substantial Control over Their U.S. Subsidiaries. ..................................48

       1.     Defendants' High-Level Employees Organized the Conspiracies and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracies..................................50

       2.     Defendants' Representatives who Attended Conspiratorial Meetings and Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family. .................54

       3.     Each Defendant Parent Company, Along With Its U.S. Subsidiary, Hold Themselves Out as a Single Integrated Enterprise. .......................56

              a.     HDK Corporate Family..................................56
              b.     Kamaya Corporate Family ..................................57
              c.     KOA Corporate Family..................................58
              d.     ROHM Corporate Family ..................................59
              e.     Panasonic Corporate Family ..................................60

       4.     The Nature of the Resistor Industry Required Foreign Companies Named As Defendants Herein to Use Their U.S. Subsidiaries As Sales Arms for Price-Fixed Resistors. ..................................62

IX.    ANTITRUST INJURY ..................................62

X.     AFFECTED TRADE AND COMMERCE ..................................63

A.     Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' Antitrust Claims .......63

B.     The Defendants Targeted the United States..................................65

XI.    CLASS ACTION ALLEGATIONS ..................................66

XII.   GUILTY PLEAS IN PRIOR CASES ..................................69

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD

XIII.    VIOLATIONS ALLEGED ............................................................71

FIRST CLAIM FOR RELIEF (Violations of Sherman Act, 15 U.S.C. § 1) (On Behalf of All Plaintiffs Against All Defendants)...................................................71

SECOND CLAIM FOR RELIEF (Violations of State Antitrust and Restraint of Trade Laws) (On Behalf of Plaintiffs Against All Defendants).........................................72

THIRD CLAIM FOR RELIEF (Violations of State Consumer Protection and Unfair Competition Laws) (On Behalf of All Plaintiffs Against All Defendants) ...................79

XIV.    REQUEST FOR RELIEF ...........................................................83

JURY DEMAND ...........................................................................88

Plaintiffs Microsystems Development Technologies, Inc., Nebraska Dynamics, Inc., MakersLED LLC, Linkitz Systems, Inc., Top Floor Home Improvements, Angstrom, Inc., In Home Tech Solutions, Inc. and Anthony Sakal (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated (the "Classes" defined below).  Plaintiffs' allegations in this Complaint are based upon personal knowledge as to the facts pertaining to them, and upon information and belief as to all other matters.  These allegations are also based on the investigation of counsel.  Plaintiffs seek damages, injunctive relief, and all other relief available under the federal antitrust laws and the antitrust, unfair competition and consumer protection laws of the laws of the various states.

Plaintiffs demand a trial by jury, and allege as follows:

**I.      NATURE OF ACTION**

1.      Resistors are one of the most common electronic components in the world today. They are designed to provide a specific amount of resistance to an electronic circuit.  They are "passive" components in the sense that they regulate, as opposed to generate, electrical currents. Since many electronic components have capacity for more electrical current than is necessary, and additional electrical current may be harmful, resistors serve a regulatory function by assuring that appropriate levels of voltage go to specific parts of an electronic circuit.  Almost all electronic products—from cellphones to personal computers—contain resistors, often hundreds of them.  *See* images below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







2.     Resistors are widely used in a range of industries, including the telecommunications, audiovisual, automotive, and server computing markets.   The overall resistor market can be separated into two categories: ***linear resistors*** and ***non-linear resistors***, the former of which (*i.e.*, linear) are the subject of this Complaint.  In basic terms, a linear resistor is a resistor "in which current produced is directly proportional to the applied voltage."  *See* http://jabelufiroz.hubpages.com/hub/Linear-and-Non-Linear-Resistors (last visited on August 18, 2015).   A non-linear resistor is a resistor "whose current does not change linearly with changes in applied voltage."  *Id*.  In contrast to non-linear resistors, which are used in specialized products, linear resistors are highly standardized.[1]

---

[1]     Many manufacturers compete in both the capacitor and resistor markets (*e.g.* Panasonic, Rohm, Vishay, and  Yageo).  *See* Dennis M. Zogbi, Resistors:  World Markets, Technologies & Opportunities: 2014-2019 (Paumanok Publications, September 2014).

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**                                                                                   3

3.      Linear resistors consist of fixed and variable resistors, and represent the largest category of resistors.  The thick film chip resistor is considered to be the workhorse of the resistor industry. These so-called chip resistors are used in cellular phones, computer motherboards, disc drives, monitors, automotive electronic assemblies, television sets, stereo amplifiers, and many other components.  Given the high level of standardization of chip resistors, prices naturally fall over time.  As a result, manufacturing has migrated from western countries to Asia.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19





20    4.    Plaintiffs purchased resistors as stand-alone products from distributors that had

21  previously purchased them from Defendants.  When purchased as stand-alone products, resistors

22  are directly traceable to the specific manufacturer, because they either bear the Defendants'

23  markings (*e.g.*, name, logo, series) or they are marked with a chemical that permits a "chemical

24  trace" back to the manufacturer.

25    5.    From at least 2003 until the present, Defendants—the worlds' largest

26  manufacturers of linear resistors—along with other co-conspirators (as yet unknown) agreed,

27  combined, and conspired, to inflate, fix, raise, maintain or artificially stabilize prices of linear

28

resistors sold in the United Sates (the "Class Period").[2]  Defendants' conspiracy successfully targeted various individuals and entities that purchased linear resistors from distributors, and those purchasers—*i.e.* the Plaintiffs—paid artificially-inflated, supracompetitive prices for linear resistors as a result.

6.      Defendants' conduct violated, and continues to violate, Section One of the Sherman Act and the antitrust, consumer protection, and unfair competition laws of the various states.  Plaintiffs and the Classes paid artificially inflated prices for resistors, and have thereby suffered antitrust injury to their business or property as a direct result of the anticompetitive and unlawful conduct alleged herein.

## II.    GOVERNMENT INVESTIGATIONS INTO THE RESISTORS INDUSTRY AND RELATED INDUSTRIES

### A.    U.S. Investigations

7.      It was widely reported that the Department of Justice (DOJ) initiated an investigation of price fixing in the resistors industry in June of 2015.

8.      It was also reported that the DOJ's investigation in the resistors industry is an "offshoot" of its price-fixing investigation into the capacitors industry.  According to reports, there is significant overlap in companies under investigation, though there are some companies in the resistors case that do not appear in the capacitors case.  It has been reported that these two cases are part of a probe into the larger market for passive electronic components, and that it is widely expected that the DOJ's inquiry will continue to expand.

9.      So far, eight companies, including Panasonic Corporation, have acknowledged being contacted by U.S. or other antitrust authorities in connection with the capacitors probe. Panasonic—one of the world's leading manufacturers of *both* resistors and capacitors— cooperated with the DOJ in the capacitors investigation and sought leniency under the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA").

---

[2]      "Defendants" refers collectively to the following entities: Panasonic Corporation; Panasonic Corporation of North America; KOA Corporation; KOA Speer Electronics, Inc.; ROHM Co. Ltd.; ROHM Semiconductor U.S.A., LLC; Kamaya Electric Co., Ltd.; Kamaya Inc.; Hokuriku Electric Industry Co.; and HDK America, Inc.

10.     A report in MLex issued on July 22, 2015 stated the following:

> The US Department of Justice is investigating allegations of price-fixing in the resistors industry, MLex has learned.
>
> Resistors are fundamental parts of an electrical circuit that help reduce the flow of current. Trillions of them are sold every year, and they are used by any product that needs electricity from smartphones to coffeemakers.
>
> A spokesman for the Justice Department declined to comment.
>
> The investigation is understood to be an offshoot of the DOJ's investigation into capacitors, which began in 2014. Eight Japanese companies, including Panasonic and Hitachi Chemical, have acknowledged being contacted by US or other antitrust authorities in connection with the capacitor probe, though none have yet faced sanctions or charges.
>
> Japan's Panasonic is understood to have approached DOJ's antitrust division, seeking leniency related to resistors. The DOJ's leniency program grants complete immunity from prosecution to the first company that admits involvement in a price-fixing conspiracy and agrees to cooperate.
>
> Akira Kadota, a spokesman for Panasonic in Tokyo, declined to comment.

11.     The existence of this investigation was been confirmed by DOJ's intervention in these cases and its attempts to stay discovery.

12.     On February 2, 2016, the Court ordered Defendants to produce to Plaintiffs all documents previously produced to governmental agencies.  Dkt. No. 112.

13.     The aforementioned MLex report about Panasonic's seeking of leniency is consistent with Panasonic's own statements.  In its 2012 Form 10-K filed with the Securities & Exchange Commission, Panasonic said that it was cooperating with governmental competition authorities in a number of investigations that were not identified.[3]

**B.     Foreign Investigations**

14.     In addition to the DOJ investigation, there were also investigations by foreign

[3]http://www.sec.gov/Archives/edgar/data/63271/000119312512286456/d230958d20f.htm#tx23 0958_6.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD                                                                                                7

antitrust authorities.  For example, it was reported that the Korean Fair Trade Commission ("KFTC") conducted an on-site investigation of suspected price fixing in the market for resistors. It was also reported that the Japanese Fair Trade Commission ("JFTC") conducted raids at some of the Defendants' offices.

## III.    **THE DEFENDANTS CONCEALED THEIR UNLAWFUL CONDUCT**

### A.    **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims.**

15.    Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) June 2015, when reports of the investigations into anticompetitive conduct concerning resistors were first publicly disseminated.

16.    Plaintiffs and members of the Classes purchased resistors manufactured by a Defendant from a distributor. They had no direct contact or interaction with any of the Defendants and had no means from which they could have discovered the combination and conspiracy described in this Complaint before June 2015, when reports of the investigations into anticompetitive conduct concerning resistors were first publicly disseminated.

17.    No information in the public domain was available to Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in June 2015 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to fix prices for resistors.

18.    Publicly, some Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion seen in this litigation.

19.    It was reasonable for members of the Classes who may have been exposed to these public policies to believe that the Defendants were enforcing the policies.

20.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run with respect to the claims that Plaintiffs alleged in this Complaint.

**B.     Defendants' Fraudulent Concealment Tolled the Statute of Limitations.**

21.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs (and those of the Classes) until June 2015 at the earliest.  Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until news sources first reported in June 2015 that the DOJ was conducting a probe into anticompetitive conduct among resistors manufacturers.  Prior to that date, no information in the public domain or available to the Plaintiffs and the Classes suggested that any Defendant was involved in a criminal conspiracy to fix prices for resistors.

22.     Plaintiffs exercised reasonable diligence.  Plaintiffs and the Classes could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

23.     Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices for resistors throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

24.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

25.     Defendants used mechanisms designed to conceal their collusion, such as covert meetings, use of code words or terms to refer to competitors and/or customers, use of pretexts to mask the true purpose of collusive communications, use of non-company phones, and instructions to destroy emails evidencing collusive activities.

26.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**                                                                                       9



27.

. As noted, participants in the conspiracy concealed their activities by warning each other to treat collusive discussions as "confidential," by referencing co-conspirators with code words, and by reminding their them not to distribute evidence of their price-fixing outside the conspiracy.

28.    When distributing his notes on a discussion with Defendant Kamaya and other JEITA participants about available capacity, volume, and prices,

1

2 ”

3 29.

4

5

6

7

30.     By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Resistors are not exempt from antitrust regulation, and thus, before June 2015, Plaintiffs reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' resistors prices before June 2015.

31.     Plaintiffs and members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

32.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until June 2015, when reports of the investigations into anticompetitive conduct concerning resistors were first publicly disseminated.

33.     For these reasons, the statute of limitations applicable to the claims of Plaintiffs' and members of the Classes was tolled and did not begin to run until, at the earliest, June 2015.

# IV.    JURISDICTION AND VENUE

34.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to California's antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure all other available relief against Defendants for violation of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under these laws.

