Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Kit A. Pierson (*pro hac vice*)
Daniel A. Small (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
dsmall@cohenmilstein.com

*Co-Lead Counsel for Direct Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE RESISTORS ANTITRUST LITIGATION | Case No. 3:15-cv-03820-JD |
| | DIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARD |
| | Date:   September 5, 2019 |
| | Time:   10:00 a.m. |
| | Dept:   Courtroom 11, 19th Floor |
| This Documents Relates to: | Judge:  Hon. James Donato |
| DIRECT PURCHASER ACTIONS | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................1

II.     THE WORK UNDERTAKEN BY THE DIRECT PURCHASERS ....................2

     A.    Plaintiffs alleged a decade-long price-fixing conspiracy in the resistors' industry.....2

     B.    Class Counsel successfully litigated multiple rounds of motions to dismiss, including after discovery revealed additional participants in the conspiracy.............3

     C.    Class Counsel engaged in substantial discovery efforts on behalf of the Settlement Class. ........................................................................................4

           1.    Class Counsel coordinated with counsel for indirect purchasers to maximize efficiency and obtain critical early discovery. ................4

           2.    Class Counsel conducted substantial written and document  discovery and prevailed on several critical discovery disputes. ...............................5

           3.    Class Counsel took and defended 20 depositions, with most conducted in foreign languages with interpreters and one conducted in Japan. ..................8

     D.    The work of the economic experts hired by Class Counsel was critical to obtaining the outstanding settlements from Defendants. ............................8

     E.    Class Counsel reached settlements strategically with Defendants to maximize recovery for the Settlement Class...........................................................9

III.    ARGUMENT ........................................................................................10

     A.    Class Counsel's fee request in reasonable.................................................10

           1.    A 20-percent award is reasonable—likely below market—using a percentage of the fund analysis. ................................................11

           2.    A lodestar cross-check confirms the reasonableness of the requested fees. .............................................................................18

     B.    Class  Counsel requests reimbursement of reasonable out-of-pocket expenses incidental and necessary to the effective representation of the Class. .....................23

     C.    Plaintiffs request that the class representative, Schuten Electronics, be awarded a reasonable service award to compensate it for critical dedication to this case. ........24

     D.    Plaintiffs request that they be authorized to pay up to $50,000 from the settlement fund for the future expected cost to distribute the settlement funds..........................25

IV.    CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ....................................................................... 17

*In re Aremissoft Corp. Secs. Litig.*,
210 F.R.D. 109 (D.N.J. 2002) ..................................................................................... 21

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007) ................................................................... 13, 14

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ................................................................................ 21

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ................................................................................ 18, 19

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .................................................................................................... 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 3648478 (N.D. Cal. July 7, 2016) ......................................................... 1, 12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ....................................................... 17, 21

*Chambers v. Whirlpool Corp.*,
214 F. Supp. 3d 877 (C.D. Cal. 2016) ....................................................................... 18

*In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...................................................................... 17

*de Mira v. Heartland Emp't Serv., LLC*,
2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) ........................................................... 12

*Dyer v. Wells Fargo Bank, N.A.*,
303 F.R.D. 326 (N.D. Cal. 2014) ............................................................................... 21

*Four in One Co. v. S.K. Foods, L.P.*,
2014 WL 28808 (E.D. Cal. Jan. 2, 2014) ................................................................... 13

*Harris v. Marhoefer*,
24 F.3d 16 (9th Cir. 1994) .......................................................................................... 23

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972) .................................................................................................... 11

*Hopkins v. Stryker Sales Corp.*,
  2013 WL 496358 (N. D. Cal. Feb. 6, 2013) ................................................................. 16

*In re Ikon Office Sols., Inc., Secs. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) ............................................................................. 17

*Kerr v. Screen Extras Guild, Inc.*,
  526 F.2d 67 (9th Cir. 1975) ........................................................................ 18, 19, 21

*Lane v. Facebook, Inc.*,
  2010 WL 2076916 (N.D. Cal. May 24, 2010) ............................................................. 21

*In re Linerboard Antitrust Litig.*,
  321 F. Supp. 2d 619 (E.D. Pa. 2004) ....................................................................... 13

*In re Linerboard Antitrust Litig. ("Linerboard I")*,
  2004 WL 1221350 (E.D. Pa. June 2, 2004) ........................................................... 13, 17

*In re Media Vision Tech. Secs. Litig.*,
  913 F. Supp. 1362 (N.D. Cal. 1996) ....................................................................... 23

*In re Netflix Privacy Litig.*,
  2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ............................................................ 21

*Noll v. eBay, Inc.*,
  309 F.R.D. 593 (N.D. Cal. 2015) ........................................................................... 21

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................... 23

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .................................................................. 11, 12, 13, 16

*In re Polyurethane Foam Antitrust Litig.*,
  2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) ........................................................... 17

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ........................................................................................... 11

*Resurrection Bay Conserv. Alliance v. City of Seward*,
  640 F.3d 1087 (9th Cir. 2011) ............................................................................... 18

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................................... 14, 24

*Stanger v. China Elec. Motor, Inc.*,
  812 F.3d 734 (9th Cir. 2016) ............................................................................... 18

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................... 11

*Steiner v. Am. Broad. Co., Inc.*,
   248 F. App'x 780 (9th Cir. 2007)...................................................... 21

*Stetson v. Grissom*,
   821 F.3d 1157 (9th Cir. 2016) ...................................................... 18

*In re Superior Beverage/Glass Container Consol. Pretrial*,
   133 F.R.D. 119 (N.D. Ill. 1990) ...................................................... 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)...................................................... 17

*Thornberry v. Delta Air Lines*,
   676 F.2d 1240 (9th Cir. 1982) ...................................................... 23

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ...................................................... 16

*In re Urethane Antitrust Litig.*,
   2016 WL 4060156 (D. Kan. July 29, 2016) ...................................................... 17

*Van Vraken v. Atl. Richfield Co.*,
   901 F. Supp. 294 (N.D. Cal. 1995) ...................................................... 24

*Vincent v. Hughes Air West, Inc.*,
   557 F.2d 759 (9th Cir. 1977)...................................................... 23

*In re Vitamins Antitrust Litig.*,
   2001 WL 34312839 (D.D.C. July 16, 2001) ...................................................... 17

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ...................................................... *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...................................................... 11, 14, 21

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ...................................................... 16

*In re Zynga Inc. Secs. Litig.*,
   2015 WL 6471171 (N.D. Cal. Oct. 27, 2015) ...................................................... 13

**FEDERAL RULES**

Federal Rule of Civil Procedure 26(f) ...................................................... 4

**SECONDARY AUTHORITIES**

Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92
   N.Y.U. L. Rev. 937, 952 (2017)...................................................... 18

1

2

F. Patrick Hubbard, *Substantive Due Process Limits on Punitive Damages Awards:*
    *"Morals Without Technique"?*, 60 Fla. L. Rev. 349, 383 (2008) ................................................ 16

3

Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal*
    *Practice*, 47 DePaul L. Rev. 267, 286 (1998) ................................................................ 16

4

5

Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*,
    65 Fordham L. Rev. 247, 248 (1996) ................................................................ 16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 5, 2019, at 10:00 a.m. or as soon thereafter as the matter may be heard by the Honorable Judge James Donato of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Direct Purchaser Plaintiffs ("Plaintiffs" or "DPPs") will and hereby do move the Court for an award of attorneys' fees, expenses, and a service award for the DPP Class Representative. This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing of this motion, and all papers and records on file in this matter.

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|---|---|
| Berman Decl. | Declaration of Steve W. Berman in Support of Direct Purchaser Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Award, concurrently submitted herewith |
| Class Counsel | Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll PLLC |
| Class Representative | Schuten Electronics, Inc. |
| Defendants | KOA, Panasonic, ROHM, Kamaya-Walsin, and HDK |
| Plaintiffs/DPPs | Direct Purchaser Plaintiffs |
| ECF No. | Unless otherwise noted, all "ECF No." references are to the docket in *In re Resistors Antitrust Litig.*, No. 3:15-cv-03820-JD (N.D. Cal.) |
| Friedman Decl. | Declaration of Jeff D. Friedman in Support of Direct Purchaser Plaintiffs' Motion For Preliminary Approval of Class Action Settlements With HDK, Kamaya/Walsin, Panasonic, and Rohm Defendants and Dissemination of Class Notice, Nov. 8, 2018, ECF No. 507-2 |
| HDK | HDK America, Inc. and Hokuriku Electric Industry Co. |
| IPPs | Indirect Purchaser Plaintiffs |
| Kamaya-Walsin | Kamaya Electric Co., Ltd., Kamaya Inc., Walsin Technology Corporation, and Walsin Technology Corporation U.S.A.  (The Kamaya-Walsin Defendants are referred to together because Kamaya Electric Co., Ltd., Kamaya Inc., and Walsin Technology Corporation U.S.A. are all subsidiaries of Walsin Technology Corporation.) |
| KOA | KOA Corporation and KOA Speer Electronics, Inc. |
| Levens Prelim. App. Decl. | Declaration of Emmy L. Levens in Support of Direct Purchaser Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with KOA and Dissemination of Class Notice, Feb. 28, 2019, ECF No. 534-1. |
| Levens Decl. | Declaration of Emmy L. Levens in Support of Direct Purchaser Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Award, concurrently submitted herewith |

| | |
|---|---|
| Panasonic | Panasonic Corporation and Panasonic Corporation of Norther America |
| Schuten Decl. | Declaration of James Schuten, concurrently submitted herewith |
| ROHM | ROHM Co., Ltd. and ROHM Semiconductor U.S.A., LLC |

