Joseph W. Cotchett (State Bar No. 36324)
Adam J. Zapala (245748)
Elizabeth T. Castillo (280502)
Tamarah P. Prevost (313422)
**COTCHETT PITRE & McCARTHY LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
tprevost@cpmlegal.com

*Lead Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE RESISTORS ANTITRUST LITIGATION** | **Case No. 3:15-CV-03820-jd** |
| **THIS DOCUMENT RELATES TO:**<br><br>**ALL INDIRECT PURCHASER PLAINTIFF ACTIONS** | **INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES; REIMBURSEMENT OF EXPENSES; AND CLASS REPRESENTATIVE SERVICE AWARDS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:  December 12, 2019<br>Time: 10:00 a.m.<br>Place: Courtroom 11, 19th Floor<br>Judge: Hon. James Donato |

1

2

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3

4

5

6

7

8

9

**PLEASE TAKE NOTICE** that at 10:00 am on December 12, 2019, in connection with the hearing on final approval, the Indirect Purchaser Plaintiffs ("IPPs") and their counsel ("Lead Counsel") will move, and hereby do move, this Court before the Honorable James Donato, United States District Judge, at the United States Courthouse, 450 Golden Gate Avenue, Courtroom 11 (19th Floor), San Francisco, California, for an award of attorneys' fees in the amount of $8,350,000 (or 25% of the Settlement Fund), and reimbursement of litigation expenses in the amount of $1,387,079.41.  This motion is brought pursuant to Fed. R. Civ. Proc. 23(h), 54(b) and 54(d)(2).

10

11

12

13

14

15

16

The motion should be granted because (a) the requested attorneys' fees are fair and reasonable considering Lead Counsel's extensive and longstanding efforts to create a Settlement Fund of $33.4 million; (b) the requested fees comport with Ninth Circuit case law regarding attorneys' fees in similar common fund litigation; (c) the expenses for which reimbursement is sought were reasonably and necessarily incurred in connection with the prosecution of this Action; and (d) the service awards for each of the eight class representatives fairly compensate them for their excellent work on behalf of the Class.

17

18

19

20

21

This motion is based upon this Notice of Motion and Motion; the following Memorandum of Points and Authorities; the accompanying Declaration of Adam J. Zapala; the Declarations of Supporting Counsel; the [Proposed] Order submitted herewith; and such other records, pleadings, and papers filed in this action the Court may consider; and upon such argument as may be presented to the Court at the hearing on this motion.

22

DATED:  August 13, 2019                    Respectfully submitted,

23

24

25

26

27

28

*/s/ Adam J. Zapala*
Joseph W. Cotchett
Adam J. Zapala
Elizabeth Tran
Tamarah P. Prevost
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000 │ Fax: (650) 697-0577
*Lead Counsel for Indirect Purchaser Plaintiffs*

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED ........................................................................ v

I. INTRODUCTION .................................................................................................... 1

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................... 3

    A. Litigation History ............................................................................................ 3

        1. Initial Complaints and Appointment of Leadership ............................ 3

    B. The Discovery Process .................................................................................... 4

        1. Written Discovery Completed by IPPs ................................................ 4

        2. The Meet and Confer Process and Motion Practice Before the Court ................ 5

        3. ESI, Expert Discovery, and Protective Orders .................................... 6

        4. Defendants' Document Productions and IPPs' Review Efforts ........... 6

        5. IPPs' Document Collections and Productions ..................................... 8

III. ARGUMENT ........................................................................................................... 8

    A. Granting a Percentage-of-the-Fund is the Predominant Method for Determining Attorneys' Fees in Class Actions ............................................. 8

    B. Lead Counsel's Attorney Fee Request is Reasonable ................................... 10

        1. Counsel for IPPs Have Achieved an Excellent Recovery ................. 11

        2. A High Level of Skill Was Required to Prosecute This Case ........... 11

        3. The Risks of this Litigation Militate in Favor of the Request .......... 12

        4. The Contingent Nature of the Litigation Justifies the Request ......... 12

        5. The High Quality of the Work Performed ......................................... 13

        6. The Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee ................................................................................... 13

    C. IPPs Are Entitled to Reimbursement of Their Reasonable Litigation Expenses ........ 14

    D. For their Excellent Service to the Class, IPPs Seek Modest Service Awards for the Eight Class Representatives ............................................................... 15

IV. CONCLUSION ...................................................................................................... 15

**Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820-JD**

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) .....................................................................................9

*Arenson v. Board of Trade*,
    372 F. Supp. 1349 (N.D. Ill. 1974) .......................................................................................11

*In re Auto. Refinishing Paint Antitrust Litig.*,
    617 F. Supp. 2d 336 (E.D. Pa. 2007) ....................................................................................12

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ................................................................................................13

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................................................................8

*In re Capacitors Antitrust Litigation*,
    No. 14-cv-3264, ECF No. 1714 (N.D. Cal. June 27, 2017)....................................................9

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. C-07-5944 JST, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ....................................9, 10

*Central R.R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885)................................................................................................................8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) ....................................................9

*In re Flash Memory Antitrust Litig.*,
    No. C 07-10-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ...................................12

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008)...........................................................................................12

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972)................................................................................................................8

*In re Heritage Bond Litig.*,
    02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) .......................................10, 11

*Hopkins v. Stryker Sales Corp.*,
    2013 WL 496358 (N.D.Cal. Feb. 6, 2013) .............................................................................13

*In re King Res. Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976)..........................................................................................11

**Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820-JD**

ii

*In re Linerboard Antitrust Litig.*,
   No. Civ. A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ....................................11, 12

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017)....................................12

