Joseph W. Cotchett (State Bar No. 36324)
Adam J. Zapala (245748)
Elizabeth T. Castillo (280502)
Tamarah P. Prevost (313422)
**COTCHETT PITRE & McCARTHY LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
tprevost@cpmlegal.com

*Interim Lead Class Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE RESISTORS ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>**ALL INDIRECT PURCHASER PLAINTIFF ACTIONS** | **Case No. 3:15-cv-03820-JD**<br><br>**DECLARATION OF ADAM J. ZAPALA IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES; REIMBURSEMENT OF EXPENSES; AND CLASS REPRESENTATIVE SERVICE AWARDS**<br><br>Date:   December 12, 2019<br>Time: 10:00 a.m.<br>Place: Courtroom 11, 19th Floor<br>Judge: Hon. James Donato |

I, Adam J. Zapala, declare as follows:

1.    I am an attorney duly licensed to practice law in the State of California and admitted to practice in this Court and the courts of the State of California.  I am a partner with Cotchett, Pitre & McCarthy, LLP ("CPM"), and my firm is the court-appointed Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs").  The matters described herein are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.  I make this declaration pursuant to 28 U.S.C. § 1746.

2.    I make this declaration in support of IPPs' Motion for Award of Attorneys' Fees; Reimbursement of Expenses; and Class Representative Service Awards.

3.    Attached hereto as **Exhibit 1** is CPM's firm resume, which briefly describes CPM's experience in antitrust and class action litigation, among other practice areas.

4.    I, or members of my law firm, have been involved in every aspect of this case since its inception.  I have personally overseen the vast majority of the work performed in this litigation on behalf of the IPP Class.  The court appointed CPM Interim Lead Class Counsel on December 21, 2015 before it was transferred to this Court for further proceedings due to Judge Whyte's impending retirement.  Dkt. 89.

5.    Lead Counsel for IPPs has prosecuted this litigation solely on a contingent-fee basis, and has been at risk that it would not receive any compensation for prosecuting the claims against Defendants.  While CPM has devoted its time and resources to this matter, it has foregone other legal work for which it would have been compensated.

6.    The purpose of this declaration is to summarize (a) the factual and procedural history of the litigation, (b) the work performed by Lead Counsel for IPPs and Supporting Counsel,[1] (c) the time expended in prosecuting this Action, (d) the costs and expenses for which counsel seek reimbursement, (e) the steps Lead Counsel for IPPs employed to ensure the efficient management of

---

[1] "Supporting Counsel" refers to a number of attorneys and law firms that assisted Lead Counsel for IPPs in the prosecution of this litigation.  Declarations and exhibits attesting to the amount of time and expenses Supporting Counsel incurred can be found at Exhibits 7-16 to this Declaration.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

this complex litigation, and (f) the diligent efforts undertaken by the eight IPP Class Representatives, warranting their requested service awards.

## INTRODUCTION AND SUMMARY OF WORK PERFORMED

7.     During this hard-fought litigation, Lead Counsel for IPPs supervised and directed the work performed by Supporting Counsel to ensure that it was accomplished effectively and efficiently.

8.     As this Court knows well from the over 546 docket entries, this case has been vigorously contested by some of the most sophisticated defense counsel in the country.

9.     To date, Lead Counsel for IPPs performed the following work:

- Conducted an initial investigation of the case to develop the theories of liability and the facts that formed the basis of the allegations against Defendants.  This research included a review of publicly-available information regarding the Resistors industry and consultation with industry experts and economists;

- Drafted and extensively researched the indirect purchaser complaint, and three comprehensive consolidated amended complaints detailing Defendants' violations of the antitrust laws, which were initially submitted under seal and later filed in the public record (Dkt. 1, 126-4 (141), 329, and 402);

- Conducted exhaustive legal research regarding the Class' claims and the defenses thereto, particularly with respect to Defendants' multiple rounds of motions to dismiss;

- Opposed and, on the whole, prevailed after extensive rounds of hard-fought motions to dismiss.  Defendants filed eight motions with arguments covering the statute of limitations, standing, the sufficiency of the conspiracy allegations under *Twombly* and *Iqbal*, the sufficiency of the complaint in light of the numerous state laws under which IPPs sued, among several other attacks on the pleadings;

- Propounded several sets of discovery that – after extensive meeting and conferring with Defendants and motion practice before this Court – resulted in identifying the relevant document custodians and the production of more than 2.7 million documents (10.5 million pages and 1.4 terabytes) in addition to approximately 500 gigabytes of electronic transactional data;

- Drafted, met and conferred, negotiated and entered into agreements with Defendants over several case management documents, such as the Stipulation and Order Concerning the Discovery of Electronically Stored Information and Hard Copy Documents ("ESI") (Dkt. 252) the Protective Order (Dkt. 122), the Stipulation and Order Concerning Expert Discovery (Dkt. 215), the Stipulation and Order re Discovery Limits (Dkt. 308) and several other similar documents that contribute to the effective and efficient administration of this litigation;