35.    This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1137.  This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

36.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391(b)-(d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

37.    This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of resistors throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as

a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

38.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

39.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce in the United States. Defendants' products are sold in the flow of interstate commerce.

40.     Resistors manufactured abroad by Defendants and sold as stand-alone products that were either manufactured in the United States or manufactured abroad and sold in the United States, are goods brought into the United States for sale and therefore constitute import commerce.  To the extent any resistors are purchased in the United States, and such resistors do not constitute import commerce, Defendants' unlawful conduct with respect thereto, as more fully alleged herein during the respective Class Periods, had and continues to have a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.  In conspiratorial meetings between and among the resistors manufacturers, they often discussed conditions in the United States market.  Their conduct targeted United States' commerce.

41.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states,

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**                                                                                           13

to fix, raise, maintain and/or stabilize prices, and allocate market shares for resistors, which conspiracies unreasonably restrained trade and adversely affected the market for such resistors.

42.      Defendants' anticompetitive conduct adversely affected individuals and entities in the United States, including Plaintiffs and members of the Classes, who indirectly purchased resistors as stand-alone products.

## V.   **INTRADISTRICT ASSIGNMENT**

43.      Intradistrict assignment to the San Francisco Division is appropriate.

## VI.   **PARTIES**

### A.    **Indirect Purchaser Plaintiffs**

44.      **Microsystems Development Technologies, Inc.** ("MDTI") is a California Corporation with its principal place of business in San Jose, California..  MDTI purchased resistors as stand-alone products in California from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period. MDTI has been injured in California and is threatened with further injury as a result of the violations alleged in this Complaint.

45.      **Nebraska Dynamics, Inc.** ("Nebraska Dynamics") is a Nebraska Corporation with its principal place of business in Louisville, Nebraska.  Nebraska Dynamics purchased resistors as stand-alone products in Nebraska from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period.  Nebraska Dynamics was injured in Nebraska and is threatened with further injury as a result of the violations alleged in this Complaint.

46.      **MakersLED LLC** ("MakersLED") is an Iowa Limited Liability Company with its principal place of business in Ames, Iowa.  MarkersLED purchased resistors as stand-alone products in Iowa from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period. MakersLED was injured in Iowa and is threatened with further injury as a result of the violations alleged in this Complaint.

47.     **Linkitz Systems, Inc. ("Linkitz")** is located in New York, New York.  Linkitz purchased resistors as stand-alone products in New York from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period. Linkitz has been injured in New York and is threatened with further injury as a result of the violations alleged in this Complaint.

48.     **Top Floor Home Improvements** ("Top Floor") is located at 16 Woodworth Avenue in Jamestown, New York.  Top Floor purchased resistors as stand-alone products in New York from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period.  Top Floor was injured in New York and is threatened with further injury as a result of the violations alleged in this Complaint.

49.     **Angstrom, Inc.,** ("Angstrom") resides in Michigan and has its principal place of business in Michigan.  Angstrom purchased resistors as stand-alone products in Michigan from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period.  Angtrom has been injured in Michigan and is threatened with further injury as a result of the violations alleged in this Complaint.

50.     **In Home Tech Solutions, Inc.** ("InHome Tech Solutions") is a Minnesota company with its principal place of business in Minnesota.  In Home Tech Solutions purchased resistors as stand-alone products in Minnesota from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the respective Class Periods.  In Home Tech Solutions has been injured in Minnesota and is threatened with further injury as a result of the violations alleged in this Complaint.

51.     **Anthony Sakal** is a Florida resident who purchased resistors as stand-alone products in Florida from one or more distributors that purchased such resistors as stand-alone products from one or more defendants during the Class Period. Mr. Sakal has been injured in Florida and is threatened with further injury as a result of the violations alleged in this Complaint.

B.      **Defendants**

52.     Defendant **Panasonic Corporation** ("Panasonic Corp.") is a Japanese corporation with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  Panasonic Corp. is one of the world's leading manufacturers of resistors. Panasonic Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

53.     Defendant **Panasonic Corporation of North America** ("PNA"), a wholly owned subsidiary of Panasonic, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102.  PNA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—marketed, distributed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.   Together, Panasonic Corp. and PNA are referred to as "Panasonic" or the "Panasonic Defendants".

54.     Defendant **KOA Corporation** ("KOA Corp.") is a Japanese corporation with its principal place of business located at 2-17-2 Midori-Cho, Fuchu-Shi, Tokyo 183-0006, Japan. KOA Corp. is one of the world's leading manufacturers of resistors.  KOA Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

55.     Defendant **KOA Speer Electronics, Inc.** ("KOA Speer") is a Delaware corporation with its principal place of business located at 199 Bolivar Drive, Bradford, Pennsylvania 16701.  KOA Speer is a wholly owned subsidiary of KOA Corp. Together, KOA Corp. and KOA Speer are referred to as "KOA" or the "KOA Defendants".  KOA Speer— directly and/or through its subsidiaries, which it wholly owned and/or controlled—marketed, distributed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.  Plaintiffs purchased linear resistors made by the KOA

Defendants, or one of their subsidiaries, as a stand-alone product from a distributor during the Class Period.

56.    Defendant **ROHM Co., Ltd.** ("ROHM Co.") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-Ku, Kyoto 615-8585, Japan. ROHM Co. is one of the world's leading manufacturers of resistors.  ROHM Co.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

57.    Defendant **ROHM Semiconductor U.S.A., LLC** ("ROHM USA") is a Delaware limited liability corporation with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara, California 95054.  ROHM USA is a wholly owned subsidiary of ROHM Co.  Together, ROHM Co. and ROHM USA are referred to as "ROHM" or the "ROHM Defendants".  ROHM USA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—marketed, distributed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.  Plaintiffs purchased linear resistors made by the ROHM Defendants, or one of their subsidiaries, as a stand-alone product from a distributor during the Class Period.

58.    Defendant **Hokuriku Electric Industry Co.** ("HDK Japan") is a Japanese corporation with its principal place of business located at 3158 Shimo-okubu, Toyama City, Toyama 939-2292, Japan.  HDK Japan is one of the world's leading manufacturers of linear resistors.  During the Class Period, HDK Japan manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

59.    Defendant **HDK America, Inc.** ("HDK America") is an Illinois corporation with its principal place of business located at 200 N. Northwest Highway, Suite 201, Barrington, Illinois 60010.  HDK America is a wholly-owned subsidiary of HDK Japan.  Together, HDK Japan and HDK America are referred to as "HDK" or the "HDK Defendants". HDK America

directly and/or through its subsidiaries, which it wholly owned and/or controlled—marketed, distributed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.  Plaintiffs purchased linear resistors made by the HDK Defendants, or one of their subsidiaries, as a stand-alone product from a distributor during the Class Period.

60.     Defendant **Kamaya Electric Co., Ltd.** ("Kamaya Japan") is a Japanese corporation with its principal place of business located in PSA Building 3F, 6-1-6 Chou, Yamato-shi Kanagawa, 242-0021, Japan.  During the Class Period, Kamaya Japan manufactured, sold, and distributed linear resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

61.     Defendant **Kamaya Inc.** ("Kamaya America") is a subsidiary of Kamaya Japan with its principal place of business located at 6407 Cross Creek Boulevard, Fort Wayne, Indiana 46818. Kamaya Inc. maintains a sales office at 4163 Cleveland Ave #1 San Diego, CA 92103, and a warehouse at 28-A Concord Street, El Paso, TX 79906. Kamaya America is a wholly owned subsidiary of Kamaya Japan.  During the Class Period, Kamaya America – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers of linear resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, Kamaya Japan.  Together, Kamaya Japan and Kamaya America are referred to as "Kamaya" or the "Kamaya Defendants".  Kamaya America directly and/or through its subsidiaries, which it wholly owned and/or controlled—marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.  Plaintiffs purchased linear resistors made by the Kamaya Defendants, or one of their subsidiaries, as a stand-alone product from a distributor during the Class Period.

## VII.   AGENTS AND CO-CONSPIRATORS

62.     Each Defendant acted as the principal of, or agent for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

63.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct.  Plaintiffs reserve the right to name some or all of these persons and entities as Defendants at a later date.

64.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## VIII.   FACTUAL ALLEGATIONS

### A.     The Characteristics of the Resistors Market Render Collusion Plausible

65.     The characteristics of the resistors industry in the United States are conducive to price-fixing and have rendered collusion plausible.   Industry characteristics are critically important to determining the likelihood of collusion in that industry.  Collusion is more plausible in industries where: (1) high barriers to entry exist; (2) demand is inelastic; (3) the market is highly concentrated; (4) the products are homogenous; (5) there are ample opportunities to conspire; (6) purchasers lack buying power; and (7) there is a history of collusive behavior.

#### 1.     The Resistors Industry Has High Barriers to Entry

66.      The resistors industry has high barriers to entry that facilitate the formation and maintenance of a cartel.  Collusion between manufacturers that effectively increases product prices above competitive levels would attract new entrants seeking to benefit from supra-competitive pricing.  New entrants are less likely, however, where there are significant barriers to entry.

67.     There are substantial barriers that preclude, reduce, or make more difficult entry into the resistors market.  Industry analysts state that "[o]nly through massive economics of scale is it possible to achieve profitability in the thick film chip resistor markets…."

68.     A potential new entrant faces costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, distribution infrastructure, skilled labor, and long-standing customer relationships with existing manufacturers.

69.     Resistors are expensive to manufacture.  The cost to create the appropriate manufacturing facilities for resistor manufacturing are also very high and prohibitive to new entrants breaking into the market.  For instance, in 2011, KOA Corporation planned to invest 2.3 billion JPY into the construction of a new resistors facility, a figure that does not even account for expenses associated with land acquisition and production.

### 2.     The Demand for Resistors Is Inelastic.

70.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.

71.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

72.     Demand for resistors is highly inelastic because there are no close substitutes for these products.  The demand for resistors will continue to rise due to increasing use of PCs, notebooks, ultrabooks, smartphones, and other consumer and electronic products that meet basic requirements in day-to-day life.  No other type of passive electrical component (*e.g.*, inductors and capacitors) can serve as a substitute or a functional equivalent to a resistor in an electric circuit.  Accordingly, a purchaser that is either an OEM or an Electronic Manufacturing Services

1   ("EMS") provider cannot design quickly an electric circuit to bypass its need for a resistor with

2   a certain resistance.

3          73.      The pricing of linear resistors as a whole has experienced a dramatic rise since

4   2002.  During this time period, demand for linear resistors has generally increased, and has thus

5   been relatively inelastic.  Demand for resistors also did not fluctuate in response to the recession

6   of 2008 or the earthquake and flooding in Asia in 2011.

7

8

9

10

11

12

13

14

15

16

17



18

19

20

21

22

23

24

25

26

27

28

Networks, Arrays & IPD Resistors
Average Price and Shipment Quantities

### 3.   The Resistors Industry Is Highly Concentrated.

74.   Market concentration facilitates collusion.  Collusive agreements are easier to implement and sustain when there are few firms controlling a large portion of the market. Practical matters such as coordinating cartel meetings and exchanging information are much simpler with a small number of players.  If the participants can coordinate pricing decisions, their control over total industry output may result in prices that are elevated across the industry. Moreover, their high degree of control also simplifies their coordination issues because there is little outside competitive presence to undermine the cartel.  With fewer firms in the market, the transitory bump in profits that could be achieved by undercutting the cartel price and gaining a transitory increase in market share would be outweighed by the greater long-term market share for a colluding firm in a concentrated industry.

75.   By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's

continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

76.     As the resistors market is dominated by a few companies that control the lion's share of these markets, the continuing agreements, understandings, combinations or conspiracies to fix, raise, maintain and/or stabilize prices, and to allocate market shares for resistors are effective at setting the prices of resistors at artificially high, supra-competitive prices.