## I.      INTRODUCTION

After three-and-a-half years of hard-fought litigation, Court-appointed Interim Co-Lead Counsel ("Class Counsel") for the Direct Purchaser Plaintiffs ("Plaintiffs") has secured settlements totaling $50.25 million for the Settlement Class. Having obtained an excellent result for the Class, and undertaken substantial risk in furtherance of the Class's interests, Plaintiffs respectfully request (1) an award of $10.05 million in attorneys' fees – equal to 20 percent of the total common fund; (2) reimbursement of expenses incurred in connection with this litigation totaling $1,815,881.92; and (3) a service award of $25,000 for the sole class representative, Schuten Electronics, Inc.

Plaintiffs' fee request is reasonable, if not below-market, in light of the circumstances of this case.  An award equal to 20 percent of the common fund would be five percent **below** the Ninth Circuit benchmark of 25 percent (a fee reduction equal to more than $2.5 million in this case), even though application of factors considered in the Ninth Circuit would justify an award of 25 percent or more. Most importantly, the total settlement fund of $50.25 million constitutes between approximately 33 and 57 percent of estimated single damages according to Plaintiffs' experts' preliminary analysis; thus, even with the most bullish estimate of damages, the combined settlements in this case exceed the average recovery in analogous cases, constituting an excellent result for the Class.[1] According to the damages estimated by the expert for the indirect purchaser plaintiffs, the combined settlements by Plaintiffs equal a remarkable 80 percent of the DPP Class's damages.

Counsel achieved successful settlements for the Class despite facing significant risks and challenges that required a high level of skill by Class Counsel to address. Unlike in other cases, such as in the *Capacitors* litigation also before this Court, Plaintiffs did not have the benefit of Department of Justice indictments or any cooperating witnesses. This is also an intrinsically difficult case due to the scope and length of the conspiracy alleged and the complexity associated with proving the existence of overcharges. Plaintiffs alleged a conspiracy lasting more than eleven years (from July 9, 2003 to August 1, 2014), with the conspiracy centered in Japan. Nearly all of the

---

[1] *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *7 n.19 (N.D. Cal. July 7, 2016) (citing survey of 71 settled cartel cases which showed that the weighted mean— weighting settlements according to their sales—was 19% of possible single damages recovery).

pivotal documents were in Japanese, requiring substantial investment in foreign-language reviewers and translations. Moreover, most of the depositions were conducted via Japanese interpreters by attorneys experienced and skilled in taking foreign-language depositions in cartel cases.

The requested 20-percent fee award is also reasonable compared to awards in similar antitrust class actions. For example, in *Capacitors*, this Court awarded counsel for the direct purchasers 25 percent of the common fund after each of the first two rounds of settlements. In other comparable antitrust class actions in this District involving price fixing by electronics manufacturers, courts have awarded similar percentages in attorneys' fees. A recent empirical study of fees in class action settlements also shows that the 20 percent fee request is reasonable, and likely below-market.

The reasonableness of the requested award is further confirmed by a "lodestar cross-check." Based on Class Counsel's total lodestar for the case of $8,325,627.50, granting of the requested award would lead to a modest multiplier of 1.26. This multiplier would be at the low end of the range of multipliers surveyed by the Ninth Circuit in *Vizcaino v. Microsoft Corp.*[2] It also is well within the range of multipliers in other similar cases litigated in this District and nationally. Plaintiffs respectfully submit that a modest multiplier is particularly justified given the complexity of this case, which Class Counsel litigated efficiently and on a purely contingent basis, risking no fee award while investing a substantial amount of time and resources.

Beyond fees, the requested expenses were all necessary to the representation of the Class. For example, the contributions of Plaintiffs' experts were critical to litigating the case, as well as negotiating the substantial settlements with Defendants. The requested service award to the one class representative is also reasonable given the significant commitment to the Class and investment of time provided to this case. Plaintiffs respectfully request that their motion be granted.

## II.      THE WORK UNDERTAKEN BY THE DIRECT PURCHASERS

**A.      Plaintiffs alleged a decade-long price-fixing conspiracy in the resistors' industry.**

Plaintiffs' class representative, Schuten Electronics. filed a complaint alleging price-fixing in

---

[2] 290 F.3d 1043, 1050, 1051 n.6 (9th Cir. 2002).

the resistors' industry on October 23, 2015.[3] On December 21, 2015, Hagens Berman Sobol Shapiro

LLP and Cohen Milstein Sellers & Toll PLLC were appointed as Interim Co-Lead Class Counsel.[4]

On May 27, 2016, Plaintiffs filed a detailed Consolidated Amended Class Action Complaint.

Plaintiffs alleged that Defendants conspired to fix the prices of linear resistors from July 9, 2003

through August 1, 2014. Linear resistors are known as "passive electronic components" and are a

fundamental part of electrical circuits. Plaintiffs alleged that the global conspiracy was carried out in

Japan, the United States, and other parts of the world through agreements to fix prices and restrict

output and was facilitated in a variety of ways, including via face-to-face meetings, electronic

communications, phone calls, and trade associations. Defendants included five Japanese electronics

companies and each of their U.S. subsidiaries.[5]

**B.      Class Counsel successfully litigated multiple rounds of motions to dismiss, including
         after discovery revealed additional participants in the conspiracy.**

In response to Plaintiffs' Consolidated Amended Class Action Complaint, on August 24,

2016, Defendants filed a joint motion to dismiss on behalf of all Defendants. Defendants argued,

among other things, that Plaintiffs (1) failed to alleged facts plausibly alleging a conspiracy sufficient

to meet the *Twombly* standard; (2) failed to allege facts showing a conspiracy within the limitations

period; and (3) failed to meet their burden to plead fraudulent concealment with the required

particularity.[6] At the same time, the U.S. subsidiary defendants simultaneously filed a motion to

dismiss on their collective behalf, arguing specifically with regard to each of five U.S. subsidiary

defendants, that Plaintiffs had not sufficiently alleged their participation in the conspiracy.[7] Plaintiffs

opposed each motion, and in total the briefing generated 109 pages.[8] Following oral argument, on

September 5, 2017, this Court held that Plaintiffs had adequately alleged a conspiracy within the

---

[3] Antitrust Class Action Complaint, *Schuten Electronics, Inc. v. AVX Corporation, et al.*, No. 5:15-cv-04878 (N.D. Cal. Oct. 23, 2015), ECF No. 1.

[4] *See* Order Following Case Management Conference, *In re Resistors Antitrust Litig.*, No. 3:15-cv-03820-RNW (N.D. Cal. Dec. 21, 2015), ECF No. 89.

[5] ECF No. 126.

[6] ECF No. 204.

[7] ECF No. 202.

[8] Berman Decl., ¶ 8.

limitations period, denied the joint motion to dismiss in its entirety, but granted the U.S. subsidiary

defendants' motion to dismiss, with leave to amend.[9]

Plaintiffs filed the operative Second Consolidated Amended Class Action Complaint

("Complaint") on October 26, 2017. The Complaint added numerous specific allegations regarding

the U.S. subsidiary defendants. In addition, because discovery revealed participation in the

conspiracy by Taiwanese corporation, Walsin Technology Corporation (parent corporation of

existing Defendants Kamaya Electric Co., Ltd., and its U.S. subsidiary, Kamaya Inc.), as well as its

U.S. subsidiary, Walsin Technology Corporation U.S.A., Plaintiffs added them as defendants.[10]

On November 3, 2017, the U.S. subsidiary defendants filed a motion to dismiss, arguing that

Plaintiffs still had not sufficiently alleged their participation in the conspiracy.[11] Walsin Technology

Corporation and Walsin USA also each filed separate motions to dismiss the Complaint.[12] Following

full briefing and oral argument, this Court denied all three motions.[13]

**C.     Class Counsel engaged in substantial discovery efforts on behalf of the Settlement Class.**

**1.     Class Counsel coordinated with counsel for indirect purchasers to maximize efficiency and obtain critical early discovery.**

From the beginning of the case, Class Counsel sought to maximize efficiency and avoid

duplication by coordinating discovery efforts with the indirect purchasers. For example, direct and

indirect purchasers jointly drafted proposed orders and protocols for coordinated discovery,

depositions, protective orders, and discovery of electronically stored information.[14] Counsel also

worked together to negotiate search terms, to ensure the completeness of discovery responses, and to

---

[9] ECF No. 326.