*Mark v. Valley Ins. Co.*,
   Case No. CV 01-1575-BR, 2004 WL 2260605 (D. Or. Oct. 6, 2004).....................................11

*In re Media Vision Tech. Secs. Litig.*,
   913 F. Supp. 1362 (N.D. Cal. 1995) ...................................................................................14

*Meijer v. Abbott Laboratories*,
   C-07-05985 (N.D. Cal. Aug. 11, 2011) ................................................................................9

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)...............................................................................................................8

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................................12

*In re OmniVision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................................................................14

*In re Optical Disk Drive Products Antitrust Litigation*,
   No. 3:10-md-2143 RS (N.D. Cal. Dec. 19, 2016) ..............................................................10

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1968)...............................................................................................................8

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983)...............................................................................................................8

*In re Polyurethane Foam Antitrust Litig.*,
   2015 WL 1639269 (N.D. Ohio Feb. 26, 2015)....................................................................9

*In re Portal Software, Inc. Sec. Litig.*,
   No. C-03-5138 VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007)....................................14

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ............................................................................................12

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)...............................................................................................................8

*Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*,
   779 F.3d 934 (9th Cir. 2015) ...................................................................................... *passim*

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ..............................................................................................15

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
Case No. 07-13-md-1819-CW (N.D. Cal. June 30, 2011)...........................................9

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
No. 07-md-1819-CW (N.D. Cal. Oct. 14, 2011) ...................................................9

*Std. Iron Works v. Arcelormittal,*
No. 08-C-5214, 2014 U.S. Dist. LEXIS 162557 (N.D. Ill. Oct. 22, 2014) ...........................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011)...............................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)................................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013)...........................9, 14

*Thornberry v. Delta Air Lines,*
676 F.2d 1240 (9th Cir. 1982) .................................................................14

*In re Urethane Antitrust Litig.,*
2016 WL 4060156 (D. Kan. July 29, 2016) ..................................................9

*Van Vraken v. Atl. Richfield Co.,*
901 F.Supp.294 (N.D. Cal. 1995) ..............................................................15

*Vincent v. Hughes Air West,*
557 F.2d 759 (9th Cir. 1977) ...................................................................14

*Vizcaino v. Microsoft Corp.,*
290 F.3d 1043 (9th Cir. 2002) .........................................................9, 10, 13

*Vizcaino v. Microsoft Corp.*
(W.D.Wash. 2001) 142 F.Supp.2d 1299......................................................11

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
396 F.3d 96. (2d Cir. 2005)....................................................................12

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
19 F.3d 1291 (9th Cir. 1994) ...............................................................8, 13

**Rules**

Federal Rules of Civil Procedure
Rule 30(b)(6)..................................................................................2
Rule 45 .......................................................................................5

**Other Authorities**

1 Alba Conte, Attorney Fee Awards § 2.19 (3d ed. 2004) .....................................14

1

## <u>STATEMENT OF ISSUES PRESENTED</u>

2    1.    Whether this Court should grant the Indirect Purchaser Plaintiffs' ("IPPs") request for

3 attorneys' fees in the amount of $8,350,000 as fair and reasonable given that it amounts to 25% of

4 the settlement fund—the benchmark for attorneys' fees in the Ninth Circuit—and in light of the

5 excellent results achieved where IPPs recovered more than 100% in damages?

6    2.    Whether this Court should approve IPPs' request for reimbursement of litigation

7 expenses and costs given that they were reasonably and necessarily incurred during the course of

8 this four-year complex antitrust litigation?

9    3.    Whether this Court should approve the modest Class Representative service awards in

10 the amount of $2,500 for each of the eight Class Representatives given the excellent results they

11 helped secure and the diligent performance of their duties for the benefit of the Class?

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

After nearly four years of hard-fought litigation, the Indirect Purchaser Plaintiffs ("IPPs") have reached settlements worth a cumulative $33.4 million with all five of the Defendant families in this litigation.[1]  In light of the substantial risks and complex issues in this litigation, IPPs respectfully request an award of attorneys' fees in the amount of 25% of the settlement fund, for a total of $8,350,000, reimbursement of litigation expenses in the amount of $1,437,576.88, and $2,500 service awards for each of the eight Class Representatives.

Lead Counsel have prosecuted this case on a purely contingent basis, opposing large corporations, represented by some of the country's most sophisticated defense counsel.  The declarations accompanying this motion demonstrate that IPP Counsel spent 33,818.65 hours in time litigating this important case.  *See* Declaration of Adam J. Zapala in Support of IPPs' Motion for Reimbursement of Attorneys' Fees and Expenses ("Zapala Decl.") ¶ 101.  If the requested attorneys' fees are granted, the total lodestar cross-check, based on historical hourly rates, demonstrates a negative multiplier of 0.73–a factor further justifying the award.  And over almost four years, IPP Counsel have advanced $1,437,576.88 in reasonably incurred and necessary litigation expenses.  *Id.* ¶ 105.  Lead Counsel also requests reimbursement of these expenses.

To date, Lead Counsel have performed an enormous amount of high-quality work, including but not limited to the following:

- Conducted an initial investigation of the case to develop the theories of liability and the facts that formed the basis of the allegations against Defendants.  This research included a review of publicly-available information regarding the Resistors industry and consultation with industry experts and economists;

- Drafted and extensively researched the indirect purchaser complaint, and three comprehensive consolidated amended complaints detailing Defendants' violations of the antitrust laws, which were initially submitted under seal and later filed in the public record (Dkt. 1, 126-4 (141), 329, and 402);

---

[1] IPPs have reached settlements with (1) Panasonic Corporation and Panasonic Corporation of North America (together, "Panasonic"); (2) KOA Corporation and KOA Speer Electronics, Inc. (together, "KOA"); (3) ROHM Co. Ltd. and ROHM Semiconductor U.S.A., LLC (together, "ROHM"); (4) Kamaya Electric Co., Ltd. and Kamaya Inc. (together, "Kamaya"); and (5) Hokuriku Electric Industry Co. and HDK America, Inc. (together, "HDK") (collectively, "Settling Defendants").  *See* Dkt. 514; 531.