- Engaged in multiple, extended discovery meet and confers with Defendants concerning the appropriate document custodians for each corporate family, the appropriate English-language search terms, the appropriate Japanese-language search terms and other search mechanisms that would assist Defendants in identifying and producing responsive documents;

---

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

2

- Organized teams of lawyers that reviewed, searched, and extensively coded and analyzed these documents—most of which were in Japanese (or Korean, or Chinese) and required translations;

- Engaged in extensive non-party discovery, including issuing comprehensive subpoenas for documents to 25 non-party distributors of resistors to obtain their transactional data for both their purchases of resistors from Defendants and their sales of resistors to IPPs;

- Propounded Interrogatories and issued Rule 30(b)(6) deposition notices;

- Answered several sets of discovery propounded by Defendants, including Requests for Production of Documents, and Interrogatories;

- Contended with seriatim discovery disputes and many motions to compel, concerning document custodians, search terms, and other matters;

- Prepared for and took the depositions of 15 fact and 30(b)(6) witnesses from Defendants;

- Prepared for and defended the depositions of one of the IPP Class Representatives prior to settlement;

- Engaged and consulted extensively with industry experts, economists, and statisticians on issues pertaining to electronic discovery, liability, class certification, and damages, throughout the course of the Action;

- Engaged in protracted settlement discussions and mediations with the Settling Defendants, *see, e.g.,* Dkt. 514-3, 514-4, 514-5, 514-6, 514-7; Zapala Decl. in Support of Motion for Preliminary Approval;

- Engaged and retained class action notice experts to develop a robust notice program; and

- Engaged in preparations with experts regarding IPPs' expected motion for class certification.

10.   Throughout this arduous litigation, IPPs have faced substantial risks.  IPPs have faced:

- The risk of litigating against some of the largest and most sophisticated law firms in the world with seemingly limitless resources;

- The risk that the consolidated complaints would not withstand the extensive individual and joint motions to dismiss;

- The risk that even if IPPs were able to obtain a favorable settlement or judgment, that the financial condition or bankruptcy of a Defendant would materially change or lessen the amount of the settlement;

- The risk that Defendants would, and in fact did, vehemently contest their participation in the alleged conspiracy;

- The risk that Defendants would prevail on their arguments at summary judgment or any other phase of this litigation;

- The risk that each Defendant would successfully argue that despite the existence of an antitrust conspiracy, IPPs suffered no "antitrust impact" and no damages were caused as a result;

- The risk of not achieving class certification;

- The risk of trying this antitrust case when several courts have commented that such a task is "notoriously complex," *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989); and

- The changing landscape of the law with respect to civil antitrust actions, proving damages and class actions generally.

### <u>CONSOLIDATED COMPLAINTS AND MOTIONS TO DISMISS</u>

11.    Cotchett, Pitre & McCarthy, LLP ("CPM") filed the indirect purchaser complaint in this case on September 3, 2015 in the Northern District of California on behalf of Makers LED. Dkt. 1.  This complaint was the product of many hours of investigation and research by CPM.

12.    On September 4, 2015, IPPs filed an administrative "Motion to Consider Whether Cases Should be Related" with *Microsystems Development Technologies, Inc. v. Panasonic Corporation et. al.*, Case No. 5:15-cv-03820-RMW (Dkt. 6), which was granted by Honorable Judge Ronald Whyte on September 28, 2015.  Dkt. 8.

13.    IPPs filed their unopposed Motion to Appoint Cotchett, Pitre and McCarthy LLP Interim Lead Plaintiffs' Counsel on November 20, 2015.  Dkt. 68.

14.    Judge Whyte granted IPPs' unopposed motion on December 21, 2015.  Dkt. 89

15.    On June 29, 2016, this case was re-assigned to this Court in light of Judge Whyte's anticipated retirement.  Dkt. 151.

16.    On May 27, 2016, IPPs filed under seal a 67-page, factually-detailed Consolidated Class Action Complaint ("CCAC").  Dkt. 126-4.  The CCAC initially named 5 Defendant families and outlined price-fixing conspiracies with respect to some overlapping Defendants and some independent Defendants regarding linear resistors.

17.    This CCAC was the result of considerable work.  Lead Counsel for IPPs spent significant time researching legal, economic, and factual issues.  Plaintiffs alleged a global price-fixing conspiracy for linear resistors, which are found in countless electronic devices, that was carried out in Japan, the United States, and other parts of the world through agreements to fix prices and

---

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

4

restrict output. Defendants included five Japanese electronics companies and each of their U.S. subsidiaries. As such, Japanese documents had to be reviewed and translated to supplement factual allegations and to ensure that the classes' claims survived any challenges under *Twombly*.