77.     A concentrated market is more susceptible to collusion and other anticompetitive practices.  The resistors market was concentrated during the Class Period.  In fact, throughout the Class Period, Defendants collectively maintained high market shares.

### 4.     Resistors Are Homogenous and Commoditized Products.

78.     Homogenous products enhance collusion because they enable manufacturers to more easily negotiate agreement on prices and/or quantities and facilitate monitoring.  Resistors are homogenous products or commodities because their characteristics and qualities are essentially uniform across different manufacturers.  Although different sub-types of resistors are not interchangeable, within each category, resistors are designed to be interchangeable.

79.     The homogenization of resistors is aided by industry-standard product specifications.  The principal dimensions of product differentiation in resistors are well known and easily quantifiable.  Therefore, resistors can be purchased and sold in large volume quantities by manufacturers and distributors based on common size and technology characteristics.  Indeed, manufacturers and distributors maintain very detailed product catalogs and substitution guides that outline rules for swapping out resistors made by other Defendants based on their common characteristics.

80.     In economics, a commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type.  Commodities are most often used as inputs in the production of other goods or services.  Product homogeneity facilitates collusion more than product differentiation.  Examples of traditional commodities are sugar, wheat, and rubber.

As technologies and markets for goods mature, it is more likely to be considered a commodity, at least in its more basic implementations.

81.     While there are various forms of linear resistors, the product for which each linear resistor type is used (*e.g.*, cell phones, personal computers, and home appliances) are highly standardized.  Such standardization allows the production of thick film resistors (the largest category of linear resistors) to be highly automated to yield large amounts of output.

### 5.     Sales of Resistors

82.     Once a resistor is manufactured by a vendor, it must be distributed to the customer. Resistor sales are made either directly to an OEM or to an EMS, or they are sold through an authorized distributor (*e.g.*, TTI, Digi-Key, Future, Arrow, Avnet, or WPG).  In the Americas and Europe, distributors now account for slightly more than half of regional sales.  This type of distribution network is made possible by the fact that resistors are highly standardized.  This further enables resistors to be purchased in large quantities by distributors and then sold by those distributors based on common size and characteristics.

83.     Resistors straddle the line between traditional commodities and emerging commodities because the resistors market is still developing.  As resistors are in almost every electronic device—and as the electronic device market is expanding due to the exponential growth in computing technology—the established resistors market is still evolving.

84.     The United Nations ("UN") Commodity Trade Statistics Database, the largest depository of international trade data, includes resistors on its Commodity List.  Over 170 reporter countries provide the UN Statistics Division with their annual international trade statistics data detailed by commodities and partner countries.  The UN and UN member countries therefore consider resistors as commodities.



**Source**: http://comtrade.un.org/db/mr/rfCommoditiesList.aspx?px=H1&cc=8533
(last visited August 2, 2015).

85.     Further, according to some market analysts, the ubiquity of smartphones and personal computers and the consistency of features from one brand to another means that the products are becoming commodities.   The commoditization of smartphones and personal computers has increased the commoditization of resistors.

86.     Markets for commodity products are conducive to collusion.  Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service.   This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

**B.**   **Opportunities in the Industry to Conspire**

    **1.**   **Defendants Have Ample Opportunities to Conspire.**

87.   Trade associations provided opportunities for Defendants to meet frequently and exchange information to facilitate collusion.  Defendants are members of a number of trade associations in the United States, Asia and Europe.  Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor one another's activities in the resistors market and punish non-compliance.  Defendants' participation in trade associations helped facilitate their collusion.

88.   One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia.  Several of the Defendants are members of this organization, including KOA, Panasonic, and ROHM. They regularly meet to discuss matters of mutual concern.

89.   By virtue of their membership in such organizations, Defendants have the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  ECIA, for example, hosts an annual "Executive Conference."  The 2014 conference was held in Chicago, Illinois, and the 2015 conference is also scheduled to be held in Chicago.

90.   Trade associations and other common forums facilitated Defendants' collusion.  Trade association meetings provide an excellent cover for meeting and communicating about the pricing of resistors and to conspire to fix, raise, maintain and/or stabilize prices, and to allocate market shares for resistors.

91.   Defendants also regularly met and exchanged competitively, sensitive and confidential business information, including prices, at meetings of JEITA – the Japanese Electronics and Information Technology Industry Association.  Defendants Panasonic, Rohm, KOA, HDK, and Kamaya, were all members of JEITA's Passive Components Committee.

92.     At JEITA Passive Components Committee meetings, Defendants met at regular intervals where members of the committee provided each other with information, including pricing and production capacity information.  Before and after the official JEITA meetings, Defendants held smaller, bilateral meetings where they continued to exchange information and engage in further discussions concerning the pricing and supply of resistors.

93.     Members of JEITA were also expected to submit and exchange detailed data regarding their resistors' sales.  For example, at a July 2003 JEITA meeting of the Passive Components Committee, which included Defendants Panasonic, Rohm, KOA, HDK, and Kamaya, and other co-conspirators, Defendants discussed the form and information to be submitted in future information exchanges with committee members.  Under No. 7 of the form, entitled "Common issues for the industry", members were expected to discuss and provide information regarding "prices in Japan and overseas [and] requests by customers." Committee members wanted to exchange this information in an effort to coordinary their prices and production as much as possible.

94.     In August 2006, Panasonic's Hourai wrote to Hashimoto (his Panasonic colleague) that both Panasonic and ROHM were seeking to sell resistors to Nokia, and because he had heard from another Panasonic employee that Hashimoto had directly exchanged resistor price information with ROHM, he wanted to know if Hashimoto would check the price information with ROHM.  Hourai then listed his proposals for the prices that he wanted Hashimoto to confirm with ROHM.  Hourai wrote a later email to Panasonic employees Minouru Sowa, Hiroaki Kamioka, and Hideki Matsuhashi about pricing for Nokia.  "Yesterday, related to handling prices for Nokia, I had GM Hashimoto contact the personal responsible for General Gobal at R Co."  "R Co." was used in Hourai's email as a code word for competitor Defendant ROHM.  "The following comment came back from R. Co.: 'We plan to raise prices to Nokia for the 1005 type [resistor.]'" Hourai warned recipients not to forward his email.

95.     Defendants, including Panasonic, Rohm, HDK and KOA also attended informal trade association events named "CR Committee Meeting."  In or around May 2007, employees

of Pananonic (Nakagawa and Kamioka), Rohm (Ikeda and Kaida), HDK (Shimada), Kamaya (Miura), and KOA (Misawa and Kitabayashi) met at a CR Committee Meeting and discussed pricing strategies for Nokia.  The participants in the meeting met and discussed the need for the three of them to work together as a Japanese "alliance."  Mr. Kamioka informs his colleagues that he will discuss the matter further with Mr. Kaita (ROHM) at the upcoming JEITA meeting.[4]

96.     On or around November 30, 2007, at a Resistors Committee Meeting, that occurred in Nagoya City, resistors manufacturers, including Defendants Panasonic, KOA, Rohm, HDK, and Kamaya, met and discussed production capacity as a means of limiting supply and thereby raising prices.  The participants in the meeting also discussed various optimal pricing levels for certain resistors.  Kamioka attended this meeting for Panasonic.  When he forwarded the minutes of this meeting to his colleagues within Panasonic, he implored them to "treat [it] as confidential."   At that meeting, KOA also discussed increasing prices, along with other competitors.  The Defendants also repeatedly discussed the United States market conditions when engaged in information exchanges and coordination of resistors prices.

97.     In a "Weekly Operation Report" circulated by Panasonic employee Yoshinori Hourai, Mr. Hourai reported to his colleagues what occurred at an August 27, 2008 JEITA Passsive Components Committee meeting concerning resistors.  The information in the report included information that occurred in the past, as well as forecasts for future sales.  Attendees at the meeting included Panasonic, Rohm, KOA, and others.

98.     KOA President Mukaiyama and representatives from other Defendants at that meeting discussed resistor market trends, market trends for end-user markets, including the United States, and pricing strategies for resistors.  Mr. Hourai's report notes that competitors

---

[4]

discussed future pricing strategies concerning resistors prices and states that 50% of resistors manufacturers are implementing activities to raise prices or to stop prices from falling.  In addition to expressing a general need to raise prices or halt price declines, specific manufacturers of resistors discussed their pricing strategies for raising or maintaining prices at that meeting.

99.    In a September 2008 email chain, representatives from Defendants Panasonic (Hourai, Kamioka, and Hashimoto), ROHM (H. Kaida and Katabushi), HDK (K. Shimada, Nomura), and KOA (Misawwa and Nonomura), planned to meet in October for an "Information exchange."  The compeitors used code words to describe the meeting, claiming that it was an "R Meeting."   On information and belief, the competitors exchanged pricing information and discussed pricing resistors at the meeting scheduled for October of 2008.  Miura from Kamaya was invited to the meeting but could not attend.

100.    Moreover, in responding to certain customers' requests for quotations, Panasonic often sought and obtained KOA's pricing information.

101.    Handwritten notes from JEITA meetings from an employee of Defendant Rohm indicate that there were information exchanges at JEITA meetings and that KOA and others were starting a 7% price increase.

102.    Other handwritten meeting minute notes from Panasonic's Hourai, indicate that at an August 2008 meeting, competitors—including Defendants Panasonic, ROHM, HDK and KOA—met and coordinated pricing strategies.  For example, HDK was given instrutions to raise prices in accord with the understandings competitors reached at the JEITA meetings.

103.    There is further evidence that participants in JEITA meetings regarding resistors, used those meetings to coordinate future pricing.  Panasonic's Hourai's minutes from meetings in or around August 2008 indicate that the participants in that meeting coordinated their future pricing decisions.  For example, the notes indicate that for HDK "there has been a direction to increasing pricing . . ."  For Alpha, the notes indicate that it will "increase price in the European market" and that Susumu "will consider price increase" to certain resistors' products. At that meeting, KOA also discussed increasing prices, along with other competitors.  The Defendants

also repeatedly discussed the United States market conditions when engaged in information exchanges and coordination of prices.

104.    Further, at a JEITA meeting in or around October of 2008, Hourai's notes indicate that HDK discussed future pricing and wanted its competitors to sell resistors at a certain level. Hourai, from Panasonic, appears to have voiced his suggested price at that meeting.  At another meeting in November of 2008, Hourai's notes indicate that the competitors further discussed pricing.

105.    Handwritten notes from a ROHM employee of a JEITA meeting indicate that the ROHM employee needed to "discuss again with KOA the price difference of . . . resistors."

106.    Similarly, notes from JEITA meetings in or around 2013 show that Defendants' agreements, understandings, and discussings regarding resistors' pricing and supply continued. Panasonic's notes indicate a meeting with Defendant Kamaya wherein the parties reached understandings concerning limiting production capacity.

107.    In a 2013 Report regarding the activities of JEITA's Electronics Components Board, authored by KOA's Yamashita, he states that the "main purpose [of the Board] is internal information exchange and industry exchange."  The "common functions" of the Board, as listed in the report, are "[t]ransmission of industry information" and "[g]rasping trends in supply and demand."

108.    At one point, JEITA's Passive Components Committee became concerned that its members' conduct violated the antitrust laws.  At that meeting, the members—including Defendants—discussed that the "current activities may be problematic."

109.    Later in the Class Period, JEITA leadership sought to engage in a review of its own activities over concerns that members had been, and continue to, engage in anticompetitive conduct by discussing production capacity and prices, including raising and maintaining prices. Regarding "antitrust law", the report stated that "[t]here are a number of issues with the specifics of current activities, so we are considering reviewing activities . . ." On information and belief,

JEITA hired an outside attorney to review its activities and concerns that members had engaged in anticompetitive conduct.