[10] ECF No. 338.

[11] ECF No. 345.

[12] ECF Nos. 366, 395.

[13] *See* Minute Entry, Jan. 22, 2018, ECF No. 384; Minute Entry, Apr. 5, 2018, ECF No. 418.

[14] *See, e.g.*, ECF No. 122  (entering Stipulated Protective Order); ECF No. 215 (entering Stipulation and Order Concerning Expert Discovery); ECF No. 252 ("Stipulation regarding production of electronically stored information and hard copy documents (ECF No. 249) is approved"); ECF No. 308 (entering Stipulation and Order re: Discovery Limits Pursuant to Fed. R. Civ. P. 26(f)).

1    schedule depositions.[15] Defendants often resisted discovery, leading to early disputes, and victories,

2    for Plaintiffs.[16] Plaintiffs successfully compelled significant early discovery and pushed hard for, and

3    obtained, critical discovery throughout the litigation – discovery that was particularly important

4    given the lack of related government indictments or cooperating witnesses.

5        **2.    Class Counsel conducted substantial written and document  discovery and
              prevailed on several critical discovery disputes.**

6            Plaintiffs propounded substantial written discovery on all Defendants, including 56 document

7    requests and 15 interrogatories (some of which were jointly served on all Defendants). Because of

8    the need to prove a worldwide conspiracy and gather documents from a variety of institutional (*e.g.*,

9    trade associations) and related parties (*e.g.*, sales agents), Class Counsel also served nine subpoenas

10   to third parties for data and documents. For example, Plaintiffs served subpoenas on trade

11   associations for electronics' manufacturers – the Japan Electronics and Information Technology

12   Industries Association (JEITA, a central vehicle for the conspiracy) and the Electronic Components

13   Industry Association (ECIA) – as well as a third party sales agent, John Manley of ADSI – which

14   supported Plaintiffs' allegations about the conspiracy.[17]

15           Class Counsel spent thousands of hours reviewing and analyzing Defendants' written

16   discovery responses and the documents produced by Defendants and third parties. In total, Plaintiffs

17   obtained documents from 62 custodians and eight third parties, spanning over 11.8 million pages of

18   documents, as well as voluminous electronic transactional data. Because most documents were

19   produced in foreign languages (Japanese primarily, but also Chinese and Korean), Plaintiffs retained

20   foreign-language reviewers or utilized staff attorneys fluent in those languages and specialists in

21   antitrust cartels to conduct a thorough analysis. Plaintiffs contracted with Everlaw to retrieve, host,

22   and review these documents. Plaintiffs and indirect purchasers paid for certified translations for

23   hundreds of documents, and coordinated in an effort to reduce duplicative translations.[18]

24

25       [15] Berman Decl., ¶ 11.

26       [16] *See, e.g.*, ECF Nos. 231, 250, 256, 257 (early discovery dispute letters); ECF Nos. 247, 267
     (orders resolving these early discovery disputes, largely in Plaintiffs' favor).

27       [17] Berman Decl., ¶ 12.

28       [18] *Id.*, ¶ 13.

To obtain this discovery, Plaintiffs brought and prevailed on, at least in part, several fiercely contested motions to compel. Some of the most important ones are summarized below.

| Order on Motion to Compel | Date | Outcome |
|---|---|---|
| Minute Entry re Joint Discovery Dispute Letter Br., re defendants' search of encrypted documents (ECF No. 231), ECF No. 247 | Nov. 10, 2016 | Granted in part |
| Minute Entry re Discovery Dispute Letter Brs., re document custodians (ECF Nos. 250, 256, 257, 263), ECF No. 267 | Jan 1, 2017 | Granted in part[19] |
| Minute Entry re Discovery Dispute Letter Br., re Panasonic document custodians (ECF No. 284), ECF No. 289 | Mar. 3, 2017 | Granted in part |
| Minute Entry re Discovery Dispute Letter Br., re Proposed Discovery Order (ECF No. 293), ECF No. 299 | May 3, 2017 | Granted in part |
| Minute Entry re Discovery Dispute Letter Br., re search term dispute with HDK Defendants (ECF No. 294), ECF No. 299 | May 3, 2017 | Granted |
| Text Order re Discovery Dispute Letter Br., re KOA's foreign sales data (ECF No. 309), ECF No. 316 | Aug. 1, 2017 | Granted |
| Minute Entry re Emergency Discovery Dispute Letter Br., re Hideaki Matsushita's Deposition (ECF No. 431), ECF No. 434 | May 18, 2018 | Resolved favorably following Court's order |

These motions necessitated a significant time investment by Counsel to meet-and-confer with Defendants, draft discovery letters to the Court, and prepare for the related hearings.[20]

Plaintiffs strategically and doggedly pursued discrete discovery aimed at resolving issues critical to the case in Plaintiffs' favor. For example, when meeting and conferring with Defendants about the identity of document custodians, Plaintiffs met strong resistance from Defendants regarding the number of custodians, the timing of identification of custodians (with Defendants demanding that documents be produced from priority custodians before additional custodians were negotiated), and whether high-ranking employees of KOA should be custodians (including KOA Corporation CEO, Koichi Mukaiyama). Unable to reach agreement, Plaintiffs brought several discovery dispute letters about these issues.[21] After hearing these disputes, the Court ordered the

---

[19] Plaintiffs provide more specific information about these discovery disputes letters and the outcome in the text, *infra.*

[20] Berman Decl., ¶ 14.

[21] *See, e.g.*, ECF Nos. 250, 256, 257, 263.

parties to immediately meet and confer to identify all custodians (not just priority custodians), and held that a "proposed custodian's position within a company is not, on its own, a good objection – CEOs are not inherently immune from discovery."[22] Defendants shortly thereafter agreed to far more custodians than they had proposed, and KOA also conceded that two high-ranking employees, including Mr. Mukaiyama, would be custodians. Unable to reach agreement with Panasonic about custodians, after discovery dispute letters this Court ordered three of four additional custodians Plaintiffs proposed to be added to Panasonic's list.[23] These early discovery motions led to the production of some of the best documentary evidence supporting the conspiracy.

Plaintiffs also brought a discovery motion to compel the KOA Defendants to produce its foreign sales data after KOA refused to do so on relevance and burden grounds. Plaintiffs argued that such data is relevant to economic analyses at class certification and on the merits. After briefing and a telephonic hearing, this Court ordered KOA to produce the requested data, holding that the discovery "is well within acceptable parameters for antitrust discovery" and "overrul[ing] the "burden objection."[24] After this Court's Order, the other Defendants agreed to produce foreign sales data, which they had been refusing to do.[25] Plaintiffs brought another discovery dispute letter to compel the deposition of KOA "consultant" Hideaki Matsushita, who played an important role in the conspiracy. KOA claimed he could not be compelled to sit for deposition. After this Court heard the dispute and issued an order compelling KOA to provide further information about Mr. Matsushita, KOA and Plaintiffs agreed that he would be deposed in Japan.[26]

---

[22] ECF No. 267.

[23] Berman Decl., ¶ 15.

[24] ECF No. 316.

[25] Berman Decl., ¶ 16.

[26] *Id.* Plaintiffs filed other discovery dispute letters, not included in the chart in the text, to compel discovery from Defendants. Those included deposition and document discovery disputes withdrawn while pending, in light of settlements in principle with Defendants. Berman Decl., ¶ 17 (citing to ROHM discovery dispute letter, ECF No. 448, withdrawn per ECF No. 487, and KOA discovery dispute letter, ECF No. 503).

3.     **Class Counsel took and defended 20 depositions, with most conducted in foreign languages with interpreters and one conducted in Japan.**

To adequately prosecute a case involving multiple defendants, with witnesses spread all over the world who could not be compelled to testify live at trial, Plaintiffs gathered key evidence via deposition. Plaintiffs took 19 depositions, including nine fact depositions and ten Rule 30(b)(6) corporate depositions, using approximately 295 exhibits. Most of these depositions were conducted through Japanese interpreters, adding to their length, complexity, and cost. Plaintiffs took one deposition in Japan. Indeed, 104 of the deposition exhibits included translations, with witnesses reviewing the deposition exhibit in Japanese, and the deposing attorney questioning the witness using the English translation, which had to be translated to Japanese for the witness. To increase efficiency, Plaintiffs and the indirect purchasers coordinated taking these depositions. Plaintiffs also defended a Rule 30(b)(6) deposition their class representative, James Schuten of Shuten Electronics, Inc.[27]

**D.     The work of the economic experts hired by Class Counsel was critical to obtaining the outstanding settlements from Defendants.**

Over the course of this litigation, the work by Plaintiffs' economic expert, Dr. Kenneth Flamm, and his supporting team of economists at Christensen Associates, provided crucial support for Plaintiffs. Their market analyses, particularly of the evolving global marketplace for linear resistors during the past several decades, informed Plaintiffs' early legal analyses of the case and litigation strategy. This input impacted the facts alleged, the claims asserted, and the discovery (written and via deposition) taken. For example, the economic experts assisted Class Counsel in their Rule 30(b)(6) depositions of each Defendant's corporate designee, particularly with regard to issues affecting class certification, impact, and damages.[28]

The economic experts conducted complex and informative analyses of the discovery obtained from Defendants, including 38.98 GB of transactional data in 3,014 files, and over 4,500 separate profit and loss statements produced by the Defendants. The data were used to, among other things,

---

[27] Berman Decl., ¶ 19.