---

- Opposed and, on the whole, prevailed after extensive rounds of hard-fought motions to dismiss. Defendants filed five motions with arguments covering the statute of limitations, standing, the sufficiency of the conspiracy allegations under *Twombly* and *Iqbal*, the sufficiency of the complaint in light of the numerous state laws under which IPPs sued, among several other attacks on the pleadings;

- Propounded several sets of discovery that – after extensive meeting and conferring with Defendants and motion practice before this Court – resulted in identifying the relevant document custodians and the production of more than 2.7 million documents (10.5 million pages and 1.4 terabytes) in addition to approximately 500 gigabytes of electronic transactional data;

- Drafted, met and conferred, negotiated and entered into agreements with Defendants over several case management documents and protocols, concerning the discovery of electronically stored information ("ESI") (Dkt. 252); expert discovery (Dkt. 215); other discovery limits (Dkt. 308); the protective order (Dkt. 122), and several other similar protocols and proposed orders that contributed to the effective and efficient administration of this litigation;

- Engaged in multiple, extended discovery meet and confers with Defendants concerning the appropriate document custodians for each corporate family, English-language search terms, Japanese-language search terms and other search mechanisms that would assist Defendants in identifying and producing responsive documents;

- Organized teams of lawyers that reviewed, searched, and extensively coded and analyzed the documentary evidence—most of which was in Japanese (or Korean, or Chinese) and required translations;

- Engaged in extensive non-party discovery, including issuing comprehensive subpoenas for documents to 25 non-party distributors of resistors to obtain their transactional data for both their purchases of resistors from Defendants and their sales of resistors to IPPs;

- Propounded Interrogatories and issued Rule 30(b)(6) deposition notices;

- Answered several sets of discovery propounded by Defendants, including Requests for Production of Documents, and Interrogatories;

- Contended with seriatim discovery disputes and many motions to compel, concerning document custodians, search terms, and other matters;

- Engaged and consulted extensively with industry experts, economists, and statisticians on issues pertaining to electronic discovery, liability, class certification, and damages, throughout the course of the Action;

- Engaged in protracted settlement discussions and mediations with the Settling Defendants, *see, e.g.,* Dkt. 514-3, 514-4, 514-5, 514-6, 514-7; Zapala Decl. in Support of Motion for Preliminary Approval;

- Engaged and retained class action notice experts to develop a robust notice program; and

Zapala Decl. ¶¶ 11-75.  During this arduous nearly four-year timeline and taking on substantial risk, Lead Counsel expended considerable litigation costs and attorney hours.  *Id.* ¶¶ 98-107.  Against this

background and considering the excellent results achieved, IPPs respectfully submit that their requests are fair and reasonable, and should be approved.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Litigation History

#### 1.   Initial Complaints and Appointment of Leadership

Cotchett, Pitre & McCarthy, LLP ("CPM") filed the indirect purchaser complaint in this case on September 3, 2015 in the Northern District of California on behalf of Makers LED. Zapala Decl. ¶ 11. This complaint was the product of many hours of investigation and research by CPM. *Id*. After the filing of several other complaints, on December 21, 2015, Judge Whyte granted CPM's unopposed motion to be appointed Interim Lead Counsel. Dkt. 89.

On May 27, 2016, after protracted proceedings concerning a potential DOJ stay and obtaining the grand jury documents, IPPs filed under seal a 67-page, factually-detailed Consolidated Class Action Complaint ("CCAC"). Dkt. 126-4. The CCAC initially named 5 Defendant families and outlined a price-fixing conspiracy with respect to linear resistors. *Id*. On June 29, 2016, this case was re-assigned to this Court in light of Judge Whyte's retirement. Dkt. 151.

The CCAC was the result of considerable work. Lead Counsel for IPPs spent significant time researching legal, economic, and factual issues. Zapala Decl. ¶ 17. IPPs alleged a global price-fixing conspiracy regarding linear resistors, which are found in countless electronic devices, that was carried out in Japan, the United States, and other parts of the world through agreements to fix prices and restrict output. *Id*. Defendants included five Japanese electronics companies and each of their U.S. subsidiaries. As a result of the nature of the conspiracy, substantial Japanese documents had to be reviewed and translated to supplement factual allegations and to ensure that the classes' claims survived any challenges under *Twombly*. *Id*.

In response to IPPs' CCAC, on August 24, 2016, Defendants filed a motion to dismiss on behalf of all Defendants alleging that IPPs claims 1) were barred by the statute of limitations; 2) failed under *Twombly*; 3) insufficiently pleaded fraudulent concealment; and 4) failed to state violations of State Consumer Protection and Unfair Competition Laws under Florida, New York, and California law. Dkt. 205. The same day, the U.S. subsidiary Defendants moved to dismiss IPPs' complaint,

arguing IPPs had not sufficiently alleged their specific participation in the conspiracy.  *Id*. ¶ 18.

IPPs opposed each motion.  Following oral argument on September 5, 2017, the Court granted Defendants' motion to dismiss IPPs complaint with leave to amend, due in part to "a gap in the allegations between 2009 and 2013."  Dkt. 326, at 8.  As such, the Court did not consider the merits of the U.S. subsidiary Defendants' motion to dismiss.  *Id*.