18.     In response to IPPs' CCAC, on August 24, 2016, Defendants filed a motion to dismiss on behalf of all Defendants alleging that IPPs claims 1) were barred by the statute of limitations, 2) failed under *Twombly* for failing to properly allege a conspiracy, 3) insufficiently plead fraudulent concealment, and 4) failed to state violations of State Consumer Protection and Unfair Competition Laws under Florida, New York, and California law. Dkt. 205. The same day, the U.S. subsidiary Defendants moved to dismiss IPPs' complaint, arguing IPPs had not sufficiently alleged their specific participation in the conspiracy with particularity. *Id.*

19.     IPPs opposed each motion. Following oral argument, on September 5, 2017, the Court granted Defendants' motion to dismiss IPPs complaint with leave to amend, due in part to "a gap in the allegations between 2009 and 2013." Dkt. 326, at 8. As such, the Court did not consider the merits of the U.S. subsidiary defendants' motion to dismiss. *Id.*

20.     In response to the Court's guidance in the order on Defendants' motions to dismiss, IPPs added substantial additional factual allegations, incorporating them into an Amended Consolidated Class Action Complaint ("ACCAC") on October 3, 2017. Dkt. 329.

21.     All Defendants filed a Joint Motion to Dismiss IPPs' Florida State Law Claims for Lack of Standing on November 3, 2017, Dkt. 344, and that same day, the U.S. Subsidiary Defendants submitted a Joint Motion to Dismiss IPPs' Complaint. Dkt. 346.

22.     And once again, IPPs prepared thorough briefing to oppose these motions on December 4, 2017 (Dkt. 350, 351). Defendants submitted Joint Reply briefs on December 19, 2017. Dkt. 357, 358.

23.     On January 22, 2018, this Court largely denied Defendants' motion, finding IPPs had alleged plausible conspiracy claims. Dkt. 384. The Court also rejected Defendants' arguments regarding statutes of limitations, and found "sufficient allegations against each U.S. subsidiary defendant." *Id.*

24.    The Second Amended Consolidated Class Action Complaint ("SACCAC") was filed March 5, 2018 (Dkt. 402) and became the operative complaint in this matter.

## THE DISCOVERY PROCESS

### A.    Written Discovery

25.    This case was unquestionably complex.  It has involved both substantial amounts of discovery, as well as a multitude of disputes with Defendants.  As reflected in the Court's docket, IPPs have been forced to fight for many categories of discovery that they have sought.

26.    IPPs propounded substantial written discovery on all Defendants.  On November 1, 2016, IPPs served a First Request for Production of Documents.  This RFP included 50 requests and sought a comprehensive set of financial, organizational, conspiracy-related and transactional documents.  At the same time, IPPs served their First Set of Interrogatories on Defendants, requiring that Defendants identify information relevant to chains of distribution, trade associations, and pricing.

27.    Because of the need to prove a worldwide conspiracy and gather documents from a variety of institutional (e.g., trade associations) and related parties (e.g., sales agents), as well as proving pass-through of the overcharge to the IPP Class, IPPs also engaged in substantial non-party discovery in this litigation.  IPPs propounded Rule 45 document subpoenas on 25 non-party resistors distributors.  These document subpoenas sought information concerning the non-party distributors' purchases of resistors from Defendants and their sales of resistors to the IPP class.

### B.    The Meet and Confer Process and Motion Practice Before the Court

28.    Moreover, throughout this litigation Defendants have vigorously contested this case, challenging IPPs' legal theories of liability, whether the facts support Defendants' level of involvement in such a conspiracy, and the damages for which each Defendant may be liable.

29.    IPPs reached agreement with the various Defendants for them to search and collect from a substantial number of document custodians' files.  IPPs also negotiated and reached agreement with Defendants after extensive discussions concerning English and Japanese ESI search terms.  The parties also negotiated extensively over, and reached agreement concerning, an ESI Stipulation and Order.  Dkt. 249.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

6

30.     After the service of the aforementioned discovery and multiple rounds of objections from Defendants, the parties held extensive meet and confer negotiations over the scope of the requests, document custodians, a search term protocol, an ESI protocol, and a discovery limitations/plan protocol.

31.     IPPs made every effort to engage with Defendants to resolve discovery disputes that arose in connection with the documents and data IPPs sought to prove their claims, or in preparation for class certification.  IPPs drafted dozens of meet and confer letters, and participated in countless corresponding telephone calls, often with counsel for multiple Defendants.

32.     IPPs were often required to consult with their retained experts, in order to negotiate with Defendants or non-parties on their transactional data requests, to ensure they were fighting for what was necessary and usable for their experts.  This took additional time and added complexity to the meet and confer process.

33.     When meet and confer efforts did not successfully resolve the parties' discovery disputes, IPPs, either alone or jointly with DPPs, drafted and filed twelve Discovery Letter Briefs, seeking the Court's assistance in resolving various discovery issues.

34.     As this Court knows, there has been extensive motion practice regarding a wide range of discovery issues in this case.  By way of examples, discovery letter briefs were drafted and filed by IPPs on October 19, 2016 regarding ESI discovery (Dkt. 231); on December 21, 2016 regarding custodians (Dkt. 256); on December 21, 2016 regarding KOA Priority Custodians (Dkt. 257); on January 30, 2017 regarding search terms (Dkt. 281); on February 13, 2017 regarding Defendant Panasonic's custodians (Dkt. 287); on April 17, 2017 regarding a proposed discovery order (Dkt. 293); on April 18, 2017 regarding a dispute with Defendant HDK about search terms (Dkt. 294); on May 31, 2017 regarding Defendant KOA's foreign sales data (Dkt. 309); on August 11, 2018 regarding Defendant KOA custodians (Dkt. 319); on December 18, 2017 regarding a discovery dispute with Defendant ROHM (Dkt. 355); and on May 11, 2018 regarding a motion to compel the deposition of KOA witness Hideki Matsushita.  (Dkt. 431).

Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820

7

35.    These briefs were most often drafted and finalized only after obtaining consensus from others: DPPs, or in some cases, IPPs' experts, and were largely successful in requiring the production of important documents, custodians, or search terms.

36.    IPPs also spent significant time and resources in discovery negotiations concerning Defendants' production of transactional sales data.  By any measure, the transactional data produced in this litigation is voluminous.  Defendants and third-parties have produced over 500 gigabytes of sales data, reflecting many millions of transactions.  IPPs and their experts spent significant time attempting to understand the data and make use of it for purposes of their class certification analysis and damages.  This process often required close consultation between IPPs and their experts for purposes of clarifying the data and normalizing it for use by the experts in support of class certification.  IPPs also propounded multiple sets of questions seeking clarification from Defendants regarding their data.  In some cases, this required multiple sets of questions to a single Defendant family.  Often answers to IPPs' questions required follow up questions as answers required more questions.

## C.    ESI, Expert Discovery, and Protective Orders

37.    The parties also spent significant time and effort setting forth the ground rules for this complex litigation.  The parties negotiated, and the Court entered, a Stipulation and Order Regarding the Production of Electronically-Stored Information and Hard Copy Documents ("ESI") (Dkt. 252), a Stipulation and Order Concerning Expert Discovery (Dkt. 215), and a Protective Order (Dkt. 122).  In addition to the foregoing, and as mentioned, the parties also negotiated several case management agreements, such as the Stipulation and Order Concerning Discovery Limits (Dkt. 308).

38.    In some instances, IPPs were forced to return to the Court to seek modifications to the foregoing documents due to changed circumstances.

## D.    Defendants' Document Productions and IPPs' Review Efforts

39.    Document discovery was largely closed when the settlements were reached. Defendants had produced roughly 2,752,883 documents to IPPs, comprised of 10,563,206 Bates-numbered pages and 1.4 terabytes of data.

---

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

8

40.     The document productions in this case have been large, even when compared to similar complex antitrust cases.  Defendants have produced to IPPs over 140 separate document productions. All of these productions have required indexing, logging, processing and uploading to IPPs' document review platform.

41.     To make matters more complex, many of these documents were produced in Japanese, Chinese, or Korean.

42.     To effectively manage and review this colossal amount of material, IPPs drafted, edited, and circulated for review a document review manual.  This manual informed the reviewers about the facts of the case, the review platform and the workflow procedure for the review itself. Given the iterative nature of any document review, these protocols and workflows have had to be altered over time because of lessons learned or the status of the review at any point in time.  The document review teams typically had calls on a weekly basis to coordinate efforts and discuss their findings.

43.     IPPs also had to organize teams of reviewers responsible for prepping counsel for depositions.  These tasks included identifying custodial files, creating "proof charts" and other work product aimed as summarizing the deposition target's best documents.  In addition, because many of these documents were produced in foreign languages (Japanese most commonly, but also Korean and Chinese), once the above process was complete, IPPs worked to identify those documents that were worthy of obtaining a certified translation for purposes of a deposition exhibit.  Those documents were then identified, culled, and sent to outside vendors for a certified translation.  Coordinating translation and review in this manner was done with the purpose, and effect, of reducing duplicative translations and for efficiency.

44.     There is no question that this aforementioned process identified the important evidence in this case.  The process was made even more complex because, as noted, many of the documents were produced in foreign languages.  These documents required review by attorneys fluent in those foreign languages, who then had to determine which documents were sufficiently relevant to the litigation to require full English translations and, in certain cases, certified translations for use in

---

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

9

depositions.  Though expensive and time consuming, the online database and process developed by IPPs permitted them to efficiently prioritize documents and custodians.

45.    IPPs ordered certified translations for 315 documents, those identified by IPPs as being critical to use in depositions.

46.    In order to contain costs and maintain resources for the benefit of the Class, IPPs made the decision that no English language document reviewer could bill at a rate higher than $250 per hour for initial document review.  Foreign language document reviewers were given a cap of $300 per hour.

47.    During the initial discovery phase and particularly in the deposition phase, the document review required daily commitment.  The process involved significant communications with IT specialists to manage, load and assist in the rolling document productions. While these issues were technical in nature, they required meet and confers with the Defendants.

**E.    Plaintiffs' Document Collection and Productions**

48.    In addition to the offensive discovery outlined above, IPPs were required to respond to discovery and to produce relevant documents to Defendants from the eight Class Representatives.  In total, Defendants jointly served 47 Requests for Production of Documents on IPPs' Class Representatives.  IPPs responded individually to each of these requests, producing documents on: April 18, 2017, and made subsequent productions on May 5, 2017, July 14, 2017, May 11, 2018, May 17, 2018, May 18, 2018, May 22, 2018, May 24, 2018, and June 29, 2018.  IPPs' counsel spent significant time responding to Defendants' discovery requests aimed at each of the eight Class Representatives and in assisting Class Representatives in the search and production of relevant documents.