110. ████████████████████████████████████████████
████████ █████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████

111. ████████████████████████████████████████
███████████ █████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

112.    Employees of Defendants that attended JEITA meetings and other conspiratorial meetings include, but are not limited to, the following: **Panasonic**—Hourai, Hashimoto, Miyoshi, Itsuki, Kuwada, Niita, Matsumoto, Takeuchi, Kamioka and others; **Rohm**—Umida, Wantanabe, Kaida, Maeda and others; **KOA**—Iga, Misawa, Kitabayashi and others; **HDK**—Nomura, Takakura, Shimada and others; **Kamaya**—Kawaguchi, Futagawa, Niikawa, Miura and others.

### 2.    Resistor Manufacturers Had Relationships in Other Price-Fixed Markets.

113.    Most of the resistor manufacturers also produce several other types of components, not just resistors.  For instance, Panasonic produced lithium ion batteries, cathode ray tubes, capacitors and optical disk drives.  ROHM also produced capacitors.  Capacitors, optical disk drives, cathode ray tubes, lithium ion batteries, and now resistors, have each been the subject of price-fixing investigations.

### C. Defendants Had a Common Motive to Conspire

114. As resistors are commodities, price is the most obvious differentiation among them for purchasers. In a market of this nature, with trillions of components being manufactured and sold a year at relatively inexpensive individual prices, there is a huge incentive to fix, stabilize, maintain and raise the prices of the components to supra-competitive levels through illegal conspiratorial agreements. By foregoing competition, each manufacturer could still guarantee themselves massive profits in such a high volume market. This anticompetitive conspiracy causes substantial harm to consumers, to competition, and to United States commerce.

### D. Indirect Purchasers Of Resistors Lacked Buying Power.

115. Standard economics holds that when there are many buyers in a market for a particular good, that good is more susceptible to effective cartel behavior. The incentive for cartel members to undercut the conspiracy is lower when there are many smaller purchasers because while each potential sale is small, disrupting the cartel can carry large penalties. A cartel member, thus, is incentivized to avoid the collapse of the entire price-setting agreement, and the loss of the supra-competitive profits on all sales in that market when there are many buyers. Conversely, a cartel's ability to raise prices can be thwarted in markets where buyers have significant negotiating power with sellers.

116. Resistors manufacturers sell their products to companies in audio-visual, communications, computers, peripherals, and home electronics businesses. The largest consumer of resistors is the telecommunications industry (29 percent), followed by the Computers and Consumer Audio-Visual Industry.



117.    Direct purchasers of resistors are generally distributors.  Except for a few tier 1 OEMs, most OEMs and EMS providers that make equipment for OEMs generally buy resistors from distributors.  There are very few large OEMs who possess buying power and as to those companies, Defendants were motivated to conspire amongst themselves to keep bid prices high to avoid cutthroat price competition that would harm them all.  Plaintiffs here are indirect purchasers that bought resistors from distributors and incorporated those resistors into other products.  Large numbers of buyers with little buying power, both at the primary level (*i.e.* distributors) and the secondary level (*i.e.* individuals and entities that purchased from distributors) is the general rule in the resistors industry.

118.    As set forth above, both direct and indirect purchasers in the resistor market lacked buying power.  Since there were many purchasers of resistors, it would have been easier to form and maintain the cartel.  This is because a large number of buyers would have made it less likely that Defendant manufacturers would have cheated on the agreement to artificially inflate prices, because the loss of supra-competitive profits on their sales of resistors outweighed the potential additional profits of raising sales to a handful of modestly-sized customers.

119.    The market for resistors in the United States accounts for a significant portion of the global resistors market.  It is currently estimated at about $959 million.  The Americas therefore account for about 23 percent of the global market at present.



**Source: United States International Trade Commission (USITC)**

E.  **Defendants Colluded To Keep The Price Of Resistors Elevated During The Class Period.**

120.   As alleged in this Complaint, Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of resistors throughout the Class Period.  Defendants' acts, practices, and course of conduct in furtherance of their conspiracy evolved over time and included, but were not limited to the following: coordinating prices for specific customers and products; engaging in continuous communications on confidential and proprietary business matters to eliminate price competition; allocating market shares; restricting supply of resistors; using input costs as a pretext for industry-wide pricing formulas; and concocting mechanisms to nullify competitive sales processes to their customers.

121.   Defendants effectively moderated and even negated the downward pressure on resistor prices caused by price competition, oversupply, technological advancements, and demand reduction.

1.   **Illustrative Examples of Defendants' Conspiratorial Conduct**

122.   Plaintiffs reallege and reincorporate each and every allegation in this Complaint as though fully set forth in this section.

123.   As discussed, Defendants utilized their positions as members of the Passive Components Committee at JEITA and other formal and informal trade association events, to meet, discuss prices and agree on pricing strategies for resistors.  In addition to discussing and agreeing on pricing strategies for resistors, Defendants also met and discussed each manufacturer's production capacity.  It was important for Defendants to meet and understand each other's production capacity because to the extent each Defendant could limit its production of resistors, this would result in the desired price increases.

124.   For example, at a July 2003 JEITA meeting of the Passive Components Committee meeting, which included Defendants Panasonic, Rohm, KOA, HDK, and Kamaya, and other co-conspirators, Defendants discussed the form and information to be submitted in

future information exchanges with committee members.   Under No. 7 of the form, entitled "Common issues for the industry", members were expected to discuss and provide information regarding "prices in Japan and overseas [and] requests by customers."   Committee members wanted to exchange this information in an effort to coordinary their prices and production as much as possible.   These aforementioned Defendants continued meeting through JEITA throughout the class period.

125. 

126.

127.

128.    Defendants, including Panasonic, Rohm, HDK and KOA also attended informal trade association events named "CR Committee Meeting".   For instance, in or around May 2007, employees of Pananonic, Rohm, and KOA, met at a CR Committee Meeting and discussed pricing strategies for Nokia.   The participants in the meeting met and discussed the need for the three of them to work together as a Japanese "alliance."   Mr. Kamioka informed his colleagues at Panasonic that he would discuss the matter further with Mr. Kaita (ROHM) at the upcoming JEITA meeting.

129.     In or around November 2007, KOA, ROHM, HDK, Panasonic and other co-conspirators met at a JEITA meeting on a subcommittee specifically designed to discuss resistors. At the meeting, the conspirators explicitly discussed production capacity and pricing.  With respect to production capacity, KOA and HDK discussed the fact that neither had any excess production capacity, while ROHM and other coconspirators still had production capacity. Regarding pricing, the competitors shared their view as to the optimal pricing for certain resistors. Despite it being 2007, for model year 2012 and over, the competitors discussed that a price rise would be implemented. At the meeting, the competitors also discussed the optimal level of pricing.

130.     On or around November 30, 2007, at a Resistors Committee Meeting, that occurred in Nagoya City, Defendants, including Panasonic, KOA, ROHM, HDK and Kamaya, met and discussed production capacity as a means of limiting supply and thereby raising prices. The participants in the meeting also discussed various optimal pricing levels for certain resistors. Kamioka attended this meeting for Panasonic.  When he forwarded the minutes of this meeting to his colleagues within Panasonic, he implored them to "treat [it] as confidential."  At that meeting, KOA also discussed increasing prices, along with other competitors.  The Defendants also repeatedly discussed the United States market conditions when engaged in information exchanges and coordination of resistors prices.

131.     On or around April 2008, Panasonic employee Yoshihiro Hashimoto sent an email to a number of colleagues from Panasonic reporting on a meeting he had with representatives from KOA.  He reported to his colleagues that he received "confidential competitor information" from KOA.  Hashimoto's email indicated that he and the representative from KOA discussed pricing strategies and that there would be continued activities to raise prices as to overseas customers.

132.     The last paragraph of Hashimoto's email also indicates that he had a separate meeting with "Company R" to exchange information.  "Company R" is a code word for ROHM and at the meeting the parties discusses pricing strategies for resistors.

133.     Similarly, in Panasonic email chains regarding future pricing for a customer, employees Sato and Kamioki discuss potential future pricing strategies while taking into account advanced information they had obtained regarding KOA's pricing.

134.     In a "Weekly Operation Report" circulated by Panasonic employee Yoshinori Hourai, Mr. Hourai reported to his colleagues what occurred at an August 27, 2008 JEITA Passsive Components Committee meeting concerning resistors.  The information in the report included information that occurred in the past, as well as forecasts for future sales.  Attendees at the meeting included, but were not limited to, Panasonic, ROHM, KOA and others.

135.     KOA President Mukaiyama and representatives from other Defendants at that meeting discussed resistor market trends, market trends for end-user markets, including the United States, and pricing strategies for resistors.  Mr. Hourai's report notes the fact that competitors discussed future pricing strategies concerning resistors prices and states that 50% of resistors manufactures are implementing activities to raise prices or to stop prices from falling. In addition to expressing a general need to raise prices or halt price declines, specific manufactuers of resistors discussed their pricing strategies for raising or maintaining prices at that meeting.

136.     There is further evidence that participants in JEITA meetings regarding resistors, used those meetings to coordinate future pricing.  Panasonic's Hourai's minutes from meetings in or around August 2008 indicate that the participants in that meeting coordinated their future pricing decisions.  For example, the notes indicate that for HDK "there has been a direction to increasing pricing . . ."  For Alpha, the notes indicate that it will "increase price in the European market" and that Susumu "will consider price increase" to certain resistors' products.

137.     In a September 2008 email chain, representatives from Defendants Panasonic (Hourai, Kamioka, and Hashimoto), ROHM (H. Kaida and Katabushi), HDK (K. Shimada and Nomura), KOA (Misawwa and Nonomura), planned to meet in October for an "Information exchange."  The competitors used code words to describe the meeting, claiming that it was an "R Meeting."  On information and belief, the competitors exchanged pricing information and

discussed pricing resistors at the meeting in October of 2008.  Kamaya's Miura was invited to the meeting but could not attend.

138.     In Septmember 2008, Shimada from HDK corresponded with Hourai from Panasonic concerning the pricing to be provided on resistors to an American company. The email indicates that they previously exchanged "valuable information."  Hourai implores Shimada to avoid reducing the price to this potential customer as far as possible because the customer's requested price "is not very profitable."

139.     Handwritten notes from JEITA meetings from an employee of ROHM indicate that there were information exchanges at JEITA meetings and that KOA and others were starting a 7% price increase.

140.     Further, at a JEITA meeting in or around October of 2008, Hourai's notes indicate that HDK discussed future pricing and wanted its competitors to sell resistors at a certain level. At another meeting in November of 2008, Hourai's notes indicate that the competitors further discussed pricing.

141.     In December of 2008, JEITA's Passive Components Committee became concerned that its members' conduct violated the antitrust laws.  At that meeting, the members—including Defendants—discussed that the "current activities may be problematic."

142.     

143.     In or around September of 2009, Mr. Hourai emailed internal Panasonic emploees concerning pricing to a major cell phone manufacturer that had been doing business with "Company R" (*i.e.,* Defendant ROHM).  Hourai states that the day before, Panasonic Director Hashimoto contacted ROHM's global controller regarding their prices for this particular

customer.  Defendant ROHM discussed its strategy of attempting to raise the prices for this customer with Panasonic.

144.    In previous Panasonic internal correspondence, Mr. Hourai of Panasonic indicates that Panasonic's Hashimoto regularly exchanges pricing and other competitively sensitive information with employees of ROHM to reach common ground on pricing.

145.    An employee from ROHM held a meeting where he indicated that he had obtained extensive pricing information from Kamaya in relation to customers.

146.    KOA employees discussed pricing strategies related to a particular customer and circulated a chart that included the coordinated pricing positions of Vishay and Yageo with respect to the same customer.