[28] *Id.*, ¶ 20.

generate estimates of the sales by each Defendant, which was used during settlement negotiations.[29]

The economic experts also completed a substantial amount of work for the class certification expert report because the final settlement in this case with KOA was reached on the eve of the report's due date. In addition to the work described above, the economists analyzed over 30 million sales transactions for the Defendants' parent companies, their international subsidiaries, and their U.S. subsidiaries. They also assisted counsel with multiple rounds of question and answers with the Defendants about data topics. The economists consulted the Defendants' product guides, specification sheets, websites, and distributor websites for over 127,000 resistor models to determine and classify resistor types and to decode characteristics. The economists further consulted reports by industry analysts, such as those by Paumanok, and assessed the impact and duration of the natural disasters such as the Tōhoku Earthquake and Tsunami of March 2011, and the Thai floods of 2011. The experts used this and other information to come up with preliminary estimates of the range of the overcharge for sales of linear resistors to the Settlement Class.[30]

**E.      Class Counsel reached settlements strategically with Defendants to maximize recovery for the Settlement Class.**

Starting with the Defendant with the lowest dollar value of sales to direct purchaser class members, HDK, counsel engaged in negotiations strategically with Defendants to maximize recovery for the Settlement Class. After informal settlement negotiations and a mediation, on July 6, 2018, Plaintiffs and HDK reached a settlement totaling $2,000,000. Following separate negotiations, on July 11, 2018, Plaintiffs reached an agreement with the Kamaya-Walsin defendant family, which had the second smallest amount of sales to the direct purchaser class for $5,250,000.[31]

After concluding these settlements and moving for preliminary approval of them on August 16, 2018 (ECF No. 474), which meant that the remaining Defendants knew that others had settled in this joint and several liability case, Plaintiffs continued on and intensified discovery against the remaining three largest remaining Defendants. On September 3, 2018, Plaintiffs and Panasonic

---

[29] *Id.*, ¶ 21.

[30] *Id.*, ¶ 22

[31] *Id.*, ¶ 24.

1    executed a settlement agreement for $12,000,0000. On October 29, 2018, DPPs and ROHM executed

2    an agreement resolving Plaintiffs claims against ROHM for $6,500,0000.[32]

3         After Plaintiffs filed an amended motion for preliminary approval of settlements on

4    November 8, 2018 that included Panasonic and ROHM (ECF No. 507), KOA was left as the sole

5    remaining Defendant in this joint and several liability case. This was part of Plaintiffs' strategy, as

6    KOA was also the largest Defendant in the case in terms of sales to Class, and also some of the best

7    evidence in the case is against KOA. At that point, Plaintiffs also knew from statements by counsel

8    on the record that the indirect purchasers had settled in principle with all Defendants, leaving

9    Plaintiffs' claims against KOA as the sole claims remaining in the case. KOA also knew that

10   Plaintiffs were working on their class certification report, which was due on December 21, 2018.

11   This factor enabled Plaintiffs to negotiate with KOA with a strong hand, leading to an agreement in

12   principle on December 2018 to settle the case, which was finalized on January 29, 2019 after the

13   Court stayed pending deadlines (ECF No. 516). Plaintiffs ultimately settled with KOA for

14   $24,500,000, bringing the total common fund from all of Defendants' settlements to $50,250,000.[33]

15                              **III.    ARGUMENT**

16        Plaintiffs respectfully request that this Court award fees equal to 20 percent of the common

17   fund, $10,050,000, which is below the Ninth Circuit's 25 percent benchmark. Applying a lodestar

18   crosscheck, this would result in a modest 1.26 multiplier of Class Counsel's current lodestar of

19   $8,325,627.50, which will increase through final approval and any appeals. Plaintiffs also request

20   reimbursement of expenses incurred in connection with this litigation of $1,815,881.92. Finally,

21   Plaintiffs request a service award of $25,000 to Schuten, the sole class representative.

22   **A.    Class Counsel's fee request in reasonable.**

23        Class Counsel has produced a shared benefit for the settlement class in the form of the $50.25

24   million common fund. The Supreme Court has explained that "a litigant or a lawyer who recovers a

25   common fund for the benefit of persons other than himself or his client is entitled to a reasonable

26

27        [32] *Id.*, ¶ 25.

28        [33] *Id.*, ¶ 26.

1    attorney's fee from the fund as a whole."[34] Here, an award of reasonable attorneys' fees from the

2    common fund compensates Class Counsel for vigorously litigating this action on behalf of direct

3    purchasers across the country victimized by Defendants' illegal conduct. The Supreme Court has

4    explained that such work is critical to the effective enforcement of the antitrust laws.[35]

5          Courts in the Ninth Circuit award attorney's fees in common fund cases using either the

6    "percentage-of-recovery" method or the "lodestar" method.[36] Some courts have expressed a

7    preference for the percentage-of-recovery method because it "directly aligns the interests of the class

8    and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of

9    litigation[.]"[37] "In contrast, the 'lodestar [method] create[s] an unanticipated disincentive to early

10   settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a

11   gimlet-eyed review of line-item fee audits.'"[38] Regardless of which method is chosen as the primary

12   one, the Ninth Circuit encourages "a cross-check using the other method."[39] In this case, both

13   methods support Class Counsel's fee request.

14       **1.**    **A 20-percent award is reasonable—likely below market—using a percentage of the fund analysis.**

15          When applying the percentage-of-the fund method, the Ninth Circuit has established a

16   benchmark of 25 percent.[40] "That percentage amount can then be adjusted upward or downward

17

18

---

19       [34] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Staton v. Boeing Co.*, 327 F.3d 938, 967

20   (9th Cir. 2003) (same).

       [35] *See, e.g. Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co.*, 405

21   U.S. 251, 266 (1972).

22       [36] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015).

23       [37] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (internal quotation
    marks and citations omitted); *Vizcaino*, 290 F.3d at 1050 ("the primary basis of the fee award
    remains the percentage method").

24       [38] *Wal-Mart Stores*, 396 F.3d at 121 (internal quotation marks and citation omitted; alteration

25   added and in original); *Vizcaino*, 290 F.3d at 1050 n.5 (lodestar is normally used "merely a cross-
    check on the reasonableness of a percentage figure" because "it is widely recognized that the lodestar

26   method creates incentives for counsel to expend more hours than may be necessary on litigating a
    case so as to recover a reasonable fee, since the lodestar method does not reward early settlement").

27       [39] *Online DVD*, 779 F.3d at 949.

28       [40] *Id.* at 949, 955.

depending on the circumstances of the case."[41] Courts in this district have recognized that "'in most common fund cases, the award *exceeds* the benchmark.'"[42] At bottom, the Ninth Circuit asks district courts to "consider[] all of the circumstances of the case" and "reach[] a reasonable percentage."[43]

The Ninth Circuit instructs that courts may consider the following factors when determining the percentage of the fund to award: (1) whether counsel achieved "exceptional results for the class"; (2) whether the case was risky for class counsel; (3) whether counsel's performance "generated benefits beyond the cash settlement fund"; (4) whether the case was handled on a contingency basis; (5) the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work); and (6) the market rate for the particular field of law.[44] Each of these factors supports Class Counsel's request for a fee award of 20 percent of the total common fund.

### a. Class Counsel achieved exceptional results for the Class.

Plaintiffs' recovery of $50.25 million for the Settlement Class from Defendants is an exceptional result and shows that the 20-percent fee request is more than reasonable. Based on the detailed transactional records Defendants produced, Plaintiffs' preliminary estimate of the total sales commerce on which to model potential overcharge damages in this litigation is approximately $1.1 billion. While the case resolved prior to the completion of expert discovery, Plaintiffs' experts preliminarily calculated an approximate overcharge between 8% and 14%, which would result in total single damages between approximately $88 million and $154 million.[45] The settlement fund of $50.25 million would therefore equate to between approximately 33% and 57% of the Settlement Class's estimated total single damages. Even with the most bullish estimate of damages, the combined settlements in this case exceeds the average recovery in analogous cases and demonstrate the exceptional result obtained by Plaintiffs.[46]

---

[41] *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014).