In response to the Court's guidance in the order on Defendants' motions to dismiss, IPPs added substantial additional factual allegations, incorporating them into an Amended Consolidated Class Action Complaint ("ACCAC") on October 3, 2017.  Dkt. 329.  A month later, on November 3, 2017, all Defendants filed a Joint Motion to Dismiss IPPs' Florida State Law Claims for Lack of Standing, and the U.S. subsidiary Defendants submitted a parallel Joint Motion to Dismiss.  Dkt. 344; 346.  Once again, IPPs prepared thorough briefing opposing these motions on December 4, 2017, Dkt. 350, 351, and Defendants jointly replied on December 19, 2017.  Dkt. 357, 358.

On January 22, 2018, this Court largely denied Defendants' motion, finding IPPs had alleged plausible conspiracy claims. Dkt. 384.  The Court also rejected Defendants' arguments regarding statutes of limitations, and found "sufficient allegations against each U.S. subsidiary defendant."  *Id*.  A Second Amended Consolidated Class Action Complaint ("SACCAC") was filed March 5, 2018 and became the operative complaint in this matter.  Dkt. 402.

## B.   The Discovery Process

### 1.   Written Discovery Completed by IPPs

This case was unquestionably complex.  The case involved both substantial amounts of discovery, as well as a multitude of disputes with Defendants.  As reflected in the Court's docket, IPPs have been forced to fight for many categories of discovery they sought.  *See e.g.*, Zapala Decl. ¶¶ 28-36.  IPPs propounded substantial written discovery on all Defendants.  On November 1, 2016, IPPs served a First Set of 50 Requests for Production of Documents seeking a comprehensive set of financial, organizational, conspiracy-related and transactional documents.  Zapala Decl. ¶ 26.  IPPs concurrently served their First Set of Interrogatories on Defendants, seeking information relevant to chains of distribution, trade associations, and pricing.  *Id*.

Because of the need to prove a worldwide conspiracy and gather documents from a variety of institutional (e.g., trade associations) and related parties (e.g., sales agents), as well as proving pass-through of the overcharge to the IPP Class, IPPs also engaged in substantial non-party discovery. IPPs propounded Rule 45 document subpoenas on 25 non-party resistors distributors seeking information concerning the non-party distributors' purchases of resistors from Defendants and their sales of resistors to the IPP class. *Id.* ¶ 27.

### 2. The Meet and Confer Process and Motion Practice Before the Court

Throughout this litigation Defendants have vigorously contested IPPs' legal theories of liability, facts supporting Defendants' level of involvement in such a conspiracy, and damages owed to the Class. IPPs nonetheless reached agreement with the various Defendants—after the service of the aforementioned discovery and multiple rounds of objections from them—to search and collect from document custodians' files. Zapala Decl. ¶¶ 28-30. The parties met and conferred extensively over the scope of IPPs' requests, document custodians, English and Japanese ESI search terms, and ultimately stipulated to an ESI Stipulation and Order and various other protocols governing discovery. Zapala Decl. ¶¶ 29-32; Dkt. 249. In short, IPPs made every effort to engage with Defendants to resolve discovery disputes that arose in connection with the documents and data IPPs sought. *Id.* ¶ 31. IPPs drafted dozens of meet and confer letters, and participated in countless corresponding telephone calls, often with counsel for multiple Defendants. *Id.*

In connection with these discovery efforts, IPPs were often required to consult with their experts to negotiate with Defendants or non-parties regarding their transactional data, to ensure they would obtain what was necessary and usable for their experts. *Id.* ¶ 32. This added more time and complexity to meet and confer efforts. And when they were unsuccessful, IPPs, either alone or jointly with DPPs, drafted and filed a dozen Discovery Letter Briefs on a wide variety of issues, seeking the Court's intervention. *Id.* For example, IPPs drafted discovery letter briefs on October 19, 2016 regarding ESI discovery (Dkt. 231); on December 21, 2016 regarding custodians (Dkt. 256); on December 21, 2016 regarding KOA Priority Custodians (Dkt. 257); on January 30, 2017 regarding search terms (Dkt. 281); on February 13, 2017 regarding Defendant Panasonic's custodians (Dkt. 287); on April 17, 2017 regarding a proposed discovery order (Dkt. 293); on April 18, 2017 regarding

1    a dispute with Defendant HDK about search terms (Dkt. 294); on May 31, 2017 regarding Defendant

2    KOA's foreign sales data (Dkt. 309); on August 11, 2018 regarding Defendant KOA custodians (Dkt.

3    319); on December 18, 2017 regarding a discovery dispute with Defendant ROHM (Dkt. 355); and

4    on May 11, 2018 regarding a motion to compel the deposition of KOA witness Hideki Matsushita

5    (Dkt. 431). These briefs were largely successful in requiring the production of important documents,

6    custodians, or search terms. Zapala Decl. ¶¶ 33-35.

7        IPPs also spent significant time and resources in discovery negotiations concerning

8    Defendants' production of transactional sales data. *Id*. ¶ 36. By any measure, the transactional data

9    produced in this litigation is voluminous. *Id*. Defendants and non-parties have produced over 500

10    gigabytes of sales data, reflecting many millions of transactions. *Id*. IPPs and their experts spent

11    significant time attempting to understand and use the data for their class certification analysis and

12    damages. *Id*. This process often required close consultation between IPPs and their experts to clarify

13    and normalize the data for class certification. *Id*. IPPs also propounded multiple sets of questions

14    seeking clarification from Defendants regarding their data, in some cases, requiring multiple sets of

15    questions to a single Defendant family. *Id*. Often answers to IPPs' questions required follow up

16    questions as answers required more questions. *Id*.