49.    In addition to responding to Requests for Production of Documents, Defendants also served a total of eleven interrogatories on the eight Class Representatives.  IPPs spent time and resources with their clients researching and responding to these inquiries.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

10

**F.      Depositions**

50.    Lead Counsel for IPPs and Supporting Counsel have also spent significant time preparing for and taking the depositions of Defendants' employees and former employees. Conspiracy cases are document heavy and depositions are a critical component of a Plaintiffs' burden to prove their case.

51.    IPPs have taken 15 depositions of Defendants' employees or former employees in either their Fed. R. Civ. Proc. 30(b)(1) or 30(b)(6) capacity.  IPPs used approximately 229 exhibits in these depositions, and all of these depositions required a language interpreter, adding to the length and complexity of the questioning.  To increase efficiency, IPPs coordinated taking these depositions with DPPs, where feasible.

52.    In one case, Defendant KOA's employee, Hideaki Matsushita, refused to appear for deposition in the United States, thus requiring IPPs to organize a trip to Japan.  Adding to the complexity, deponents in Japan are precluded from appearing voluntarily.  IPPs, therefore, were required to prepare motions with the Court, obtain deposition rooms at the U.S. Consulate or Embassy, and prepare to obtain a deposition visa after a diplomatic exchange between the United States and Japan.  Because the settlements in this case were procured before this deposition was set to occur, IPPs never took this deposition, but completed the preparatory work necessary to do so.

53.    In addition to the depositions taken above, Defendants also noticed and took the deposition of a corporate representative from Linkitz Systems, Inc., which IPPs defended.  Lead and Supporting Counsel prepared their Class Representative, who had never been deposed before, for the deposition, through several in person meetings and telephone calls.

**G.      Non-Party Discovery**

54.    IPPs have also engaged in extensive, and protracted, non-party discovery.  On August 24, 2017, Plaintiffs served an initial tranche of Rule 45 subpoenas seeking documents and transactional data from 25 non-party resistors distributors.  Obtaining this discovery was critical to IPPs' case for purposes of demonstrating pass-through of the overcharge.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

11

55.    Though additional documents were sought, IPPs were primarily interested in receiving *both* the distributors' purchasing data *and* their sales data to demonstrate pass-through to the IPP classes.  Counsel for IPPs spent significant time meeting and conferring with representatives of the non-party distributors to obtain usable data.

56.    Over the course of two years, IPPs were successful in obtaining useable transactional data from the vast majority of the subpoena recipients.  The subpoenaed entities produced 10.68 GB of transactional data, amounting to hundreds of thousands of purchases and sales records.

## MOTION PRACTICE

57.    IPPs also engaged in prolonged motion practice before the Court, largely concerning discovery.  On November 19, 2015, the Department of Justice ("DOJ") moved to intervene in this case for the sole purpose of seek a limited and temporary stay of discovery, in light of then-ongoing criminal grand jury investigations.   Dkt. 61-1

58.    On December 31, 2015, Hon. Judge Ronald Whyte requested proposed orders from Defendants, DPPs, and IPPs, setting forth each parties' respective position on the DOJ's requested stay.  Dkt. 91.  IPPs met and conferred with DPPs and Defendants over the course of a week, and when it became clear the parties were at an impasse, IPPs filed their proposed order on January 8, 2016.  Dkt. 101.  The Court held a hearing on this matter on January 29, 2016.

59.    On January 22, 2016, IPPs filed a brief supporting the provisions included in IPPs' Proposed Order and responding to other parties' proposals.  Dkt. 107.  On February 16, 2016, the Court issued an order that, *inter alia*, stayed discovery for a period of two months, until April 18, 2016, and on April 1, 2018, after significant meet and confer, the Parties and the Department of Justice stipulated to lift the discovery stay, subject to a few limitations.  Dkt. 120.

60.    IPPs also spent substantial time in connection with preparing for class certification motion, including preparing for their expert's report, working with their experts to analyze Defendants' transactional data, non-party document productions, Defendants' pricing, and other class certification and merits-related issues.  But, the settlements reached obviated the need for further proceedings and costs related to class certification.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

12

61.    Lead Counsel worked with their experts to obtain the necessary documents and data to build econometric models to demonstrate overcharge, pass-through, and damages, in preparation for class certification and focused on the merits.

## SETTLEMENT PROCESS

62.    IPPs engaged in extensive settlement negotiations with the Settling Defendants after significant discovery in this litigation. As described more fully below and in IPPs' motion for preliminary approval, the parties held multiple in-person and telephonic meetings, as well as exchanged information and settlement proposals. The proposed settlements were arrived at only after both sides had the opportunity to be fully informed of the relative strengths and weaknesses of their positions, litigation risks, and issues involving ability to pay.

63.    On July 5, 2018, IPPs settled with HDK. This settlement required HDK to pay $900,000 for the benefit of the IPP class.  In addition to the cash component, HDK was required to cooperate with IPPs to assist them in the further prosecution of the case.