147.    Notes from JEITA meetings in or around 2013 show that Defendants' discussing of resistors' pricing strategies continued.  Panasonic's notes indicate a meeting with Kamaya wherein the parties discussed limiting production capacity.

148.



149.

**F.    Defendants Utilized "R Meetings" to Further their Conspiracy.**

150.    Cartel members used the term "R Meetings" to refer to meetings when they met to exchange competitively sensitive information and reach agreements as to price increases.  R Meetings often happened around the time of JEITA meetings.  ████████████████

151.    ████████████████████████████████████████████████████

152.    ████████████████████████████████████████████████████

**G.**    **Defendants Conspiratorial Meetings and Efforts Occurred Outside Japan and Took Many Forms.**

153.    Defendants did not limit their cartel meetings to Japan.  Nor were Defendants' cartel activities limited to JEITA and R Meetings.  In the paragraphs below, Plaintiffs allege certain meetings that Defendants attended (and groups of which they were a part) to further the goals of their conspiracy, namely artificially maintaining and raising resistors prices.



1

2

158. 

3

4

5

6

7

8

9

10

159.

11

12

13

14

15

160.

16

17

18

19

161.          Members of the resistors cartel were fond of golf and

used such golf meetings to further the aims of the cartel.







168.   **Bilateral Information Exchanges:** In addition to group meetings, Defendants also engaged in bilateral communications in which they shared pricing, supply, and production information in furtherance of the conspiracy's goals.[5]

169.

170.

171.

172.

[5]

1 ████████████████████████████████████████████ ██████

2 ████████████████████████████████████████████████████

3 ████████████████████

173.    As alleged above, Defendants had informal bi- and multi-lateral cartel meetings,

before and after, official JEITA meetings, where they exchanged competitively sensitive

information and reached agreements as to the pricing of resistors.  The following lists dates on

which resistors-related JEITA meetings occured after early 2009 that Defendants'

representatives attended:

174.    **CEATEC**: The Combined Exhibition of Advanced Technologies ("CEATEC")

is an annual trade show in Japan; it is Japan's largest IT and electronics exhibition and

conference.

### 1. Illustrative Examples of U.S. Subsidiaries Engaging in Conspiratorial Conduct

175. Defendants utilized their U.S. subsidiaries, also Defendants in these actions, to further the aims of the cartel.

176. Defendants' U.S. subsidiaries had direct contact with each other to discuss pricing and coordinating behavior.

177. Information sharing streamed back and forth across the Pacific. Defendants' U.S. Subsidiaries gathered information from their ostensible competitors in furtherance of the conspiracy and sent it back to their corporate parents in Japan to ensure compliance with the agreements reached abroad.

178. Another example is a June 2010 email

179. In a May 2010 email chain, ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

180. Likewise, U.S.-based employees engaged in collusive conduct with other cartel members. ██████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

**H.**   **Defendants' Corporate Families Acted as Single Enterprises; Defendant Parent Companies Exercised Substantial Control over Their U.S. Subsidiaries.**

181.   When Defendants reached agreement on fixing, raising, maintaining, and/or stabilizing prices of resistors—whether as a result of formal or informal cartel meetings, or during *ad hoc* bilateral or tri-lateral meetings arranged to enforce, implement, or effectuate cartel purposes and agreements—each of the Defendants meant for their collusive agreements to impact the pricing for all resistors subject to the cartel's anticompetitive efforts, regardless of where they were sold, and regardless of which member of the cartel member's corporate family sold the resistors.

182.   Defendants sell, market, and distribute resistors as part of a single, integrated global enterprise.  Each Defendant sells its resistors around the world, including in the United States.  Accordingly, to achieve the cartel's anticompetitive aims, Defendants effectuated the cartel by establishing pricing on their resistors in all markets—including the United States—in which they sell resistors.  The cartel's scheme would not have been effective in a global market were they to sell resistors at a lower price in some locations – in the United States, for example – as compared to others – in Japan, for example.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD                                                                                      48

183.   The Japan-based defendants – Hokuriku Electric Industry Co. (HDK Japan), Kamaya Electric Co. (Kamaya Japan), KOA Corporation (KOA Corp.), Panasonic Corporation (Panasonic Corp.), and ROHM Co. Ltd. (ROHM Co.)[6] – established subsidiaries in the United States not only to market, sell, and distribute their resistors in the United States, but also to effectuate and achieve the cartel's aims and purposes.  Without doing so, these parent corporate entities in Japan would have had to perform such functions themselves; they chose not to do so and instead established corporate subsidiaries and affiliates in the United States that perform functions at the direction of, and are controlled by, the parent companies' officers and managers in Japan.

184.   These U.S. subsidiaries – HDK America, Inc. (HDK America), Kamaya Inc. (Kamaya America), KOA Speer Electronics, Inc. (KOA Speer), Panasonic Corporation of North America (PNA), and ROHM Semiconductor U.S.A., LLC (ROHM USA)[7] – have no authority to set prices below the prices for resistors agreed to among the cartel's members; though it may be true that, from time to time, U.S.-based personnel had authority to charge prices higher than that those set by the cartel.  For these U.S. subsidiaries, pricing authority was held by their Japan-based defendant corporate parent, or the Parent Defendant's designated representative in the United States.

185.   Because their Japan-based Parent Defendants had significant control over all aspects of their business (*e.g.*, resistors supply, pricing authority, business strategy, customer development and relations, sales and personnel decisions), the U.S.-based Subsidiary Defedants (as described more fully below) operated as little more than sales offices in the United States for their respective Japan-based Defendant parents.  Indeed, many of the Japan-based Parent Defendants named their own employees directors, officers or managers of their U.S. subsidiaries,

---

[6]   Defendants Hokuriku Electric Industry Co., Kamaya Electric Co., KOA Corporation, Panasonic Corporation, and ROHM Co. Ltd. are referred to collectively as the "Parent Defendants."

[7]   Defendants HDK America, Inc., Kamaya Inc., KOA Speer Electronics, Inc., Panasonic Corporation of North America, and ROHM Semiconductor U.S.A., LLC are referred to collectively as the "Subsidiary Defendants."

and many of these employees held these positions without ever even leaving Japan.  As a result, these Subsidiary Defendants were—as intended—able to advance the cartel's aims in the United States.

        **1.**        **Defendants' High-Level Employees Organized the Conspiracies and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracies.**

186.    The conspiracy was organized at a high level within the defendant corporate families. The conspiracy was carried out by both executives and subordinate employees. Further, given the nature of the industry, the conspiratorial agreements were implemented by the subsidiaries and distributors within the respective corporate families.

187.    Each of the corporate families alleged herein operate not as separate corporate entities but as a single global enterprise. As the following allegations demonstrate, each corporate family holds itself out to the public as a single, integrated enterprise.  Each of the Parent Defendants named in this case operates a hierarchical corporate structure wherein they treat subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.

188.    Each Parent Defendant alleged herein also coordinates and manages the finances and meetings between managers from each of its different subsidiaries, including the Subsidiary Defendants, to facilitate an integrated enterprise to link the various supply chains within the corporate family and to the corporate families' clients.  The Parent Defendants dominate and control the finances, policies, and business practices of their various subsidiaries, including the Subsidiary Defendants.

189.    In light of the fact that the Subsidiary Defendants were treated as mere sales offices of the Parent Defendants, they were not permitted to undercut the pricing agreements reached at the competitor meetings occurring in Japan and elsewhere.

190.    By virtue of their integrated enterprises, and by virtue of the other allegations in this Complaint, each Defendant individually entered into the conspiracies alleged herein on behalf of, and reported these meetings and discussions to, their respective corporate family and

1   U.S. subsidiaries.  In fact, Defendant parent companies often provided pricing instructions to

2   their U.S. subsidiaries, which acted as their U.S. sales arms.

3       191.   **KOA:** KOA's directives came from the top of the company;



13      192.   KOA Corp. considered, treated, and even referred to KOA Speer as a

20      193.   Under KOA's current pricing regime



194.   KOA Speer's

195.

196.   **Kamaya:** Kamaya Japan

197.   Kamaya Japan 

198.   **HDK:** At HDK,

199.   For example,

200.   When negotiating with customers,

201.   For some customers, HDK Japan

202.   **Panasonic**: Panasonic Corp.

203.   **ROHM**: ROHM USA

204.



### 2. Defendants' Representatives who Attended Conspiratorial Meetings and Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family.

205.   In many instances of meetings and communications between and among Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege which

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD

54

corporate family was represented in a particular meeting or communications.  This is because, as documents reviewed to this date demonstrate, the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "HDK", "Kamaya", "KOA", "Panasonic", or "ROHM".  Indeed, the employees from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective U.S. subsidiaries.  Further, because of their generic uses of Defendants' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts, nor did they distinguish between entities within the respective corporate families.  Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and U.S. affiliates.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

206.    For example, 

207.    Similarly, a memo reporting the information shared

At this meeting, the attendees discussed resistors prices and their respective production capacities.

208.    In advance of the October 2, 2009 ████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████

209.    Further, Defendants knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.

### 3.    Each Defendant Parent Company, Along With Its U.S. Subsidiary, Hold Themselves Out as a Single Integrated Enterprise.

#### a.    HDK Corporate Family

210.    HDK Japan and HDK America lack corporate separation.  HDK America for example, lacks its own web domain (*e.g.*, www.company.com/); HDK America's homepage is merely a webpage within HDK Japan's website: accessing a link for HDK America on HDK Japan's website[9] merely redirects to another page on HDK Japan's website.[10] Indeed, entering "www.hdkamerica.com" into a web browser redirects to an English-language page on HDK Japan's website (https://www.hdk.co.jp/english/index_e.htm).  HDK Japan refers to HDK America in different places as a "Sales Base"[11] and a "Sales Office."[12]  HDK America is but one arm of HDK Japan's global sales operation: HDK Japan operates a "Global Network" through its multiple "Sales Offices" in Shanghai (Hokuriku (Shanghai) International Trading Co., Ltd.), Taipei (Taipei Hokuriku Electric Industry Co., Ltd.), Guang Dong (HDK China Ltd.), Singapore (Hokuriku (Singapore) Pte, Ltd.), Thailand (Hokuriku International (Thailand) Co., Ltd.), and the United States (HDK America).[13]

[9]      https://www.hdk.co.jp/english/prfile_e/prf006_e.htm.

[10]     https://www.hdk.co.jp/english/index_e.htm.

[11]     https://www.hdk.co.jp/english/prfile_e/prf006_e.htm (Overseas bases)

[12]     https://www.hdk.co.jp/english/prfile_e/prf008_e.htm ("Global Network" map)

[13]     https://www.hdk.co.jp/english/prfile_e/prf008_e.htm

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD
56

211.

### b. __Kamaya Corporate Family__

212.    Kamaya Japan and Kamaya America lack corporate separation.  According to both Kamaya Japan and Kamaya America's website, Kamaya America "was established as a sales office with warehouse in the U.S.A."[14]  Kamaya America's website identifies Kamaya America as a "division" of Kamaya.[15]  Kamaya Japan's website states that it "aim[s] to be a global company that will progress into the world through the supply of resistors."[16] And the "Kamaya Electronics Catalog" identifies Kamaya Japan and Kamaya America as members of the "Kamaya Global Network."  The Catalog identifies Kamaya Japan's Kanagawa location as the "Head Office," and like the "Global Network" section of Kamaya Japan's website, it identifies Kamaya America's locations as "Warehouses" and "Sales Offices."[17]  Indeed, the product catalog on Kamaya America's website is identical to that on Kamaya Japan's website, and bears Kamaya Japan's name and logo and website url on its cover.  Kamaya America's website indicates that Kamaya Japan claims copyright protections over its contents.