[42] *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)).

[43] *Vizcaino*, 290 F.3d at 1048; *accord Online DVD*, 779 F.3d at 949.

[44] *Id.* at 954-55.

[45] Berman Decl., ¶ 27.

[46] *See CRT.*, 2016 WL 3648478, at *7 & n.19  (citing survey of 71 settled cartel cases which showed that the weighted mean—weighting settlements according to their sales—was 19% of

1      Moreover, Defendants would without question challenge Plaintiffs' estimate of damages and

2  argue that these overcharge ranges are inflated. Indeed, indirect purchaser plaintiffs' expert in this

3  case estimated the percentage overcharge on sales by Defendants to be 5.75%.[47] Applying this

4  proposed overcharge to total sales to the direct purchasers would result in damages of $63 million.

5  Pursuant to IPPs' estimated damages measure, Plaintiffs' combined settlements equal a remarkable

6  80% of potential total single damages. This underscores the excellence of Plaintiffs' recovery.

7      Further demonstrating the excellence of the recovery, in total the settlements represent

8  approximately 4.6 percent of estimated class period sales. In similar direct purchaser cases, courts

9  have approved of settlements equating to *significantly* lower percentages of defendants' sales, even

10  where recovery was equivalent to 1% of defendants' relevant commerce.[48]

11              **b.      This case posed significant risks and challenges.**

12      That this recovery was obtained despite substantial risks and challenges also supports the

13  reasonableness of the 20-percent fee request. The risk associated with a case plays an important role

14  in determining a fair fee award.[49] Courts have recognized that the "'antitrust class action is arguably

15  the most complex action to prosecute.'"[50] Even where liability is proven, there is the very real risk

16

17

18  possible single damages recovery); *see also In re Zynga Inc. Secs. Litig.*, 2015 WL 6471171, at *11

19  (N.D. Cal. Oct. 27, 2015) (approving settlement of 14% of estimated damages in securities class
    action because, *inter alia*, it substantially exceeded average recovery in securities actions).

20      [47] Supp. Brief in Support of IPPs' Mot. for Prelim. Approval, Feb. 7, 2019, ECF No. 531; Decl.
    of Russell Lamb, Feb. 7, 2019, ECF No. 531-1; *see also* Berman Decl., ¶ 29.

21
       [48] *See Four in One Co. v. S.K. Foods, L.P.*, 2014 WL 28808, at *9 (E.D. Cal. Jan. 2, 2014)
22  (settlements equal to 1% of defendants' U.S. sales of tomatoes "compares favorably with antitrust
    class action settlements ultimately approved by other courts"); *In re Auto. Refinishing Paint Antitrust*
23  *Litig.*, 617 F. Supp. 2d 336, 344 (E.D. Pa. 2007) (granting final approval to settlements representing
    1.5% of settling defendants' sales of the relevant product for the four years during the class period in
24  which they had their highest sales totals); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627
    (E.D. Pa. 2004) (approving settlement equal to 1.62% of the settling defendants' sales).

25      [49] *Online DVD-Rental*, 779 F.3d at 955.

26      [50] *In re Linerboard Antitrust Litig. ("Linerboard I")*, 2004 WL 1221350, at *10 (E.D. Pa. June 2,
    2004) (quoting *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga.
27  2000)); *see also Auto. Refinishing.*, 617 F. Supp. 2d at 341 (the "antitrust class action is arguably the
    most complex action to prosecute[;] [t]he legal and factual issues involved are always numerous and
28  uncertain in outcome" (internal quotation marks and citation omitted)).

1    that plaintiffs will "recover[] no damages, or only negligible damages, at trial, or on appeal."[51]   And

2    this litigation has had unique risks and challenges.

3         Defendants have vigorously denied their participation in the alleged cartel, and courts have

4    held there proving liability in cases like this one, where the Department of Justice ended its

5    investigation prior to the start of discovery and without issuing any indictments, would be more

6    challenging than in other cases where defendants have been found criminally liable, such as the

7    *Capacitors* case before this Court.[52] Yet, Plaintiffs' settlements compare favorably to settlements in

8    cases where the defendants faced criminal prosecutions.

9         This is also an intrinsically difficult case due to the scope and length of the conspiracy

10   alleged and the complexity associated with proving the existence of overcharges. Plaintiffs alleged a

11   more than eleven year conspiracy period (from July 9, 2003 to August 1, 2014), which required

12   obtaining discovery and evidencing the beginning of the conspiracy in 2003, more than a decade

13   prior to when Plaintiff Schuten filed its complaint in 2015. Adding to the difficulty and complexity,

14   the Defendants' headquarters and the primary witnesses (many retired) are located in Asia (primarily

15   Japan). Class Counsel also had to review and analyze more than 11.8 million pages of predominantly

16   foreign-language documents. That required attorneys with specialized knowledge of antitrust law, of

17   organizing and running a foreign language review, and of managing hundreds of certified

18   translations—including some individuals who had these skills and who could also speak Japanese (as

19   well as Korean and Chinese). Class Counsel brought to bear hard-learned lessons from *ODD*,

20

21   [51] *See Wal-Mart Stores*, 396 F.3d at 118 ("'Indeed, the history of antitrust litigation is replete
      with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or
22   only negligible damages, at trial, or on appeal.'" (quoting *In re NASDAQ Market-Makers Antitrust
      Litig.,* 187 F.R.D. 465, 476 (S.D.N.Y. 1998)); *see also In re Superior Beverage/Glass Container
23   Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990) ("The 'best' case can be lost and the 'worst'
      case can be won, and juries may find liability but no damages. None of these risks should be
      underestimated.").

24
      [52] *See Auto. Refinishing*, 617 F. Supp. 2d at 344-45 (fact that Department of Justice, like here,
25   terminated its investigation without issuing any indictments, favored approval of settlements because
      this indicated that establishing liability "would not be a foregone conclusion" and thus the
26   settlements were reasonable "considering the risks of litigation and considering the Government's
      reluctance to prosecute"); *Cf. Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (in
27   favor of affirming approval of class action settlement, the Ninth Circuit explained that "[t]he class in
      this case does not have the benefit, like some other antitrust classes, of previous litigation between
28   the defendants and the government").

DPPs' MOTION FOR ATTORNEYS' FEES
AND EXPENSES- Case No.: 15-cv-03820-JD                    -14-
010554-11 1124651 V1

*Batteries*, and other antitrust cases, and the class benefited enormously. After reviewing the documents and having them translated in the weeks before depositions, Class Counsel with extensive experience taking foreign-language depositions in cartel cases were necessary to ensure that these difficult depositions were effectively utilized to build the Class's case. These lawyers brought a degree of skill and experience to the depositions that could be matched by very few other firms. Moreover, Defendants have argued that, even assuming liability, proving impact and damages would be difficult because of the relatively small margins in the resistors industry.

In light of these significant risks and complex issues, the large common settlement fund achieved in this case demonstrates the high level of skill and work required by Class Counsel to face down these challenges. This supports finding that the requested fee award is reasonable.

### c.   Class Counsel obtained benefits for the Class in addition to the cash fund.

The settlements obtained by Class Counsel generated benefits beyond the cash settlement fund. Each settlement agreement did not settle or compromise any of Plaintiffs' claims against any of the other Defendants or co-conspirators and expressly provided that settling sales were not removed from the case.[53] Those provisions are important because each settlement, therefore, ratcheted up the exposure and pressure on the remaining Defendants given their joint and several liability exposure.

All of the settlements also included cooperation provisions from the settling defendants. For example, each agreement required the settling defendant to provide declarations and/or testimony to support the admissibility and authenticity of documents.[54] Even the agreement with KOA, the last settling Defendant, has this provision, in case one of the other settlements is not finally approved. Counsel also secured agreements from three settling defendants to provide a declaration or deponent to support the claims against the remaining Defendants.[55] Plaintiffs took the deposition of Kamaya-

---

[53] Friedman Decl., Ex. A (HDK Settlement Agreement), ¶ 32 (ECF No. 507-3); Ex. B (Kamaya-Walsin Settlement Agreement), ¶ 51 (ECF No. 507-4); Ex. C (Panasonic Settlement Agreement), ¶ 48 (ECF No. 507-5); Ex. D (ROHM Settlement Agreement, ¶ 52 (ECF No. 507-6); Levens Prelim. App. Decl., Ex. A (KOA Settlement Agreement), ¶ 49 (ECF No. 534-2).

[54] Friedman Decl., Ex. A, ¶¶ 25-26; Ex. B, ¶¶ 42-43; Ex. C, ¶¶ 40-41; Ex. D, ¶ 40-44; ); Levens Prelim. App. Decl., Ex. A, ¶ 42.