### 3. ESI, Expert Discovery, and Protective Orders

18        IPPs spent significant time and effort setting forth the ground rules for this complex litigation.

19    Zapala Decl. ¶¶ 37-38. The parties negotiated, and the Court entered, two Stipulations concerning

20    Electronically-Stored Information ("ESI"), Dkts. 249, 252, a Stipulation and Order Concerning

21    Expert Discovery, Dkt. 215, and a Protective Order, Dkt. 122. In addition to the foregoing, and as

22    mentioned, the parties also negotiated several case management agreements, such as the Stipulation

23    and Order Concerning Discovery Limits. Dkt. 308; Zapala Decl. ¶ 37. In some instances, IPPs were

24    forced to return to the Court to seek modifications to the foregoing documents due to changed

25    circumstances. *Id*. ¶ 38.

### 4. Defendants' Document Productions and IPPs' Review Efforts

27        Document discovery was largely closed when the settlements were reached. Zapala Decl. ¶

28    39. The document productions in this case have been large, even when compared to similar complex

---

antitrust cases. *Id.* ¶ 40. Defendants have produced to IPPs over 140 separate document productions, comprising roughly 2,752,883 documents, 10,563,206 Bates-numbered pages, and 1.4 terabytes of data. *Id.* ¶¶ 39-40. All of these productions have required indexing, logging, processing and uploading to IPPs' document review platform. *Id.* ¶ 40. To make matters more complex, many of these documents were produced in Japanese, Chinese, or Korean. *Id.* ¶ 41.

To effectively manage and review this colossal amount of material, IPPs drafted, edited, and circulated for review a document review manual. *Id.* ¶ 42. This manual informed the reviewers about the facts of the case, the review platform and the workflow procedure for the review itself. *Id.* Given the iterative nature of any document review, these protocols and workflows have had to be altered over time because of lessons learned or the status of the review at any point in time. *Id.* ¶ 42. The document review teams typically had calls on a weekly basis to coordinate efforts and discuss their findings. *Id.* IPPs also had to organize teams of reviewers responsible for prepping counsel for depositions. *Id.* ¶ 43. These tasks included identifying custodial files, creating "proof charts" and other work product aimed as summarizing the deposition target's best documents. *Id.* In addition, because many of these documents were produced in foreign languages (Japanese, Korean and Chinese), once the above process was complete, IPPs worked to identify those documents that were worthy of obtaining a certified translation for purposes of a deposition exhibit. *Id.* Those documents were then identified, culled, and sent to outside vendors for a certified translation. Coordinating translation and review in this manner was done with the purpose, and effect, of reducing duplicative translations and for efficiency. *Id.*

There is simply no question that these aforementioned processes identified the important evidence in this case. *Id.* ¶ 44. The process was made even more complex because, as discussed, many of the documents were produced in foreign languages. *Id.* ¶ 43. These documents required review by attorneys fluent in those foreign languages, who then had to determine which documents were sufficiently relevant to the litigation to require full English translations and, in certain cases, certified translations for use in depositions. Though expensive and time consuming, the online database and process developed by IPPs permitted them to efficiently prioritize documents and custodians. *Id.* ¶ 44.

IPPs ordered certified translations for 315 documents, those identified by IPPs as being critical to use in depositions, and in order to contain costs and maintain resources for the benefit of the Class, IPPs made the decision that no English language document reviewer could bill at a rate higher than $250 per hour for initial document review. *Id.* ¶¶ 45-46.  Foreign language document reviewers were given a cap of $300 per hour. *Id.* ¶ 46.

### 5.     IPPs' Document Collections and Productions

In addition to the offensive discovery outlined above, IPPs were required to respond to discovery and to produce relevant documents to Defendants from the eight Class Representatives.  In total, Defendants jointly served 47 Requests for Production of Documents on IPPs' Class Representatives.  Zapala Decl. ¶ 48.  IPPs responded individually to each of these requests, producing documents on: April 18, 2017, and made subsequent productions on May 5, 2017, July 14, 2017, May 11, 2018, May 17, 2018, May 18, 2018, May 22, 2018, May 24, 2018, and June 29, 2018.  *Id.*  IPPs' counsel spent significant time responding to Defendants' discovery requests aimed at each of the eight Class Representatives and in assisting in the search and production of relevant documents.  *Id.* In addition to responding to Requests for Production of Documents, Defendants also served a total of eleven interrogatories on the eight Class Representatives.  *Id.* ¶ 49.  IPPs spent time and resources with their clients researching and responding to these inquiries.

## III.     ARGUMENT

### A.     Granting a Percentage-of-the-Fund is the Predominant Method for Determining Attorneys' Fees in Class Actions

As the Supreme Court has explained, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[2]  The Supreme Court has also repeatedly recognized that private antitrust litigation is essential to the effective enforcement of the antitrust laws.[3]  A district court has discretion in a

---

[2] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 392–93 (1970); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 123 (1885); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*").

[3] *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262–63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968); *WPPSS*, 19 F.3d at 1296.

common fund case to choose either the "percentage-of-the-fund" or the "lodestar" method in calculating fees.[4]  Most district courts in the Ninth Circuit have exhibited a clear preference for the percentage-of-the-fund method, and virtually all major recent antitrust class actions in the Northern District of California have applied this method.[5]

Courts in the Ninth Circuit applying the "percentage of the fund" approach use a twenty-five percent benchmark.[6]  And Federal district courts across the country routinely award class counsel fees equivalent to, and often exceeding, 30 percent of the common fund.[7]  In comparable large antitrust class actions involving cartels of electronics manufacturers litigated in this District, courts have awarded similar, and higher, percentages in attorneys' fees.[8]

Here, Lead Counsel's efforts have created a common fund of $33.4 million and are seeking 25% of this common fund in attorneys' fees to compensate them for their substantial efforts.  Under either a "percentage-of-the-fund" or "lodestar" method, the requested fees are warranted considering the value of the extensive work performed, the difficulty and risk of the case, and the results achieved.  Indeed, the amount requested—exactly 25% of the settlement fund—precisely comports with the Ninth Circuit's 25% benchmark for class action settlements.