64.    Based on the data provided to IPPs, the settlement with HDK represents more than 300% of HDK's affected commerce (*e.g.*, sales to distributors) during the relevant class period.

65.    On August 24, 2018, IPPs settled with ROHM. This settlement required ROHM to pay $2 million for the benefit of the IPP class.  In addition to the cash component, ROHM would provide certain cooperation to IPPs to assist them in further prosecution of the case.

66.    Based on the data provided to IPPs, the settlement with ROHM represents approximately 8.8% of ROHM's affected commerce during the relevant class period.

67.    On September 19, 2018, IPPs settled with Kamaya.  This settlement required Kamaya to pay $2 million for the benefit of the IPP class.  In addition to the cash component, Kamaya would provide certain cooperation to IPPs to assist them in further prosecution of the case.

68.    Based on the transactional data provided to IPPs during the course of litigation, IPPs have calculated that Kamaya's relevant commerce (sales to distributors in the United States during the class period) was approximately $13.7 million. Accordingly, the settlement with Kamaya represents approximately 14.6% of Kamaya's relevant commerce during the relevant class period.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

13

69.   The cooperation provisions in the HDK, Kamaya, and ROHM settlements provided IPPs with significant leverage in negotiations with Panasonic and KOA—the two defendants with the largest volume of commerce.

70.   On September 28, 2018, IPPs settled with KOA. This settlement required KOA to pay $18.5 million for the benefit of the IPP class.  In addition to the cash component, KOA would provide certain cooperation to IPPs to assist them in further prosecution of the case.

71.   IPPs engaged in settlement negotiations with Defendant KOA for many months. These negotiations included assistance from a nationally renowned mediator and the exchange of confidential information reflecting the parties' respective views of liability and damages.  The case did not settle at the mediation, despite the substantial efforts of the parties and the mediator.  With the continued assistance of the mediator, the parties engaged in several additional discussions and negotiations regarding an appropriate settlement in the weeks following the mediation. These negotiations were hard fought.  The proposed settlement was only agreed upon after the exchange of information, continued dialogue between the parties, and negotiation concerning appropriate financial consideration.  Based on the data provided to IPPs, the settlement with KOA represents approximately 8.5% of their sales to distributors during the relevant class period.

72.   On October 4, 2018, IPPs settled with Panasonic.  This settlement required Panasonic to pay $10 million for the benefit of the IPP class.  IPPs have calculated that the settlement with Panasonic represents approximately 6.2% of Panasonic's relevant commerce (approximately $161.2 million in sales to distributors during the class period).

73.   The Settling Defendants' cumulative commerce to distributors during the class period is approximately $415.3 million on a joint and several basis. The cumulative settlement fund established by these three settlements is $33,400,000.00 ($33.4 million) or 8% of their overall sales, which represents an excellent recovery for the Classes.  Indeed, as explained in IPPs' motion for preliminary approval, the overall recovery to the IPPs constitutes more than 100% of damages.

74.   The foregoing settlements are truly excellent recoveries for the classes in the view of Lead Counsel.

Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820

14

75.    On December 14, 2018, IPPs sought preliminary approval of the foregoing settlements. Dkt. 514.   On June 17, 2019, after supplemental information was provided, the Court granted preliminary approval of the settlements.  Dkt. 545.

## NOTICE TO CLASS MEMBERS AND CLASS MEMBER RESPONSES

76.    Counsel for IPPs consulted with and engaged recognized experts in the class action notice field, A.B. Data, for the purpose of providing the class with notice of the proposed settlements.

77.    The Notice Program, developed in consultation with A.B Data, provided for (1) individual mailed notice to Class Members who could be identified through reasonable efforts (*i.e.*, individual notice); (2) multiple and targeted publications of the class notice in those paid media outlets most likely to inform potential class members about the settlements (*i.e.,* publication notice);   (3) press releases (*i.e.*, earned media) that were uniquely targeted to potential Class Members; (4) the placement of the class notice on internet banner advertisements, including through social media outlets; (4) the establishment of a settlement website that provided notice of the settlements; and (5) a toll free telephone support line to service class members' inquiries regarding the notice, which in turn, permitted them to request a copy of the notice delivered via direct mail.  *See, e.g.*, December 18, 2018 Declaration of Eric Schachter in Support of Motion for Preliminary Approval of Class Action Settlements, Dkt. 518.

78.    On June 17, 2019 this Court approved IPPs' Notice Program.  Dkt. 545.  Notice was sent directly to Class Members pursuant to the Notice Program (*see* Dkt. 518-12 (Long-Form Notice); Dkt. 518-4 (Short-Form Notice)) and was published on July 29, 2019.  See also Dkt. 514.

79.    Thus far, IPPs have received no objections to any of the settlements, the Notice Program, to the request for attorneys' fees or to the request for reimbursement of litigation expenses, which were all outlined in the notices.  However, the deadline for Class Members to request exclusion or bring objections has not yet passed, as that deadline is September 17, 2019.

## CLASS REPRESENTATIVES' CONTRIBUTIONS

80.    The eight Class Representatives in this litigation have remained actively involved throughout the litigation of this case and counsel has kept them apprised regularly with updates

regarding the case.  IPPs request a service award for the class representatives in the amount of  $2,500 each.