213.    Kamaya America's Distribution Sales Network [18] completely overlaps with Kamaya Japan's "Global Network";[19] both identify America II Electronics; Area51 ESG, Inc.

[14]    http://www.kamaya.com/ (Kamaya America);
http://www.kamaya.co.jp/about.php#history (Kamaya)
[15]    http://www.kamaya.com/
[16]    http://www.kamaya.co.jp/vision.php
[17]    http://www.kamaya.co.jp/contact.php?global#network
[18]    http://www.kamaya.com/
[19]    http://www.kamaya.co.jp/contact.php?global#network

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**                                                                57

Chris Electronics; Concord Components, Inc.; Digi-Key Corporation; Integra Electronics, Inc.; Ital Sales; Miltronics Distribution; Mouser Electronics; NAC; Nexsun Electronics, Inc.; NRC Electronics; PCX, Inc. (Pacific Component Xchange, Inc.); PUI (Projections Unlimited, Inc.); RCD Industries; Tonar Industries, Inc.; UTECH Electronics; and YES-TECH.

214. ████████████████████████████ ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████.

### c. KOA Corporate Family

215.    KOA Corp. and KOA Speer lack corporate separation.  KOA Corp.'s website for example, lists KOA Speer as but one of the company's many "Offices" around the world.[20]  KOA Speer joins KOA entities in Germany, Singapore, Thailand, Malaysia, China, and Taiwan, as part of KOA Corp.'s sprawling "Overseas Network," which are controlled by KOA Corp. headquarters in Japan.  KOA Corp. identifies the establishment of KOA Speer as a milestone in the company's "Corporate History."[21] Through KOA Speer, KOA Corp. claims a 40% market share in the United States.[22] ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

216.    On a section of KOA Speer's website titled, "Manufacturing Expertise," KOA Speer states: "KOA Corporation strives to be a world leader in the technology and operational systems of manufacturing. . . . Our manufacturing programs meet the highest international standards for finished component quality with defect levels measured in parts per billion."[23]  It makes no reference to KOA Speer's manufacturing expertise.

[20]        https://www.koaglobal.com/corporate/offices#usa

[21]        https://www.koaglobal.com/corporate/history3?sc_lang=en

[22]        https://www.koaglobal.com/ir/top-message

[23]        http://www.koaspeer.com/manufacturing-expertise/

217.   The "Global Presence"[24] section of KOA Speer's website provides the following:

> To become an effective partner with a company utilizing widely dispersed plants it is essential that a supplier address global requirements. **KOA Corporation is such a supplier.**
>
> ***Complementing our United States sales, tech support, warehousing and distribution operation is a European sales office, our corporate headquarters in Japan and twenty-four manufacturing facilities located throughout the Pacific Rim.*** Our emphasis on a worldwide presence works in concert with our customers and allows us to implement responsive, localized technical support and inventory management programs.

### d.   ROHM Corporate Family

218.   ROHM Co. and ROHM USA lack corporate separation.  ROHM USA is ROHM Co.'s wholly-owned U.S. subsidiary.  ROHM USA is identified on ROHM Co.'s web site as one of its "Overseas Operations."  ROHM Co. and  Rohm USA share a website; jobs at ROHM Co. subsidiaries around the globe, including ROHM USA are listed on the same webpage.[25] ROHM Co. identifies establishing a "US subsidiary company in California" as part of its "Overseas Expansion" on the Company History Portion of its webpage.[26]

219.   ROHM USA sells ROHM Co.'s resistors to customers in the United States. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████. Accordingly, ROHM USA is dependent on ROHM Co. for the resistors it markets, sells or delivers in the United States.

220.   ROHM Co. closely oversees sales of its resistors in the United States. Sales to U.S.-based customers are important to ROHM's overall business. ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[24]   http://www.koaspeer.com/global-presence/ (emphasis supplied).

[25]   http://www.rohm.com/web/global/careers

[26]   http://www.rohm.com/web/global/company-history

221.    ROHM USA sells, at ROHM Co.'s direction, resistors manufactured at factories operated by ROHM affiliates:

### e.    Panasonic Corporate Family

222.    Panasonic Corp. and PNA likewise hold themselves out as an integrated corporation.  "The Panasonic Group is compromised primarily of the parent Panasonic Corp. and [496] consolidated subsidiaries in and outside of Japan, operating *in close cooperation* with each other."[27]  Panasonic Corp. has a streamlined governance structure that runs from the top down. "[T]he Board of Directors has the ultimate responsibility for administration of the Company's affairs and monitoring of the execution of business by the Directors. . . . At the same time, the Company employs an Executive Officer system to provide for the execution of business at its various domestic and overseas Group companies.  This system facilitates the development of optimum corporate strategies that integrate the Group's comprehensive strengths."[28]

---

[27]    Panasonic Corp., Annual Securities Report for the fiscal year ended March 31, 2014, at 6 (107th Business Term) ("Securities Report") (emphasis added), *available at* http://www.panasonic.com/global/corporate/ir/pdf/AnnualSecuritiesReport2014.pdf; Company Profile, *http://www.panasonic.com/global/corporate/profile/overview.html*, last visited September 21, 2017 (noting 496 "consolidated companies").

[28]    2014 Annual Report at 37, *available at*, http://www.panasonic.com/global/corporate/ir/pdf/panasonic_ar2014_e.pdf.;

223.     Panasonic Corp.'s Executive Officers include the heads of regional subsidiaries, including Thomas Gebhart, Chairman and CEO of PNA.[29]   PNA's CEO is identified by Panasonic Corp. as Panasonic Corp.'s "Regional Head for North America."[30] In its Annual Reports, Panasonic Corp. presents a consolidated financial statement for "Panasonic Corp. and Subsidiaries."[31]   Panasonic also presents employee data in its Annual Report on a consolidated basis.[32]

224.     Panasonic Corp. and its subsidiaries act as a single entity.  Panasonic Corp. issues releases, for example, of all changes to the membership of the Board of Directors and Executive officers, across all divisions and subsidiaries, including PNA.[33]   In its annual report, Panasonic Corp. lists key dates in its history, including the founding of Matsushita Electric Corp. of America, which went on to become PNA.[34]  Panasonic Corp. controls 100 percent of "voting rights interests" in PNA.[35]  PNA maintains a webpage (shop.panasonic.com/home) that is nested within the Panasonic Corp. domain name.  The "Investor Relations" tab on the PNA website links back to Panasonic Corp.'s investor relations page at http://www.panasonic.com/global/corporate/ir.html.

225.     ███████████████████████████████████████

---

[29]     Panasonic Corp., 2017 Annual Report at 74, *available at*, http://www.panasonic.com/global/corporate/ir/pdf/panasonic_ar2017_e.pdf
[30]     *Id.*
[31]     2014 Annual Report at 3–4.
[32]     Securities Report at 11.
[33]     *See* Press Release, Panasonic Corp., *Panasonic Announces Proposed Senior Management Changes, Panasonic* (February 26, 2014), *available at* http://www.panasonic.com/content/panasonic/global/en/corporate/ir/pdf/en140226.pdf.
[34]     Securities Report at 3.
[35]     *Id.* at 9.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**                                                                              61

**4.      The Nature of the Resistor Industry Required Foreign Companies Named As Defendants Herein to Use Their U.S. Subsidiaries As Sales Arms for Price-Fixed Resistors.**

226.    The Subsidiary Defendants are wholly-owned and/or controlled by their parent companies.  As part of each Parent Defendant's global enterprise, the U.S.-based Subsidiary Defendants assist the Parent Defendants with the sale and/or delivery of resistors to U.S. purchasers.  The Subsidiary Defendants carry out the sales of resistors to customers in the United States after obtaining products manufactured at their parent company's factories located in Japan and/or other locations in Asia.  Generally, the Subsidiary Defendants facilitate direct purchaser orders for resistors with their parent companies overseas.  That is, the parent company manufactures and packs resistors in Japan (or another subsidiary or affiliate of the parent company manufactures and packs resistors in Japan or a different country) and sends the purchased resistors directly to the United States, often through its U.S. subsidiaries.  Indeed, Defendant parent companies make hundreds of millions of dollars of sales annually to their U.S. subsidiaries as part of their global business.

227.    As the allegations above demonstrate, the Subsidiary Defendants acted as no more than sales arms of their respective parent companies.  The Subsidiary Defendants had no true discretion as to the prices at which they sold resistors or the profit they would make from their sales; these Subsidiary Defendants lacked any independence from their corporate parents in Japan.  In short, Defendants operate their resistor business as a single global enterprise in which they sell resistors in the United States through subsidiaries located here.

## IX.    <u>ANTITRUST INJURY</u>

228.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)      Price competition has been restrained or eliminated with respect to resistors;

(b)      The prices of resistors have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)      Indirect purchasers of resistors have been deprived of free and open competition; and

(d)     Indirect purchasers of resistors, including Plaintiffs, paid artificially inflated prices.

229.     During the respective Class Periods, Plaintiffs and the Classes paid supra-competitive prices for resistors.

230.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for resistors than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.     AFFECTED TRADE AND COMMERCE

231.     During the Class Period, Defendants collectively controlled the vast majority of the market for resistors, both globally and in the United States.

232.     Defendants, directly and indirectly, sold resistors to manufacturers and consumers located in numerous states in the United States other than states in which Defendants are located.  Substantial quantities of resistors containing resistors are shipped from outside the United States into the United States, and are shipped interstate in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

233.     In addition, substantial quantities of equipment and supplies necessary to the production and distribution of resistors, as well as payments for resistors and related products sold by Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of resistors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

### A.     Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S.

**Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' Antitrust Claims**

234.    Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed resistors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues.  In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed resistors to enter the United States market and inflating the prices of resistors destined for the United States.  Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

235.    The United States resistors market is enormous. Defendants and others shipped millions of resistors, including those incorporated into finished products, into the United States during the respective Class Periods for ultimate resale to U.S. consumers.  As a result, a substantial portion of Defendants' revenues were derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.

236.    Because of the importance of the U.S. market to Defendants and their co-conspirators, resistors intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct. Defendants knowingly and intentionally sent price-fixed resistors into a stream of commerce that led directly into the United States. This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for resistors.

237.    During the Class Period, every Defendant shipped resistors directly into the United States.

238.    When high-level executives within Defendants' companies agreed on prices, they knew that their price-fixed resistors would be sold in the United States.

239.    For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

240.    Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce in the form of higher prices for resistors and electronic products containing resistors that Plaintiffs and Members of the Classes paid. These prices, tainted by collusion, directly and immediately impacted Plaintiffs and Members of the Classes in the United States. In this respect, the U.S. effects of Defendants' illegal conduct gave rise to Plaintiffs' and Members of the Classes' antitrust claims and were the proximate cause of the injury that Plaintiffs and Members of the Classes suffered.  Defendants often discussed conditions in the United States market while they coordinated their prices.

241.    A number of facts demonstrate that Defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable effect on domestic commerce.

## B.    The Defendants Targeted the United States

242.    Because of the small size of resistors, transportation costs are relatively minor and there is substantial international trade in these electronic components.

243.    During the Class Period, Defendants manufactured and sold substantial quantities of resistors shipped from outside the United States and from other states in a continuous and uninterrupted flow of interstate and foreign trade and commerce.  In addition, substantial quantities of equipment and supplies necessary to the production and distribution of resistors, as well as payments for resistors and related products sold by Defendants, traveled in interstate and foreign trade and commerce.  The business activities of Defendants in connection with the production and sale of resistors that were the subject of the charged conspiracy were within the flow of, and affected substantially, interstate and foreign trade and commerce.

244.    Defendants engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

245.    Defendants, directly and through their agents, engaged in a conspiracy to fix or inflate prices of resistors that restrained trade unreasonably and affected adversely the market for resistors.  Defendants affected commerce, including import commerce, substantially

throughout the United States, proximately causing injury to Plaintiffs and members of the Classes.