[55] Friedman Decl., Ex. B, ¶¶ 42-43; Ex. C, ¶¶ 40-41; Ex. D, ¶ 40-44.

1    Walsin's Hideyuki Miura pursuant to this provision.

2         **d.    Class Counsel's litigation on a contingency basis supports the fee request.**

3         Class Counsel accepted this case on a purely contingency basis. Thus, for the past three-and-

4    a-half years, counsel has invested $8.32 million in attorneys' fees and $1.81 million in out-of-pocket

5    expenses with no guarantee that any of that investment would be recovered. Indeed, Plaintiffs did not

6    request any fees or expenses until now, at the end of the case after settlements with all Defendants.

7         The Ninth Circuit has held that a fee award must include consideration of the contingent

8    nature of the fee.[56] And it is well-established that attorneys who take on the risk of a contingency case

9    should be compensated for the risk they assume.[57] A 20 percent fee award reasonably compensates

10   Class Counsel for the financial burden and assumption of risk in this case.[58] Indeed, a 20 percent fee

11   award is well below the 33 percent market rate usually charged for contingent representation.[59]

12        **e.    The burdens faced by Class Counsel also support the fee request.**

13        The Ninth Circuit instructs district courts to consider the burdens class counsel experienced

14   while litigating the case (e.g., cost, duration, and foregoing other work). This litigation has been

15   pending for three and a half years. As explained in Section III.B, *infra*, Class Counsel has advanced

16   substantial sums out-of-pocket with no reimbursement to date. Class Counsel also has devoted

17

18

19        [56] *See, e.g.*, *Online DVD*, 779 F.3d at 954-55 & n.14; *Vizcaino*, 290 F.3d at 1050.

         [57] *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).

20
         [58] *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir. 1993) ("The 25%
21   contingent fee rewarded class counsel not only for the hours they had in the case to the date of the
     settlement, but for carrying the financial burden of the case, effectively prosecuting it and, by reason
22   of their expert handling of the case, achieving a just settlement for the class."); *accord Hopkins v.
     Stryker Sales Corp.*, 2013 WL 496358, at *3 (N. D. Cal. Feb. 6, 2013) (awarding 30% because "case
23   was conducted on an entirely contingent fee basis against a well-represented Defendant").

24        [59] *See, e.g.*, Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*,
     65 Fordham L. Rev. 247, 248 (1996) (noting that "standard contingency fees" are "usually thirty
25   three percent to forty percent of gross recoveries" (emphasis omitted)); F. Patrick Hubbard,
     *Substantive Due Process Limits on Punitive Damages Awards: "Morals Without Technique"?*, 60
26   Fla. L. Rev. 349, 383 (2008) (discussing "'the usual 33-40 percent contingent fee'" (quoting *Mathias
     v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003))); Herbert M. Kritzer, *The Wages of
27   Risk: The Returns of Contingency Fee Legal Practice*, 47 DePaul L. Rev. 267, 286 (1998) (reporting
     the results of a survey of Wisconsin lawyers, which found that "[o]f the cases with a [fee calculated
28   as a] fixed percentage [of the recovery], a contingency fee of 33% was by far the most common,
     accounting for 92% of those cases").

1  substantial time to this litigation – 21,302.75 hours, for a lodestar of more than $8.32 million – and

2  foregone other work while litigating this case.[60]

3          **f.      The market rate for antitrust class action lawyers with the experience of
                     Class Counsel also shows the 20 percent fee request is *under* market.**

4          The market rate for antitrust class action lawyers with Class Counsel's experience also

5  supports the 20-percent fee request and in fact shows that it is *below* market. Federal district courts

6  across the country routinely award class counsel fees equivalent to, and often exceeding, 30 percent

7  of the common fund.[61] In the *Capacitors* litigation, this Court awarded counsel for the direct

8  purchasers 25 percent of the common fund after the first two rounds of settlements.[62] In other

9  comparable antitrust class actions involving cartels of electronics manufacturers litigated in this

10  District, courts have awarded similar percentages, and often higher, in attorneys' fees.[63]

11          A recent empirical study of fees in class action settlements also supports a fee of 20 percent.

12

13     [60] Berman Decl., ¶¶ 4, 30-42; Levens Decl., ¶ 5.

14     [61] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding
15  31.33% fee on $1.075 billion settlement fund); *accord In re Urethane Antitrust Litig.*, 2016 WL
     4060156, at *6 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million settlement;
16  "Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in
     which the court awarded fees of 30 percent or higher."); *see also, e.g., In re Polyurethane Foam
17  Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (awarding 30% fee on $147.8
     million settlement fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D.
18  Fla. 2011) (awarding 33.3% fee on $510 million settlement fund); *Linerboard I*, 2004 WL 1221350,
     at *1 (awarding 30% fee on $202.5 million settlement fund); *In re Cardizem CD Antitrust Litig.*, No.
19  99-md-1278 (E.D. Mich. Nov. 26, 2002), at 18-20 (awarding 30% of a $110 million dollar fund,
     which produced a multiplier of 3.7); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *9
20  (D.D.C. July 16, 2001) (awarding 34.6% fee on $365 million settlement fund); *In re Ikon Office
     Sols., Inc., Secs. Litig.*, 194 F.R.D. 166, 170 (E.D. Pa. 2000) (awarding 30% fee on $111 million
     settlement fund).

21     [62] *See* Order Granting Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses, *In
22  re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal. Sept. 21, 2018), ECF No. 2196;
     Order Granting Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses, *In re
23  Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal. June 27, 2017), ECF No. 1714 (both
     orders awarding counsel for direct purchasers' 25 percent of the common fund).

24     [63] *See, e.g.*, Order Granting Co-Lead Counsel for Direct Purchaser Plaintiffs' Notice of Motion
25  and Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards, *In re
     Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420-YGR (N.D. Cal. May 16, 2018), ECF
26  No.2322 (30 percent for DPP settlements); *In re Cathode Ray Tube (CRT) Antitrust Litig. ("CRT2")*,
     2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) (30 percent for IPP settlement); *In re TFT-LCD (Flat
27  Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (28.6 percent for IPP settlement);
     Order Granting Award of Attorneys' Fees, Reimbursement of Expenses & Incentive Payments, *In re
28  Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW (N.D. Cal. Oct. 14,
     2011), ECF No. 1407 (33 percent for IPP settlement).

1   The authors found that, of the 19 antitrust settlements surveyed between 2009 and 2013 with a

2   median recovery of $37.3 million, the median percentage awarded was 30 percent.[64]

3         **2.   A lodestar cross-check confirms the reasonableness of the requested fees.**

4         Class Counsel has invested $8,325,627.50 in attorneys' fees in this litigation. This lodestar

5   does not include any fees for time spent before the appointment of lead counsel, or any time spent in

6   connection with this fee motion. Plaintiffs' requested fee of $10.05 million equates to a modest 1.26

7   multiplier of the lodestar, which is well within the range of multipliers awarded in similar litigation.

8         Lodestar is calculated "by multiplying the number of hours the prevailing party reasonably

9   expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for

10  the region and for the experience of the lawyer."[65] A court may give an upwards adjustment to a

11  lodestar (through a positive multiplier) to reflect a host of "reasonableness" factors, including: (1) the

12  amount involved and the results obtained, (2) the time and labor required, (3) the novelty and

13  difficulty of the questions involved, (4) the skill requisite to perform the legal service properly,

14  (5) the preclusion of other employment by the attorney due to acceptance of the case, (6) the

15  customary fee, (7) the experience, reputation, and ability of the attorneys, and (8) awards in similar

16  cases.[66] These are referred to as the *Kerr* "reasonableness" factors after the Ninth Circuit's opinion in

17
18      [64] Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017) ("EMG Study").

19      [65] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). Class Counsel's
20  lodestar is based on the 21,302.75 hours that they have invested in prosecuting this action, times the
    *current* hourly rates for the timekeepers that worked on this case, consistent with Ninth Circuit law.
21  Berman Decl., ¶ 31; *see Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016) ("The lodestar
    should be computed either using an hourly rate that reflects the prevailing rate as of the date of the
22  fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or
    using historical rates and compensating for delays with a prime-rate enhancement."); *Stanger v.*
23  *China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016) (same, and holding that it is an abuse of
    discretion for a district court to calculate lodestar otherwise); *see also Chambers v. Whirlpool Corp.*,
24  214 F. Supp. 3d 877, 900 (C.D. Cal. 2016) (finding "it appropriate to award class counsel attorney's
    fees based on their current hourly rates as compensation for the delay in payment"). So that the Court
25  can see the only minor difference if Class Counsel's lodestar was calculated historical rates, Class
    Counsel also has provided those figures. Using historical rates, Class Counsel's total lodestar would
26  be $7,763,017.75. Berman Decl., ¶ 31 n.2. Awarding the requested fees of $10,050,000 would equate
    to a 1.35 multiplier of that amount. Even if this Court used that lodestar and multiplier, it would be
    more than justified under the circumstances, as discussed in the text.