---

[4] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("*Vizcaino II*"); *Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*, 779 F.3d 934 (9th Cir. 2015) ("*Online DVD*")

[5] *See, e.g., In re Capacitors Antitrust Litigation*, No. 14-cv-3264, ECF No. 1714 (N.D. Cal. June 27, 2017) ("*Capacitors*") (awarding 25% of $32,600,000 settlement fund to DPP counsel); *Capacitors*, ECF No. 1938 (N.D. Cal. October 30, 2017) (awarding 25% of $14,950,000 settlement fund to IPP counsel); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) ("*CRT*") (27.5%); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 7575003, at *1–2 (N.D. Cal. Dec. 27, 2011) ("*LCD I*") (30%); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 149692, at *1–2 (N.D. Cal. Jan. 14, 2013) ("*LCD II*") (30%); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *7–8 (N.D. Cal. Apr. 3, 2013) ("*LCD III*") (28.6%); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, Case No. 07-13-md-1819-CW (N.D. Cal. June 30, 2011) (ECF No. 1370) (30%); *Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11, 2011) (ECF No. 514) (33.3%); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007), at *1 ("*DRAM*") (25%); *Online DVD*, 779 F.3d at 943.

[6] *See Online DVD*, 779 F.3d at 949 ("in this circuit, the benchmark percentage is 25%").

[7] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding 31.33% fee on $1.075 billion fund*); In re Urethane Antitrust Litig.*, 2016 WL 4060156 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million fund)*; see also, e.g., In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (awarding 30% fee on $147.8 million fund).

[8] *See, e.g., CRT,* WL 4126533 (30% for IPP settlement); *LCD III,* 2013 WL 1365900 (28.6 percent for IPP settlement); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW (N.D. Cal. Oct. 14, 2011), ECF No. 1407 (33 percent for IPP settlement).

---

**B.      Lead Counsel's Attorney Fee Request is Reasonable[9]**

Selection of a percentage of the fund should be supported by findings that consider all the circumstances of the case, including the overall reasonableness of the fee requested.[10]  In determining the appropriateness of a fee award, district courts are directed to consider: (1) the results achieved for the class; (2) the complexity of the case and the risk of and expense to counsel of litigating it; (3) the skill, experience, and performance of counsel on both sides; (4) the contingent nature of the fee; and (5) fees awarded in comparable cases.[11]  The Court may also consider benefits generated by counsel beyond the cash settlement fund, the market rate for the particular field of law; the burdens class counsel experienced while litigating the case; the volume of work performed, and the reaction of the class.[12]  Here, each of the relevant factors weigh in favor of awarding the requested $8,350,000, which is twenty-five percent of the Settlement Fund.

**1.      Counsel for IPPs Have Achieved an Excellent Recovery**

The results in the IPP case are exceptional.  Lead Counsel obtained settlements that confer substantial monetary benefits to Class Members.  IPPs' expert measured the overcharge percentage to the IPP class and found that "prices for linear resistors were approximately 5.75% higher during the proposed Class Period than they would have been but for the Defendants' alleged actions."  See Dkt. 531-1, ¶ 14.  The table below summarizes the excellent results achieved by Lead Counsel, in light of this measured overcharge.  The chart demonstrates that the settlements achieve 139.7% of damages.  See Dkt. 531; 531-1.

---

[9] IPPs stated in their motion for appointment of leadership (Dkt. 68) that they would seek a fee of 20% of the common fund or no more than a 2.0 multiplier. Judge Whyte's order appointing Lead Counsel did not appear to rely on this aspect of the leadership motion, instead focusing on IPPs' proposals concerning costs.  *See* Dkt. 89 (appointing CPM as Lead Counsel for IPPs).  Given the excellent results achieved in this litigation by IPPs, including by recovering over 100% of damages, the substantial work that was performed, and the resulting negative multiplier if the 25% fee is awarded, IPPs respectfully believe that this Court should apply the Ninth Circuit benchmark of 25%.  Finally, as noted, IPPs request does not amount to a 2.0 multiplier of their lodestar.  Dkt. 68.  For all of these reasons, this Court should award 25% of the common fund.  *See, e.g., In re Optical Disk Drive Products Antitrust Litigation*, No. 3:10-md-2143 RS, Dkt. 2133 at 18-19 (N.D. Cal. Dec. 19, 2016) ("*ODDs*") (order approving fees of 25% of settlement fund over objections); *ODDs*, Dkt. 2691 at 18-122 (same); *ODDs*, Dkt. 2889 at 21-26 (same).

[10] *Online DVD*, 779 F.3d at 949; *Vizcaino II*, 290 F.3d, at 1047.

[11] *Id.* at 1048-50; *see also CRT*, U.S. Dist. LEXIS 102408, at *62-69.