81.   Class Representative Linkitz Systems, Inc. ("Linkitz") is a designer and manufacturer of a "wearable technology" for children, a component of which is linear resistors.  During the class period, Linkitz purchased linear resistors from the Defendants.  Aside from diligently performing their other Class Representative duties, Linkitz preserved, searched for, collected, and produced 1286 pages of documents.

82.   Class Representative Microsystems Development Technologies, Inc. ("Microsystems") offers custom microprocessor application design and development for consumers, a component of which is linear resistors.  During the class period, Microsystems purchased linear resistors from the Defendants.  Aside from diligently performing their other Class Representative duties, Microsystems preserved, searched for, collected, and produced 16,796 pages of documents.

83.   Class Representative Nebraska Dynamics, Inc. ("Nebraska Dynamics") provides custom electronics design and prototype development services, a component of which used linear resistors.   During the class period, Nebraska Dynamics purchased linear resistors from the Defendants. Aside from diligently performing their other Class Representative duties, Nebraska Dynamics preserved, searched for, collected, and produced 1,084 pages of documents.

84.   Class Representative MakersLED LLC designs and manufactures products that make LED fixtures easier to build, and in part uses linear resistors.  During the class period, MakersLED LLC purchased linear resistors from the Defendants.  Aside from diligently performing their other Class Representative duties, MakersLED preserved, searched for, collected, and produced 3,995 pages of documents.

85.   Class Representative Top Floor Home Improvements ("Top Floor") offers general contracting and other home improvements.  During the class period, Top Floor purchased linear resistors from the Defendants.  Aside from diligently performing their other Class Representative duties, Top Floor also preserved, searched for, collected, and produced documents.

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

16

86.   Class Representative Angstrom, Inc. ("Angstrom") is manufacturer of "Arc-Spark Emission Spectrometers" for metals analysis, upgrade systems and service.  During the class period, Angstrom purchased linear resistors from the Defendants.  Aside from diligently performing their other Class Representative duties, Angstrom preserved, searched for, collected, and produced 1,286 pages of documents.

87.   Class Representative In Home Tech Solutions, Inc. ("In Home Tech") is TV repair company, which purchases linear resistors to use in its repairs.  During the class period, In Home Tech purchased linear resistors from the Defendants.  Aside from diligently performing their other Class Representative duties, In Home Tech preserved, searched for, collected, and produced 31 pages of documents.

88.   Class Representative Anthony Sakal conducts repairs on various electronic devices for individuals and entities; he purchased linear resistors for use in the products he repairs.  During the class period, Mr. Sakal purchased linear resistors from the Defendants. Aside from diligently performing his other Class Representative duties, Mr. Sakal preserved, searched for, collected, and produced 680 pages of documents.

89.   Each of the above Class Representatives filed a class action lawsuit in the Northern District of California against manufacturers of resistors and their U.S. subsidiaries alleging that they conspired to fix the prices of linear resistors.  Each decided to serve as a Class Representative in this litigation not only to obtain compensation for itself but also to obtain relief on behalf of the entire IPP class, and each performed diligently in their roles.

90.   Over the past three and a half years, representatives from each of the above-listed Class Representatives (or representatives of the entities serving as Class Representatives) have diligently performed their duties to assist Lead Counsel in prosecuting this case, investing significant efforts to complete specific tasks to benefit the lawsuit and the Class, and fulfilling their role as the Class Representative.

91.   Each of the Class Representatives actively assisted Lead Counsel in conducting investigation into the resistors industry, and into Defendants' price fixing, for the purpose of forming

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

17

the allegations in IPPs' complaints. Each assisted Lead Counsel in drafting and reviewing the original and amended complaints filed in this case, as well as several other key case filings.

92.    After the original complaint was filed, the Class Representatives continued to frequently consult with Lead Counsel regarding case strategy and monitored the litigation's progress through regular phone calls and emails with counsel.

93.    Each Class Representative worked with counsel to search for, preserve, review, and produce to Defendants relevant and responsive documents. Lead Counsel regularly conferred with each Class Representative, either personally or via their respective counsel, over the telephone regarding the possible locations and existence of discoverable documents.

94.     Each Class Representative also diligently responded to Interrogatories propounded upon them, which included assisting counsel in drafting and reviewing those responses, and approving and executing the final versions.

95.    Each of the Class Representatives discussed with counsel the key aspects of the proposed settlements with each of the five Defendant families, asked questions regarding those settlements, and determined that each settlement was fair and in the best interests of the Class.

96.    In sum, I estimate that each Class Representative spent between 30 and 40 hours performing their duties, to benefit the IPP class.

97.    Lead Counsel never promised any of the Class Representatives a service award. However, in my experience as Lead Counsel in this and several other large class actions, I believe that the Class Representatives in this case have contributed extensively to this litigation, and fulfilled their duties to a great benefit to the Class.