**XI.    CLASS ACTION ALLEGATIONS**

246.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive relief on the following classes ("Injunctive Relief Class"):

> All persons and entities in the United States who purchased one or more linear resistor(s) from a resistor distributor not for resale which a Defendant, its current or former subsidiary, or any of its co-conspirators from a date presently unknown to Plaintiffs and going through such time as the anticompetitive effects of Defendants' conduct ceased ("Class Period").

247.    Plaintiffs will also seek certification of State Damages Classes (defined below) pursuant to Rules 23(a) and (b)(3), asserting claims for damages under (1) the antitrust and restraint of trade laws of California, Iowa, Michigan, Minnesota, Nebraska, and New York;[36] and (2) the unfair competition and consumer protection laws of California, Florida, Nebraska, and New York.[37]

248.    Pursuant to Rule 23, Plaintiffs bring claims for damages on behalf of all persons similarly situated that are members of the following classes:

**(a) California:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the Class Period ("California Damages Class").

**(b) Florida:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the Class Period ("Florida Damages Class").

---

[36]    California Business and Professions Code, §§ 16700, *et seq.*, Iowa Code §§ 553.1, *et seq.*, Michigan Compiled Laws §§ 445.772, *et seq.*, Minnesota Statutes §§ 325D.49, *et seq.*, Nebraska Revised Statutes §§ 59-801, *et seq.*, and New York General Business Laws §§ 340, *et seq.*.

[37]    California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, and N.Y. Gen. Bus. Law § 349, *et seq.*

**(c) Iowa:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the Class Period ("Iowa Damages Class").

**(d) Michigan:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the respective Class Periods ("Michigan Damages Class").

**(e) Minnesota:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the Class Period ("Minnesota Damages Class").

**(f) Nebraska:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the respective Class Periods ("Nebraska Damages Class").

**(g) New York:** All persons and entities that indirectly purchased one or more resistors from a distributor that a defendant or co-conspirator manufactured during the Class Period ("New York Damages Class").

**State Damages Classes:** The California Damages Class, the Florida Damages Class, the Iowa Damages Class, the Michigan Damages Class, the Minnesota Damages Class, the Nebraska Damages Class, and the New York Damages Class, collectively, are the "State Damages Classes".

249. The Injunctive Relief Class and the State Damages Classes are collectively referred as the "Classes" unless otherwise indicated. Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, all jurors in this case, and all persons and entities who directly purchased linear resistors from Defendants.

250. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each of the Classes.

251.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants engaged in a combination and conspiracies among themselves to fix, raise, maintain, and/or stabilize the prices of linear resistors sold in the United States;

b.    The identity of the participants of the alleged conspiracies;

c.    The duration of the alleged conspiracies and the acts carried out by Defendants in furtherance of the conspiracies;

d.    Whether the alleged conspiracies violated the Sherman Act;

e.    Whether the alleged conspiracies violated the antitrust and restraint of trade laws of California;

f.    Whether the alleged conspiracies violated the unfair competition and consumer protection laws of California;

g.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and members of the Classes;

h.    The effect of the alleged conspiracy on the prices of linear resistors sold in the United States during the respective Class Period;

i.    The appropriate injunctive and related equitable relief for the Injunctive Classes; and

j.    The appropriate class-wide measure of damages for the State Damages Classes.

252.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for linear resistors purchased indirectly from Defendants.

253.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

254.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

255.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

256.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

257.    Plaintiffs bring the Damages Classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more linear resistors that a Defendant or co-conspirator manufactured during the respective Class Periods.

## XII.    GUILTY PLEAS IN PRIOR CASES

258.    Significantly Panasonic, one of the world's leading manufacturers of resistors, has pled guilty in numerous price-fixing cases, including electronic products.

259.    On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

260.    On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and automotive high intensity discharge ballasts installed in automobiles sold in the United States and elsewhere from at least as early as September 2003 until at least February 2010.

261.    That same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April 2007 until about September 2008.  The production and sale of both lithium ion batteries and resistors were often overseen by the same departments and personnel that were involved in fixing lithium ion battery prices.

262.    In 2008, Panasonic created "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these efforts. The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> In fiscal 2012, the company reviewed the efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. The top management strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing departments to confirm whether they encounter suspicious activities or not.

*https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf.*  The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive officers in charge of corporate operational fuctions at the company's headquarters. That group identified the "corporate major risks" for the then just-ended fiscal year 2012 and the then upcoming fiscal year 2013. On both lists was "Cartels." Subsequent corporate sustainability reports for 2013,

2014 and 2015 identified this same "corporate major risk' for the 2013, 2014 and 2015 fiscal years, as well as the 2016 fiscal year.[38]

263.    The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Defendants' corporate conduct, which has included illegal activity aimed at generating profits at the expense of their customers.

# XIII.   VIOLATIONS ALLEGED

## FIRST CLAIM FOR RELIEF
### (Violations of Sherman Act, 15 U.S.C. § 1)
### (On Behalf of All Plaintiffs Against All Defendants)

264.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

265.    Defendants and unnamed coconspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section One of the Sherman Act (15 U.S.C. § 1).

266.    Beginning at a date presently unknown to Plaintiffs and continuing through the present, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

267.    In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the prices of linear resistors

268.    As a result of Defendants' unlawful conduct, prices for linear resistors were raised, fixed, maintained, and stabilized in the United States.

---

[38]     *See* https://www.panasonic.com/global/corporate/sustainability/pdf/sr2013e.pdf; http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/2014/sr2014e.pdf;
http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/2015/sdb2015e.pdf.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**

269.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

270.   For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   Participating in meetings and conversations to discuss the prices and supply of linear resistors.

b.   Communicating in writing and orally to fix prices of linear resistors.

c.   Agreeing to manipulate prices and supply of linear resistors sold in the United States in a manner that deprived purchasers of free and open competition.

d.   Issuing price announcements and price quotations in accordance with the agreements reached.

e.   Selling linear resistors to customers in the United States at non-competitive prices.

f.   Providing false statements to the public to explain increased prices for linear resistors.

271.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their businesses and property in that they have paid more for resistors than they otherwise would have paid in the absence of Defendants' unlawful conduct.

272.   The alleged contract, combination or conspiracy is a *per se* violation of the federal antitrust laws.

273.   These violations are continuing and will continue unless enjoined by this Court.

274.   Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Classes seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
**(Violations of State Antitrust and Restraint of Trade Laws)**
**(On Behalf of Plaintiffs Against All Defendants)**

275.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

276.    Plaintiffs allege violations of the following states' antitrust and restraint of trade laws: California, Iowa, Michigan, Minnesota, Nebraska, and New York.[39]

277.    Beginning at a time currently unknown to Plaintiffs, but at least as early as 2003 and continuing thereafter through the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of various state antitrust and restraint of trade laws. Defendants, and each of them, have acted in violation of such laws to fix, raise, stabilize, and maintain prices of, and allocate markets for resistors at supra-competitive levels.

278.    In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of resistors sold in the United States.

279.    As a result of defendants' unlawful conduct, prices for resistors were raised, fixed, maintained, and stabilized in the United States.

280.    The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding, and concerted action among defendants and their co-conspirators.

281.    For purposes of formulating and effectuating their contract, combination, or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a) Participating in meetings and conversations to discuss the prices and supply of resistors;

(b) Communicating in writing and orally to fix prices of resistors;

(c) Agreeing to manipulate prices and supply of resistors sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

[39]    *See* Cal. Business and Professions Code, §§ 16700, *et seq.*, Iowa Code §§ 553.1, *et seq.*, Mich. Compiled Laws §§ 445.772, *et seq.*, Minn. Statutes §§ 325D.49, *et seq.*, Neb. Revised Statutes §§ 59-801, *et seq.*, and N.Y. General Business Laws §§ 340, *et seq.*

(d)  Issuing price announcements and price quotations in accordance with the agreements reached;

(e) Selling resistors to customers in the United States at non-competitive prices; and

(f) Providing false statements to the public to explain increased prices for resistors.

282.    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property in that they paid more for resistors than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of state antitrust and restraint of trade laws, Plaintiffs and members of the Classes seek treble damages and their cost of suit, including a reasonable attorneys' fees, pursuant to said laws.

283.    Plaintiffs allege the following violations of state antitrust and restraint of trade laws:

284.    **California**: By reason of the foregoing, defendants have violated California Business and Professions Code, §§ 16700, *et seq.* California Plaintiffs on behalf of the California Damages Classes allege as follows:

a.    Defendants' contract, combination, trust or conspiracy was entered in, carried out, effectuated and perfected mainly within the State of California, and Defendants' conduct within California injured all members of the class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of the California Damages Class.

b.    Beginning at a time currently unknown to California Plaintiffs, but at least as early as 2003, and continuing thereafter at least up to present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of resistors at supra-competitive levels.

c.      The aforesaid violations of section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of resistors.

d.      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices and course of conduct set forth above and fixing, raising, stabilizing, and pegging the price of resistors.

e.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of resistors has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for resistors have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California; and (3) those who purchased resistors directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

f.      As a direct and proximate result of Defendants' unlawful conduct, California Plaintiffs and the members of the California Damages Classes have been injured in their business and property in that they paid more for resistors than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, California Plaintiffs and the California Damages Classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

285.    **Iowa**: By reason of the foregoing, defendants have violated Iowa Code §§ 553.1, *et seq.* Iowa Plaintiff on behalf of the Iowa Damages Classes alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) resistors was restrained, suppressed, and eliminated throughout Iowa; (2) resistors prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Iowa Plaintiff and members of the Damages Classes were deprived of free and open competition;

1   and (4) Iowa Plaintiff and members of the Damages Classes paid supra-competitive, artificially

2   inflated prices for resistors.

3             b.      During the Class Periods, defendants' illegal conduct substantially

4   affected Iowa commerce.

5             c.      As a direct and proximate result of Defendants' unlawful conduct, Iowa

6   Plaintiff and members of the Damages Classes have been injured in their business and property

7   and are threatened with further injury.

8             d.      By reason of the foregoing, defendants have entered into agreements in

9   restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Iowa Plaintiff and

10  members of the Damages Classes seek all forms of relief available under Iowa Code §§ 553.1,

11  *et seq.*

12        286.    **Michigan**: By reason of the foregoing, defendants have violated Michigan

13  Compiled Laws §§ 445.772, *et seq.* Michigan Plaintiff on behalf of the Michigan Damages

14  Classes alleges as follows:

15            a.      Defendants' combination or conspiracy had the following effects: (1)

16  price competition for resistors was restrained, suppressed, and eliminated throughout

17  Michigan; (2) prices for resistors were raised, fixed, maintained and stabilized at artificially

18  high levels throughout Michigan; (3) Michigan Plaintiff and the Michigan Damages Classes

19  were deprived of free and open competition; and (4) Michigan Plaintiff and the Michigan

20  Damages Classes paid supra-competitive, artificially inflated prices for resistors

21            b.      During the Class Periods, defendants' illegal conduct substantially

22  affected Michigan commerce.

23            c.      As a direct and proximate result of Defendants' unlawful conduct,

24  Michigan Plaintiff and the Michigan Damages Classes have been injured in their business and

25  property and are threatened with further injury.