27      [66] *Id.* at 941-42. The Supreme Court has since called into question the relevance of two of the
    original *Kerr* factors: the contingent nature of the fee, and the "desirability" of the case. *See*
28  *Resurrection Bay Conserv. Alliance v. City of Seward*, 640 F.3d 1087, 1095 n.5 (9th Cir. 2011).

1    *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). Foremost among these

2    considerations is the "benefit obtained for the class."[67] Here, there can be no dispute regarding the

3    excellent results achieved for the Class. In any event, each of the factors likewise supports the

4    positive multiplier requested by Class Counsel, which is well-within the range applied in other cases.

5              **a.     Class Counsel has achieved exceptional results for the Class.**

6              The first factor, the results for the class, strongly supports an upwards adjustment from

7    lodestar. As outlined above (*see supra*, Section III.A.1.a), the results achieved on behalf of the

8    Settlement Class are exceptional.

9              **b.     Class Counsel has expended significant resources on behalf of the Class.**

10             Hagens Berman and Cohen Milstein were appointed as co-lead counsel on behalf of the direct

11   purchaser class. As a result, these two firms have staffed this case entirely with their own resources

12   during the pendency of three-and-a-half years of litigation. In total, Class Counsel has taken the

13   depositions of (usually leading the questioning) 19 current and former employees of the co-

14   conspirators. A team of staff and contract attorneys at Class Counsel's two firms with language

15   expertise in Japanese, Chinese, and Korean – as well as training in the antitrust laws – have reviewed

16   the 11.8 million pages of documents produced by the Defendants in this case. This same dedicated

17   team prepared the deposition exhibits and chronologies used by senior attorneys at depositions.

18             After the appointment of Class Counsel, attorneys and professionals at our firms have spent

19   21,302.75 hours working on this case toward the lodestar of $8,325,627.50 (no hours in connection

20   with this fee motion are being counted toward the lodestar). Class Counsel also has $1,815,881.92 in

21   unreimbursed expenses.[68] Moreover, Class Counsel has litigated the case efficiently, with a

22   streamlined core team that did the vast majority of the work and without farming out work to other

23   firms that have an incentive to over-bill. The efficiency of Plaintiffs' work is shown by comparison

24

25   _____

26   Other factors such as "time limitations imposed by the client or the circumstances" and "the nature
     and length of the professional relationship with the client" do not readily apply here. Plaintiffs, thus,
     do not address these questionable or irrelevant factors.

27   [67] *Bluetooth*, 654 F.3d at 942.

28   [68] *See* Berman Decl., ¶ 43.

DPPS' MOTION FOR ATTORNEYS' FEES
AND EXPENSES- Case No.: 15-cv-03820-JD                    -19-
010554-11 1124651 V1

to the lodestar estimated by the direct purchasers in *Capacitors* at the time of their *first* fee motion ($44,444,689.40).[69] Plaintiffs' efficient commitment of time, personnel, and money to the Class supports the requested award.

**c.     This case presented novel and difficult challenges, requiring a high level of skill by Class Counsel.**

Class Counsel explained in detail in Section III.A.1.b, *supra*, that this case was risky and presented novel and difficult challenges that had to be overcome to achieve these excellent settlements. As an example, even without a Department of Justice indictment or any cooperating witnesses, Plaintiffs were able to overcome multiple rounds of motions to dismiss challenging the sufficiency of the pleadings, that the claims were not barred by the statute of limitations, and also alleging sufficient facts plausibly showing that the U.S. subsidiaries participated in the conspiracy.

Additional challenges included supporting an alleged conspiracy for a lengthy class period that began decades ago, centered in Japan and other Asian countries, and with some of the best witnesses either retired or otherwise unable to be compelled from abroad to testify. Class Counsel had to organize a dedicated team of reviewers, contract attorneys, and others to review and translate documents mostly in Japanese, and then to prepare them for depositions conducted via translators. Class Counsel then conducted 19 fact and Rule 30(b)(6) depositions (many with translated exhibits), including one deposition that was held at the U.S. consulate in Japan. Class Counsel also obtained data and prepared to prove impact and damages to support a worldwide conspiracy that impacted their U.S. direct purchaser class. Ultimately, after vigorously contested discovery against some of the world's largest and best defense counsel, Plaintiffs achieved excellent settlements by any measure.

**d.     Class Counsel has foregone other employment due to their commitment to this case.**

Hagens Berman and Cohen Milstein dedicated a core team of individuals to the litigation of this action. Rather than the sprawling involvement of many firms, from the beginning of the case Hagens Berman and Cohen Milstein has dedicated an efficient and streamlined team to this

---

[69] *See* Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses at 12, *In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal. Sept. 21, 2018), ECF No. 1458.

litigation. The consequence of dedicating a team of experienced antitrust attorneys has meant that many of these professionals worked nearly exclusively on this case for some number of years and forwent other employment while doing so. Class Counsel's attorneys have dedicated a total of 21,302.75 hours to this litigation, and many of those attorneys have devoted many thousands of hours each.[70] Hagens Berman and Cohen Milstein's choice to commit the resources of their own firms, forgoing other cases and other projects, supports the request for fees.

> **e.      The requested fee is reasonable when compared to fees in similar litigation.**

The sixth and eighth *Kerr* factors – the customary fee and awards in similar cases – both support Class Counsel's fee request. Class Counsel's requested lodestar multiplier of 1.26 is conservative and at the low end of the range of multipliers surveyed by the Ninth Circuit in *Vizcaino*. *Vizcaino* found that in 20 of the 24 cases it surveyed, the multiplier was between 1.0 and 4.0.[71] Plaintiffs' requested fee is well within the range of other similar cases.[72] Indeed, "Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."[73] The Ninth Circuit has affirmed a multiplier of 6.85, holding that it "falls well within the range of multipliers that courts have allowed."[74]

The EMG Study, a recent empirical study of fees in class action settlements also supports the

---

[70] Berman Decl., ¶ 4; Levens Decl., ¶ 4.

[71] *See Vizcaino*, 290 F.3d at 1051 n.6.

[72] *See, e.g.*, *Vizcaino*, 290 F.3d at 1050-51 (upholding a 28% fee award that constituted a 3.65 multiple of lodestar); *id*. at 1052-54 (noting district court cases in the Ninth Circuit approving multipliers as high as 6.2, and citing only 3 of 24 decisions with approved multipliers below 1.4); *Wal-Mart Stores,.*, 396 F.3d at 123  (finding 3.5 multiplier reasonable);  *CRT*, 2016 WL 4126533, at *10 (finding that a multiplier of 1.96 was well within the range of acceptable multipliers); *Noll v. eBay, Inc.*, 309 F.R.D. 593, 610 (N.D. Cal. 2015) (finding that the lodestar cross check, with a 1.6 multiplier, confirmed the reasonableness of the percentage-based calculation); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (finding a 2.83 multiplier appropriate)*; In re Netflix Privacy Litig.*, 2013 WL 1120801, at *10 (N.D. Cal. Mar. 18, 2013) (finding that a lodestar multiplier of 1.66 confirms the reasonableness of the percentage-based attorneys' fees calculation, 25% of the settlement fund); *Lane v. Facebook, Inc.*, 2010 WL 2076916, at *2 (N.D. Cal. May 24, 2010) (finding that a multiplier of 2 should be applied).

[73] *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (collecting cases); *accord, e.g.*, *In re Aremissoft Corp. Secs. Litig.*, 210 F.R.D. 109, 134–35 (D.N.J. 2002) (awarding 28% of a settlement, resulting in a lodestar multiplier of 4.3).

[74] *Steiner v. Am. Broad. Co., Inc.*, 248 F. App'x 780, 783 (9th Cir. 2007).

requested multiplier of 1.26. The authors found that the mean and median multipliers for cases with settlements between $23.4 and $67.5 million (the range applicable here), were 1.65 and 1.5, respectively. The mean multiplier for antitrust cases, writ large, was 1.61.[75] The blended billing rate for Class Counsel in this case of approximately $471.77 per hour[76] – which Harvard Law Professor William B. Rubenstein recently showed was below the average blended billing rate of $528.11 per hour for forty approved class action settlements in the Northern District of California in 2016 and 2017 – further confirms that the fee request is at, or perhaps below, the market rate.[77]

### f.   The reputation and ability of Hagens Berman and Cohen Milstein supports the requested fee.

Hagens Berman and Cohen Milstein are two of the most well-respected class action litigation firms in the country and have litigated some of the largest class actions in history. Hagens Berman's cases include the tobacco litigation,[78] *In re Visa MasterCard Litigation*,[79] and the *In re Toyota Motor Corp. Unintended Acceleration Litigation*.[80] Hagens Berman has over 70 lawyers in offices across the country. For more than 45 years, Cohen Milstein, a 90-lawyer firm based in Washington, D.C. and five other cities, has been one of the nation's leading plaintiffs' class action firms. The firm has litigated some of the nation's most complex class cases and has recovered billions of dollars in damages for injured plaintiffs. Recently recognized by the National Law Journal as an "Elite Trial Lawyer" in four different categories, Cohen Milstein has a track record of successfully prosecuting complex cases.  The Firm's Antitrust Group has secured billions in relief for the victims of

---

[75] EMG Study, 92 N.Y.U. L. Rev.at 965-66.