[12] *See, e.g., Online DVD*, 779 F.3d at 949; *In re Heritage Bond Litig.*, 02-ML-1475 DT, 2005 WL 1594403, at *18–23 (C.D. Cal. June 10, 2005) ("*Heritage Bond*").

| Defendant Family | Defendants' Sales to Distributors | Estimated Damages Based on 5.75% Overcharge | IPP Settlement Amount | Percentage of Defendants' Sales to Distributors Recovered by Settlement | Percentage of Damages Recovered by IPPs |
|---|---|---|---|---|---|
| KOA | $217.5 million | $12.51 million | $18.5 million | 8.5% | 147.9% |
| Panasonic | $161.2 million | $9.27 million | $10 million | 6.2% | 107.8% |
| ROHM | $22.6 million | $1.3 million | $2 million | 8.8% | 153.8% |
| Kamaya | $13.7 million | $787,750 | $2 million | 14.6% | 253.9% |
| HDK | $279,000 | $16,043 | $900,000 | 322.6% | 5,610% |
| **TOTAL** | $415.3 million | $23.9 million | $33.4 million | 8.04% | 139.7% |

The foregoing results are exceptional by any measure and support the request for 25% of the settlement fund.

### 2.    A High Level of Skill Was Required to Prosecute This Case

The skill and quality of legal counsel also support the requested attorney fee award.[13] The caliber of opposing counsel is considered in assessing the quality of Lead Counsel's work.[14] Here, Counsel for IPPs are among the nation's most experienced and skilled practitioners in the antitrust class action litigation field—including within this Circuit, and IPPs were opposed by attorneys from some of the best and largest firms in the country with near limitless resources at their disposal. Zapala Decl. ¶¶ 3, 8; Exhibits 1, 7-16.

Courts also recognize that the novelty and difficulty of issues in a case are significant factors in considering fee awards.[15] Antitrust price-fixing conspiracy cases are notoriously complex.[16] Counsel for IPPs managed challenging case logistics while successfully tackling the difficult legal and factual issues presented in this case.

---

[13] *See Mark v. Valley Ins. Co.*, Case No. CV 01-1575-BR, 2004 WL 2260605, at *2 (D. Or. Oct. 6, 2004).

[14] *Vizcaino v. Microsoft Corp.* (W.D.Wash. 2001) 142 F.Supp.2d 1299, 1303 ("*Vizcaino I*"); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976); *Arenson v. Board of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974).

[15] *Id.*, at 1306; *Heritage Bond*, 2005 WL 1594403, at *19 (the "prosecution and management of a complex national class action requires unique legal skills and abilities.").

[16] *See, e.g., In re Linerboard Antitrust Litig.*, No. Civ. A. 98-5055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) ("*Linerboard*").

### 3.   The Risks of this Litigation Militate in Favor of the Request

Risk is an important factor in determining a fair and reasonable attorney fee award. *See Online DVD*, 779 F.3d at 944. "Antitrust litigation in general, and class action litigation in particular, is unpredictable."[17] Courts recognize that the "antitrust class action is arguably the most complex action to prosecute."[18]  There is always the risk that the law may change unfavorably, or that a class will not be certified, and indeed, some large antitrust class actions have been denied certification in recent years.[19]  And even if the plaintiffs can satisfy their demanding burdens on liability, there is a genuine risk that plaintiffs will "recover[] no damages, or only negligible damages, at trial, or on appeal."[20]

Here, IPPs' risks were plentiful.  *First*, this case did not benefit from a government investigation and resulting guilty pleas.  Indeed, although DOJ investigated potential price-fixing in the industry, it did not pursue criminal charges – a fact that the Defendants highlighted to this Court on numerous occasions.  IPPs also faced the risk of having to prove liability and damages for a conspiracy largely hatched and carried out overseas for a time period of over a decade.  Similarly, IPPs faced the risks of litigating against sophisticated law firms with seemingly limitless resources; that the consolidated complaints would not withstand several motions to dismiss; that even assuming a positive finding on merits, the financial condition or bankruptcy of a Defendant would materially change the settlement amount; that Defendants would prevail on their arguments at summary judgment; that IPPs could not prove damages; and the significant, independent risks attendant to any future jury trial in this case.   The settlements avoid these very real risks, while also providing class members with over 100% of their estimated damages.

### 4.   The Contingent Nature of the Litigation Justifies the Request

The Ninth Circuit has confirmed that a fair attorney fee award should include consideration of

---

[17] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998).

[18] *Linerboard*, 2004 WL 1221350, at *10; see also *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007).

[19] *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 508 (N.D. Cal. 2008); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013); *In re Flash Memory Antitrust Litig.*, No. C 07-10 0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017).

[20] *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 118. (2d Cir. 2005).

---

the contingent nature of the litigation.  *See, e.g.*, *Vizcaino II*, 290 F.3d at 1050; *Online DVD*, 779 F.3d at 955.  It is well-established that attorneys who take on the risk of a contingency case should be compensated for the risk they take.  *See WPPSS*, 19 F.3d at 1299.  Here, Counsel for IPPs have received no compensation during almost four years of litigation.  Zapala Decl. ¶ 5.  It is well understood that the standard contingency-fee percentage in the private marketplace is approximately one-third of the recovery.[21]  IPP Counsel's total lodestar is $11,480,920, and if the requested fee is granted, it would represent a negative multiplier of 0.73.  Zapala Decl. ¶ 101.  This factor strongly supports the requested fee.[22]

### 5.    The High Quality of the Work Performed

Lead Counsel respectfully submit that the work they have performed has been of high quality and has been of great benefit to the Class.  The Court is familiar with the history of this case, having presided over years of contentious litigation.  Zapala Decl. ¶¶ 11-79.  A more detailed account of the high-quality work performed by counsel is contained in the Declaration of Adam J. Zapala.