## ATTORNEYS' FEES AND EXPENSES

### A.    IPP Counsel's Attorneys' Fees and Expenses

98.    Lead Counsel for IPPs have employed many measures to ensure that the lodestar figure presented herein is not improperly inflated. Accordingly, Lead Counsel for IPPs required regular reporting of detailed time records from Supporting Counsel. In doing so, Lead Counsel for IPPs required detailed backup time to ensure that Supporting Counsel were not duplicating efforts or

Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820

18

1   billing for time that was not directed by Lead Counsel for IPPs. Even in connection with this motion,

2   for example, Lead Counsel exercised additional billing judgment and further eliminated substantial

3   time from the lodestar submission.

4         99.   Lead Counsel also employed other efforts and safeguards to ensure that billings were

5   reasonable and not duplicative. For example, Lead Counsel for IPPs have (1) capped the hourly rate

6   for attorney document review to $250 per hour and $300 per hour for foreign language document

7   review, regardless of years of experience; (2) to avoid duplication of effort and achieve other

8   efficiencies, provided strict guidelines to Supporting Counsel that they were only to work on the case

9   at the direction Lead Counsel for IPPs and that only time authorized would be included in an

10   application to the Court; and (3) required Supporting Counsel to at regular periodic intervals submit

11   contemporaneous time records to ensure compliance with Lead Counsel for IPPs' guidelines.

12         100.  Attached as **Exhibit 2** is the total lodestar incurred by CPM in this case. The hourly

13   rates for the attorneys, paralegals and law clerks at my firm included in **Exhibit 2** are the usual and

14   customary hourly rates charged by CPM on a historical rate basis. The total number of hours spent

15   by my firm during the relevant time period of time was 16,314.40 hours, with a corresponding

16   historical lodestar of $5,512,217.50. This summary was prepared from contemporaneous, daily time

17   records regularly prepared and maintained by my firm.

18         101.  Attached hereto as **Exhibit 3** is a summary of the total hours and lodestar of all IPP

19   counsel—Lead Counsel for IPPs and Supporting Counsel—that participated in the joint prosecution

20   of this litigation. The total number of hours spent by all IPP Plaintiffs' Counsel during this time

21   period, including Lead Counsel for IPPs and Supporting Counsel is 33,818.65 hours, with a

22   corresponding lodestar of $11,480,920. All Supporting Counsel firms were instructed to only submit

23   time and lodestar for work done during the Relevant Period, which is after appointment of Lead

24   Counsel to present, as well as capping certain services (*i.e.* document review) at particular hourly

25   rates and eliminating other time based on the discretion and billing judgment of Lead Counsel for

26   IPPs.

27

28

**B.     Supporting Counsel's Attorney Fees and Expenses**

102.   Attached hereto as **Exhibits 7-16** are detailed declarations with attached exhibits from all Supporting Counsel submitting time in the case, setting forth the time and costs they have incurred in this litigation, firm resumes, and their individual contributions to this case.

## COSTS

103.   Attached hereto as **Exhibit 4** is a chart outlining the itemized costs and expenses incurred by CPM during the Relevant Period.   These itemized expenses and costs are separate and apart from any costs incurred by the Litigation Fund, as more fully explained herein.   My firm expended $21,788.95 in unreimbursed costs and expenses in connection with the prosecution of this litigation.   They were incurred by my firm on behalf of the Class on a contingent basis and have not been reimbursed.   The expenses incurred in this Action are reflected in the books and records of my firm.    No outside litigation funders have been used in this case.   All costs have been advanced by counsel for IPPs.   These expenses do not include assessments made for purposes of the *Resistors* Litigation Fund.

104.   **Exhibit 5**, attached hereto, contains a compilation of each firm's unreimbursed costs and expenses in the amount of $50,497.47.   These costs and expenses are supported by each firm's separate declaration in support of fees and costs. These expenses do not include assessments made for purposes of the *Resistors* Litigation Fund.

105.   As noted, Lead Counsel also established a Litigation Fund to finance the prosecution of this litigation against the Defendants.   Counsel, including Lead Counsel for IPPs and Supporting Counsel, contributed to the Litigation Fund.   A total of $1,387,079.41 in necessary litigation costs and expenses were incurred to the Litigation Fund that remain unreimbursed.   Attached hereto as **Exhibit 6** is an accounting of these costs and expenses.   Including in that exhibit and summary chart is a compilation of invoices unreimbursed from the Litigation Fund.   As noted, none of these expenditures have been included for reimbursement in any of the individual fee and expense declarations of any Supporting Counsel or from Lead Counsel.

106.  In total, between the firms' total expenses (**Exhibit 5**) and the incurred expenses from the Litigation Fund (**Exhibit 6**), a total of $1,437,576.88 in necessary litigation costs and expenses remain unreimbursed.

107.  The cost summaries attached as Exhibit 7-16 to Supporting Counsels' declarations are derived from each of the respective firms' accounting records as kept in the ordinary course of business.

I declare that the foregoing is true and correct to the best of my knowledge. Executed on August 13, 2019 in Burlingame, California.

_/s/ Adam J. Zapala_
Adam J. Zapala

**Declaration of Adam Zapala in Support of Indirect Purchaser Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards; Case No. 3:15-cv-03820**

21