26            d.      By reason of the foregoing, defendants have entered into agreements in

27  restraint of trade in violation of Michigan Compiled Laws §§ 445.772, *et seq.* Accordingly,

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-
03820-JD**                                                              76

Michigan Plaintiff and the Michigan Damages Classes seek all relief available under Michigan Compiled Laws §§ 445.72, *et seq.*

287.  **Minnesota**: By reason of the foregoing, defendants have violated Minnesota Statutes §§ 325D.49, *et seq.* Minnesota Plaintiff on behalf of the Minnesota Damages Classes alleges as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for resistors was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for resistors were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Minnesota Plaintiff and the Minnesota Damages Classes were deprived of free and open competition; and (4) Minnesota Plaintiff and the Minnesota Damages Classes paid supra-competitive, artificially inflated prices for resistors.

b.    During the Class Periods, defendants' illegal conduct substantially affected Minnesota commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Minnesota Plaintiff and the Minnesota Damages Classes have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Statutes §§ 325D.49, *et seq.* Accordingly, Minnesota Plaintiff and the Minnesota Damages Classes seek all relief available under Minnesota Statutes §§ 325D.49, *et seq.*

288.  **Nebraska**: By reason of the foregoing, defendants have violated Nebraska Revised Statutes §§ 59-801, *et seq.* Nebraska Plaintiff on behalf of the Nebraska Damages Classes alleges as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for resistors was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for resistors were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Nebraska Plaintiff and the Nebraska Damages Classes

were deprived of free and open competition; and (4) Nebraska Plaintiff and the Nebraska Damages Classes paid supra-competitive, artificially inflated prices for resistors.

        b.     During the Class Periods, defendants' illegal conduct substantially affected Nebraska commerce.

        c.     As a direct and proximate result of Defendants' unlawful conduct, Nebraska Plaintiff and the Nebraska Damages Classes have been injured in their business and property and are threatened with further injury.

        d.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Nebraska Plaintiff and the Nebraska Damages Classes seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

289.    **New York**: By reason of the foregoing, defendants have violated New York General Business Laws §§ 340, *et seq.* New York Plaintiff on behalf of the New York Damages Classes alleges as follows:

        a.     Defendants' combination or conspiracy had the following effects: (1) price competition for resistors was restrained, suppressed, and eliminated throughout New York; (2) prices for resistors were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) New York Plaintiff and the New York Damages Classes were deprived of free and open competition; and (4) New York Plaintiff and the New York Damages Classes paid supra-competitive, artificially inflated prices for resistors.

        b.     During the Class Periods, defendants' illegal conduct substantially affected New York commerce.

        c.     As a direct and proximate result of Defendants' unlawful conduct, New York Plaintiff and the New York Damages Classes have been injured in their business and property and are threatened with further injury.

        d.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New York General Business Laws §§ 340, *et seq.* Accordingly,

New York Plaintiff and the New York Damages Classes seek all relief available under New York General Business Laws §§ 340, *et seq.*

**THIRD CLAIM FOR RELIEF**
**(Violations of State Consumer Protection and Unfair Competition Laws)**
**(On Behalf of All Plaintiffs Against All Defendants)**

290.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

291.     Plaintiffs allege violations of the following states' consumer protection and unfair competition laws: California, Florida, Nebraska, and New York.[40]

292.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of these states' consumer protection and unfair competition laws by engaging in a conspiracy to fix and stabilize the price of resistors as described above.

293.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures constitute a common and continuing course of conduct of unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices within the meaning of these states' consumer protection and unfair competition laws.

294.     Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or these states' consumer protection and unfair competition laws.

295.     Defendants' acts or practices are fraudulent or deceptive within the meaning of these states' consumer protection and unfair competition laws.

296.     Defendants' conduct was carried out, effectuated, and perfected within these states. Defendants maintained offices in some of these states where their employees engaged in

---

[40]     California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, New York General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*

communications, meetings and other activities in furtherance of defendants' conspiracy.

297.    By reason of the foregoing, Plaintiffs and the Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as result of such business acts and practices described above.

298.    Plaintiffs allege the following violations of state unfair competition and consumer protection laws:

299.    **California**: By reason of the foregoing, defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* California Plaintiffs on behalf of the California Damages Classes alleges as follows:

      a.    Defendants committed acts of unfair competition, as defined by section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of resistors as described above.

      b.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act.

      c.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d. Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq.*

      e.    Defendants' conduct was carried out, effectuated, and perfected within the State of California. Defendants maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of Defendants' conspiracy.

f.    By reason of the foregoing, California Plaintiffs and the California Damages Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

300.    **Florida**: By reason of the foregoing, defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* Florida Plaintiff on behalf of the Florida Damages Classes alleges as follows:

a.    Defendants' unlawful conduct had the following effects: (1) price competition for resistors was restrained, suppressed, and eliminated throughout Florida; (2) prices for resistors were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida Plaintiff and the Florida Damages Classes were deprived of free and open competition; and (4) Florida Plaintiff and the Florida Damages Classes paid supra-competitive, artificially inflated prices for resistors.

b.    During the Class Periods, defendants' illegal conduct substantially affected Florida commerce and purchasers.

c.    As a direct and proximate result of Defendants' unlawful conduct, Florida Plaintiff and the Florida Damages Classes have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*, and, accordingly, Florida Plaintiff and the Florida Damages Classes seek all relief available under that statute.

301.    **Nebraska**: By reason of the foregoing, defendants have violated Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* Nebraska Plaintiff on behalf of the Nebraska Damages Classes alleges as follows:

(a)     Defendants' unlawful conduct had the following effects: (1) resistors competition was restrained, suppressed, and eliminated throughout Nebraska; (2) resistors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Nebraska Plaintiff and the Nebraska Damages Classes were deprived of free and open competition; and (4) Nebraska Plaintiff and the Nebraska Damages Classes paid supra-competitive, artificially inflated prices for resistors.

(b)     During the Class Periods, defendants' illegal conduct substantially affected Nebraska commerce and purchasers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Nebraska Plaintiff and the Nebraska Damages Classes have been injured and are threatened with further injury.

(d)     Defendants' actions and conspiracy have had a substantial impact on the public interests of Nebraska and its residents.

(e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* and, accordingly, Nebraska Plaintiff and the Nebraska Damages Classes seek all relief available under that statute.

302.   **New York**: By reason of the foregoing, defendants have violated New York's General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.* New York Plaintiff on behalf of the New York Damages Classes alleges as follows:

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which resistors were sold, distributed or obtained in New York and took efforts to conceal their agreements from New York Plaintiff and the New York Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the

1  public interest of New York State in an honest marketplace in which economic activity is

2  conducted in a competitive manner.

3          (c)     Defendants made certain statements about resistors that they knew

4  would be seen by New York residents and these statements either omitted material information

5  that rendered the statements they made materially misleading or affirmatively misrepresented

6  the real cause of price increases for resistors.

7          (d)     Defendants' unlawful conduct had the following effects: (1) resistors

8  price competition was restrained, suppressed, and eliminated throughout New York; (2)

9  resistors prices were raised, fixed, maintained, and stabilized at artificially high levels

10 throughout New York; (3) New York Plaintiff and the New York Damages Classes were

11 deprived of free and open competition; and (4) New York Plaintiff and the New York Damages

12 Classes paid supra-competitive, artificially inflated prices for resistors.

13         (e)     During the Class Periods, defendants' illegal conduct substantially

14 affected New York commerce and purchasers.

15         (f)     During the Class Periods, each of the Defendants named herein, directly,

16 or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or

17 distributed resistors in New York.

18         (g)     New York Plaintiff and the New York Damages Classes seek actual

19 damages for their injuries caused by these violations in an amount to be determined at trial and

20 are threatened with further injury. Without prejudice to their contention that Defendants'

21 unlawful conduct was willful and knowing, New York Plaintiff and the New York Damages

22 Classes do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus.

23 Law § 349(h).

24 **XIV.   REQUEST FOR RELIEF**

25         WHEREFORE, Indirect Purchaser Plaintiffs respectfully request that:

26 1.      The Court determine that this action may be maintained as a class action under

27 Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable

28

notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

2.      The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

(a)      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)      A *per se* violation of Section 1 of the Sherman Act;

(c)      An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the various states' antitrust, unfair competition, and consumer protection laws as set forth herein; and

(d)      Acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

6.     Plaintiffs and the members of the Damages Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment.

Dated: March 5, 2018                          **COTCHETT, PITRE & McCARTHY, LLP**

By:   */s/ Adam J. Zapala*
    Joseph W. Cotchett
    Adam J. Zapala
    Elizabeth T. Castillo
    Mark F. Ram
    Tamarah P. Prevost
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
    Telephone: 650-697-6000
    Facsimile: 650-697-0577
    jcotchett@cpmlegal.com
    azapala@cpmlegal.com
    ecastillo@cpmlegal.com
    mram@cpmlegal.com
    tprevost@cpmlegal.com

*Interim Lead Counsel for the Indirect Purchaser Plaintiff Class*

*Additional Counsel for Indirect Purchaser Plaintiffs*

    Daniel E. Gustafson
    Daniel C. Hedlund
    Michelle J. Looby
    Daniel J. Nordin
    **GUSTAFSON GLUEK PLLC**
    Canadian Pacific Plaza
    120 South 6th Street, Suite 2600
    Minneapolis, MN 55402
    Telephone: (612) 333-8844
    Fax: (612) 339-6622
    dgustafson@gustafsongluek.com
    dhedlund@gustafsongluek.com
    mlooby@gustafsongluek.com
    dnordin@gustafsongluek.com 0

    Michael P. Lehmann (77152)
    Christopher L. Lebsock (184546)
    **HAUSFELD LLP**
    600 Montgomery St., Suite 3200
    San Francisco, CA 94111
    Tel: (415) 633-1908

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**                          85

Fax: (415) 358-4980
mlehmann@hausfeld.com
bsweeney@hausfeld.com
clebsock@hausfeld.com

Arthur N. Bailey, Sr., Esq.
**ARTHUR N. BAILEY & ASSOCIATES**
111 West Second St., Suite 4500
Jamestown, NY 14701
Telephone: (716) 483-3732
Facsimile: (716) 664-2983
artlaw@windstream.net

W. Joseph Bruckner
Heidi M. Silton
Elizabeth R. Odette
Brian D. Clark
**LOCKRIDGE GRINDAL NAUEN, PLLP**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com

Joel C. Meredith
**MEREDITH & NARINE**
Meredith & Associates
1521 Locust Street, 7th Floor
Philadelphia, PA 19102
Telephone: 215-564-5182
jmeredith@mcgslaw.com

Krishna Narine
**LAULETTA BIRNBAUM, LLC**
100 S. Broad Street
Suite 905
Philadelphia, PA 19110
knarine@lauletta.com

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
**SAVERI & SAVERI INC**.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Fax: (415) 217-6813
guido@saveri.com
rick@saveri.com
cadio@saveri.com

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; 3:15-CV-03820-JD**

Allan Steyer
D. Scott Macrae
Jill M. Manning
**STEYER LOWENTHAL BADROOKAS
ALVAREZ & SMITH LLP**
One California Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 421-3400
Fax: (415) 421-2234
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com

E. Powell Miller
Sharon Almonrode
Devon Allard
**THE MILLER LAW FIRM**
950 West University Drive, Suite 300
Rochester MI 48307
Phone: 248-841-2200
Fax: 248-652-2852

Lee Albert
**GLANCY PRONGAY & MURRAY LLP**
122 E 42nd Street
Suite 2920
New York, NY 10168
phone: (212) 682-5340
toll-free: (888) 773-9224
fax: (212) 884-0988

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 5, 2018        **COTCHETT, PITRE & McCARTHY, LLP**

By:     */s/ Adam J. Zapala*
      Joseph W. Cotchett
      Adam J. Zapala
      Elizabeth T. Castillo
      Mark F. Ram
      Tamarah P. Prevost
      840 Malcolm Road, Suite 200
      Burlingame, CA 94010
      Telephone: 650-697-6000
      Facsimile: 650-697-0577
      jcotchett@cpmlegal.com
      azapala@cpmlegal.com
      ecastillo@cpmlegal.com
      mram@cpmlegal.com
      tprevost@cpmlegal.com

      *Interim Lead Counsel for the Indirect Purchaser Plaintiff Class*