[76] *See* Berman Decl., ¶ 36. "A blended billing rate is captured by simply dividing the total fee sought by the number of hours worked, thus providing the average hourly billing rate for the case across timekeepers ranging from high-end partners to paralegals." Berman Decl., Ex. A at 16 n.23.

[77] *See* Berman Decl., Ex. A at 16-18.

[78] In the historic litigation against Big Tobacco, Hagens Berman represented 13 states and advanced groundbreaking legal claims to secure a global settlement worth $206 billion, the largest recovery in history. Only two firms went to trial, and Hagens Berman served as co-lead trial counsel.

[79] *In re Visa-MasterCard Litig*., No. CV-96-5238 (E.D.N.Y.). Hagens Berman was co-lead counsel in a case alleging antitrust violations by Visa and MasterCard. The case settled for $3 billion in cash and changes in practices valued at $20 billion.

[80] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig*., No. 8:10-ml-2151 JVS (C.D. Cal.). Hagens Berman recovered $1.6 billion for the class.

DPPs' MOTION FOR ATTORNEYS' FEES
AND EXPENSES- Case No.: 15-cv-03820-JD
010554-11 1124651 V1
-22-

anticompetitive conduct. Just a few notable examples include obtaining a favorable jury verdict in *In re Urethane Antitrust Litig.*, No. 04-md-01616 (D. Kan.), which, once automatically trebeled, amounted to more than $1 billion for the class, certifying a class and obtaining a settlement amounting to $550 million, and securing a total settlement fund of $190 million for injured class members in *In re Domestic Drywall Antitrust Litig.*, No. 13-md-02437 (E.D. Pa.).

Both firms have been recognized in courts throughout the U.S. for their ability and experience in handling major class litigation efficiently and obtaining outstanding results for their clients. Hagens Berman and Cohen Milstein include firm resumès that provide additional detail.[81]

**B.     Class Counsel requests reimbursement of reasonable out-of-pocket expenses incidental and necessary to the effective representation of the Class.**

Plaintiffs respectfully request reimbursement of out-of-pocket expenses totaling $1,815,881.92. Courts reimburse attorneys prosecuting class claims on a contingent basis for "reasonable expenses that would typically be billed to paying clients in non-contingency matters," *i.e.*, costs "incidental and necessary to the effective representation of the Class."[82] Reimbursable litigation expenses include those for document production, experts and consultants, depositions, translation services, travel, mail, and postage costs.[83] The total expenses for which Plaintiffs seek reimbursement are broken down by category in the supporting declarations and exhibits.[84]

The largest category of expenses is for economic expert costs – $1,082,209.53 or 59 percent of Plaintiffs' total costs. As explained in more detail in section II.D, *supra*, the work of these economic experts, Dr. Flamm and his supporting team of economists at Christensen Associates, was critical to the success of this case. Their market analyses, particularly of the evolving global

---

[81] Berman Decl., ¶¶ 59-77, Ex. G; Levens Decl., ¶¶ 13-14, Ex. 5.

[82] *In re Omnivision Techs.*, 559 F. Supp. 2d at 1048; *see also Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977) (Under the common fund doctrine, plaintiffs' counsel should receive reimbursement of all reasonable out-of-pocket expenses and costs in prosecution of the claims and in obtaining a settlement.).

[83] *See In re Media Vision Tech. Secs. Litig.*, 913 F. Supp. 1362, 1366-72 (N.D. Cal. 1996) (Court fees, experts/consultants, service of process, court reporters, transcripts, deposition costs, computer research, photocopies, postage, telephone/fax); *Thornberry v. Delta Air Lines*, 676 F.2d 1240, 1244 (9th Cir. 1982), *judgment vacated and remanded on other grounds*, 461 U.S. 952 (1983) (travel, meals, and lodging).

[84] *See* Berman Decl., ¶¶ 47-53, Exs. D, F; Levens Decl., Ex. 4.

marketplace for linear resistors during the past several decades, informed Plaintiffs' early legal analyses, allegations, and litigation strategy. Their input was also critical to shaping the discovery requested, including the questions asked at depositions. The economic experts also conducted complex analyses of large sets of transactional data and related documents, such as profit and loss statements. These analyses were critical to negotiating with Defendants about the impact and damages associated with the alleged conspiracy, as well as preparing the class certification expert report that was due just after the ultimate settlement with KOA.

**C.     Plaintiffs request that the class representative, Schuten Electronics, be awarded a reasonable service award to compensate it for critical dedication to this case.**

Plaintiffs request a service award for the lone class representative, Schuten Electronics, in the amount of $25,000. "[Service] *awards* are fairly typical in class action cases."[85] In the Ninth Circuit, service awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."[86] Courts have discretion to approve service awards based on the amount of time and effort spent, the duration of the litigation, and the personal benefit (or lack thereof) as a result of the litigation.[87]

Schuten Electronics is a distributor of electronic components, including linear resistors. Schuten Electronics decided to serve as a Class Representative in this litigation not only to obtain compensation for itself but also to obtain relief on behalf of the entire class.  At 86-years of age, Jim Schuten, the owner of Schuten Electronics, came forward to prosecute this case as the sole Class Representative, knowing that because the industry is controlled by a small number of suppliers, others in the industry would be unlikely to step forward.[88]

Schuten has been actively involved in this litigation and, indeed, without its willingness to come forward and prosecute the action when neither the government nor any other direct purchaser

---

[85] *Rodriguez*, 563 F.3d at 958  (emphasis in original).

[86] *Id.* at 958-59.

[87] *See Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995).

[88] Schuten Decl., ¶¶ 4-6, 7.

would, Settlement Class members would have received nothing for their injuries and the Defendants would be left to pursue their illegal conduct unfettered. Schuten assisted counsel in investigating and prosecuting this action, responded to detailed interrogatories, searched for and produced documents responsive to 54 document requests, and weighed the benefits of the settlements. Defendants also deposed a representative of Schuten Electronics, James Schuten, in a Rule 30(b)(6) deposition, after identifying eight broad subject areas in the deposition notice, each with several sub-parts.[89]

  This amounted to more than 55 hours of work on the Class's behalf.[90] This work was done with no promise of repayment and the full knowledge that, because Schuten's purchasing volume was smaller than many other class members', its likely share of any potential settlement would be smaller than many other class members who did not pursue relief for themselves or the Class. In the face of this service and perseverance, an award of $25,000 to the class representative is reasonable.

**D. Plaintiffs request that they be authorized to pay up to $50,000 from the settlement fund for the future expected cost to distribute the settlement funds.**

  This Court has approved the Settlement Notice Administrator to expend funds from the escrow accounts to pay taxes, tax expenses, notice, and administration costs as set forth in the Settlement Agreements. The Administrator has estimated that there will be a need for up to an additional $50,000 to pay for future costs of distribution.[91] Accordingly, Plaintiffs request that the Court authorize Plaintiffs to pay up to $50,000 for these costs.

## IV. CONCLUSION

  For the foregoing reasons, Plaintiffs respectfully request an award of $10,050,000 in attorneys' fees, reimbursement of expenses incurred totaling $1,815,881.92, a service award to the lone class representative of $25,000, and authorization to pay up to $50,000 from the common fund toward future costs to distribute the settlement funds.

---

[89] Berman Decl., ¶ 23; Schuten Decl., ¶¶ 8-14.

[90] Schuten Decl., ¶ 14.

[91] Berman Decl., ¶ 78; *see* ECF 542 at ¶ 8.

DATED: June 10, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By ____/s/ Steve W. Berman_____
       STEVE W. BERMAN

1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
Benjamin J. Siegel (256260)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com
bens@hbsslaw.com

Kit A. Pierson (*pro hac vice*)
Daniel A. Small (*pro hac vice*)
Emmy L. Levens (*pro hac vice*)
Robert A. Braun (*pro hac vice*)
Laura Alexander (255485)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
dsmall@cohenmilstein.com
elevens@cohenmilstein.com
lalexander@cohenmilstein.com
rbraun@cohenmilstein.com

*Co-Lead Counsel for Direct Purchaser Plaintiffs*