### 6.    The Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee

A lodestar cross-check can "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate."  *Online DVD*, 779 F.3d at 949; *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 945 (9th Cir. 2011); *see also Vizcaino II*, 290 F.3d at 1050.  Here, a cross-check of the requested attorneys' fees with counsel's lodestar demonstrates that the proposed fee is more than reasonable.  IPP Counsel have spent a total of 33,818.65 hours prosecuting this Action. Zapala Decl. ¶ 101.  Lead Counsel took meaningful steps to ensure that their work was efficient, and applied their experience litigating other antitrust class actions to this Action, resulting in additional efficiencies.  Zapala Decl. ¶ 3.   Moreover, Supporting Counsel's lodestar information has only been

---

[21] *See* Empirical Study at 35 ("[s]ubstantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases."); *Std. Iron Works v. Arcelormittal*, No. 08-C-5214, 2014 U.S. Dist. LEXIS 162557, *7 (N.D. Ill. Oct. 22, 2014) ($163.9 million settlement; one-third fee found to be the prevailing market rate for similar legal services in similar cases).

[22] *See Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, at *3 (N.D.Cal. Feb. 6, 2013) (awarding 30% fee because the "case was conducted on an entirely contingent fee basis against a well-represented Defendant").

provided since the appointment of leadership in this matter, and as a result, there is no supporting time included pre-dating appointment of CPM as Lead Counsel.  *Id*. Ex. 2; 3.  Moreover, IPPs imposed other safeguards to ensure that the reported lodestar was not inflated, such as capping the hourly rates for document review time, eliminating duplicative work, eliminating "read and review" time to the extent feasible, and exercising additional billing judgment.  *Id*. ¶¶ 98-99.  IPPs' attorney fee request of $8,350,000 amounts to less than 73% of their cumulative lodestar.  This confirms the request's reasonableness beyond question.[23]

## C.    IPPs Are Entitled to Reimbursement of Their Reasonable Litigation Expenses

Attorneys who create a common fund are entitled to reimbursement of their out-of-pocket expenses so long as they are reasonable, necessary, and directly related to the prosecution of the Action.[24]  Lead Counsel request reimbursement of litigation costs and expenses incurred on behalf of the Class in the amount of $1,437,576.88.  Zapala Decl. ¶ 106.  This amount consists of the expenses incurred by (1) Lead Counsel and Supporting Counsel; and (2) the Litigation Fund, which was created from assessments received from Lead Counsel and Supporting Counsel to pay for common litigation expenses such as experts, the ESI platform, depositions, translations and other important common expenses.  *Id*.; Ex. 5, 6.  IPPs' expenses, which are detailed in the Zapala Declaration and exhibits, were reasonable and necessary for the prosecution of this action, and are customarily approved by courts as appropriate litigation expenses.[25]  *Id*. ¶¶ 103-107; Ex. 4-16.

---

[23] *See Online DVD*, 779 F.3d, at 949 (fact that fee sought is less than the lodestar suggests fairness of award*); In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) (same); *LCD II*, 2013 WL 149692, at *1 (same).

[24] *Vincent v. Hughes Air West*, 557 F.2d 759, 769 (9th Cir. 1977); *In re OmniVision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2008); *see also*, 1 Alba Conte, Attorney Fee Awards § 2.19 (3d ed. 2004).

[25] *See In re Media Vision Tech. Secs. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1995). (for examples of costs awarded, many of which Lead Counsel seek here); *Thornberry v. Delta Air Lines*, 676 F.2d 1240, 1244 (9th Cir. 1982), judgment vacated and remanded on other grounds, 461 U.S. 952 (1983) (travel, meals, and lodging).

1

2

**D.     For their Excellent Service to the Class, IPPs Seek Modest Service Awards for the Eight Class Representatives**

3

In the Ninth Circuit, service awards "compensate class representatives for work done on

4

behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, []

5

to recognize their willingness to act as a private attorney general," and "are fairly typical in class

6

action cases."[26]  In evaluating such awards, courts consider the time and effort spent, and the duration

7

of the litigation.  *See Van Vraken v. Atl. Richfield Co.*, 901 F.Supp.294, 299 (N.D. Cal. 1995).

8

IPPs request modest service awards of $2,500 for each of the eight Class Representatives.[27]

9

Each performed their duties diligently over nearly four-years by: assisting Lead Counsel in pre-

10

complaint investigation; drafting and reviewing the complaints and other key case filings in this case;

11

keeping apprised of case strategy; monitoring the litigation's progress through regular contact with

12

counsel; searching for, preserving, reviewing, and producing responsive documents; and responding

13

to Interrogatories.  Zapala Decl. ¶¶___.  Each Class Representative spent between 30 and 40 hours

14

performing their duties, and collectively produced 23,873 documents in this case.  *Id.* at ¶¶___.  A

15

$2,500 award to compensate them is fair and reasonable in light of their efforts.

16

**IV.     CONCLUSION**

17

For the foregoing reasons, this Court should award $8,350,000 in attorneys' fees, totaling

18

25% of the Second Settlement Fund, and reimbursement of litigation expenses in the amount of

19

$1,437,576.88.

20

DATED: August 13, 2019                        Respectfully submitted,

21

                                              /s/ Adam J. Zapala_____

22

                                              Joseph W. Cotchett
                                              Adam J. Zapala

23

                                              Elizabeth T. Castillo
                                              Tamarah P. Prevost

24

                                              **COTCHETT, PITRE & McCARTHY, LLP**
                                              San Francisco Airport Office Center

25

                                              840 Malcolm Road, Suite 200

26

[26] *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

27

[27] The Class Representatives are: Linkitz Systems, Inc. ("Linkitz"), Microsystems Development Technologies, Inc. ("Microsystems"), Nebraska Dynamics, Inc. ("Nebraska Dynamics"),

28

MakersLED LLC, Top Floor Home Improvements ("Top Floor"), Angstrom, Inc. ("Angstrom"), In Home Tech Solutions, Inc. ("In Home Tech"), Anthony Sakal.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Lead Counsel for Indirect Purchaser Plaintiffs*